Lena N. Bacani (SBN 213556)
lena.bacani@lozaip.com
LOZA & LOZA, LLP
305 N. Second Ave., Ste. 127
Upland, CA 91786
Telephone:   (877) 406-5164
Facsimile:    (213) 394-3625

Attorneys for Plaintiff,
NICOR, INC.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| NICOR, INC.,<br><br>　　　　　Plaintiff,<br><br>v.<br><br>SOURCEBLUE, LLC,<br><br>　　　　　Defendant. | Case No. 2:21-CV-05876-AB-PDx<br><br>**NICOR, INC.'S FIRST AMENDED COMPLAINT**<br><br>JURY TRIAL DEMANDED |

## NICOR, INC.'S FIRST AMENDED COMPLAINT

NICOR, Inc. (hereafter "NICOR") for its Complaint against SourceBlue, LLC, formerly known as Turner Logistics, LLC ("SourceBlue") alleges as follows:

### NATURE OF THE ACTION

1.      This is an action for patent infringement to end SourceBlue's direct and indirect infringement of NICOR's U.S. Patent No. 10,824,427 ("the '427 Patent"), arising under the Patent Laws of the United States, 35 U.S.C. §§ 1, *et seq*.

### THE PARTIES

2.      Plaintiff NICOR is a corporation organized and existing under the laws of the State of New Mexico, with its principal place of business at 2200 Midtown Place NE, Suite A, Albuquerque, NM 87107.

3.      Upon information and belief, Defendant SourceBlue is a limited liability company organized and existing under the State of Delaware, File No. 3354819, with a principal place of business at 3 Paragon Dr., #1, Montvale, NJ 07645.

### JURISDICTION AND VENUE

4.      This lawsuit is an action for patent infringement arising under the patent laws of the United States, 35 U.S.C. §§ 1, *et seq*.  This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1338(a).  The Court has supplemental jurisdiction over NICOR's state law claims under §§ 1332 and 1367 because the parties are citizens of different states, the amount in controversy exceeds $75,000, and the state law claims are related to the patent claims such that they form part of the same case or controversy under Article III of the U.S. Constitution.

5.      This Court has personal jurisdiction over SourceBlue because SourceBlue has availed itself of this Court by agreeing to transfer the parties' Delaware action to this Court (Dkt. No. 17).  In addition, SourceBlue regularly conducts business within this District.

6.     Venue is proper in this District under 28 U.S.C § 1400(b) because SourceBlue agreed to transfer the Delaware action to this Court.  Upon information and belief, Defendant has committed at least a portion of the infringing acts at issue in this case within the District.

## FACTUAL ALLEGATIONS

### a.  The '427 Patent

7.     On November 3, 2020, the United States Patent and Trademark Office duly and legally issued U.S. Patent No. 10,824,427 ("the '427 Patent"), entitled a "Method and System for Power Supply Control."  The '427 Patent claims priority to Provisional Application No. 62/576,877, filed on October 25, 2017, Provisional Application No. 62/668,642, filed on May 8, 2018, and Provisional Application No. 62/764,678, filed on August 15, 2018.  A true and correct copy of the '427 Patent is attached hereto as Exhibit A and is incorporated herein by reference.

8.     NICOR holds all rights to enforce and prosecute actions for past, present and future infringement and to collect damages for all relevant times against infringers of the '427 Patent.  Accordingly, NICOR possesses the exclusive right and standing to prosecute this action for infringement against Defendant.

### b.  SourceBlue's Wrongful Conduct

9.     NICOR has been designing and selling innovative lighting solutions to customers for over forty years and often provides lighting solutions to large commercial operations across the U.S.  In February 2018, NICOR submitted a bid to provide its lighting systems to Facebook's data center NAO1 and NAO2.  NICOR was subsequently awarded the contract and supplied its lighting systems, including its patented Lighting Control Units ("LCUs"), and multiple NICOR LED light fixtures.

10.     A year later, around March 2019, NICOR submitted a bid to provide its lighting systems to Facebook data centers NAO3 and NAO4, also in Albany, Ohio.  NICOR did not supply its products to the NAO3/4 data centers and later

learned that Defendant's Remote Driver Control Center ("RDCC") product, marketed under the Solidian® brand ("Accused Product"), which includes the patented invention claimed in the '427 Patent, was installed instead.

11.    On or around May 2020, NICOR was requested by three distributors and Cupertino Electric to bid on Facebook data centers NAO5 and NAO6 in Albany, Ohio.   NICOR was informed that there had been quality problems with the Solidian® products supplied by Turner Logistics, now SourceBlue, at NAO3/4.

12.    NICOR is informed and believes that Facebook originally chose NICOR's lighting system for NAO5/6, but Turner Construction instead awarded the NAO5 and NAO6 data center lighting contracts to Turner Logistics, LLC.   On information and belief, Turner Logistics, LLC, which later changed its name to SourceBlue, LLC ("SourceBlue"), was and is a subsidiary of Turner Construction. Upon information and belief, SourceBlue, in collaboration with its supplier Infinilux, used NICOR's pricing from NICOR's bid to submit a slightly lower price for copies of NICOR's patented LCU product and other NICOR LED lighting fixtures to Facebook and, as a result, the NAO5/6 contract was awarded to SourceBlue and Infinilux around October 2020.

13.    NICOR is informed, and on that basis alleges, that SourceBlue acquired, and still acquires, the Accused Product from Infinilux.

14.    On information and belief, SourceBlue and Infinilux intentionally copied NICOR's LCU product to create the Accused Product despite knowing that the Accused Product infringes the '427 Patent.

15.    NICOR is informed and believes that SourceBlue and Infinilux knew that NICOR had been awarded the lighting contracts for the NAO5 and NAO6 Facebook data centers and offered to supply the infringing Accused Product at a lower price than NICOR's LCU product in order to intentionally interfere with NICOR's Facebook contracts.

16.     SourceBlue knew, or should have known, that offering the infringing Accused Product to replace NICOR's patented LCU product would interfere with the Facebook data center contracts.

17.     SourceBlue's infringing conduct resulted in Facebook changing the contract award for the NAO5 and NAO6 datacenters from NICOR's lighting system to SourceBlue's Solidian® system, which included the Accused Product.

18.     NICOR is also informed and believes that SourceBlue's unlawful conduct also resulted in NICOR losing other Facebook data center lighting contracts, including but not limited to: PNB1/2 in Spring 2018; PNB5/6 and RVA3/4 in Spring 2019; PNB3/4 in Winter 2019; and SNB1/2 and DKL1/2 in Fall 2020.

19.     In addition to the revenue NICOR would receive for supplying hundreds of its LCU products to each Facebook data center, each contract also included orders for thousands of LED light fixtures to be used with the NICOR system, 90% of which would also have been provided by NICOR.

20.     Defendant's unlawful conduct thus cost NICOR millions of dollars in lost revenues for the Facebook data centers alone.

21.     On November 12, 2020, NICOR sent a letter to Turner Logistics, LLC, which later changed its name to SourceBlue, regarding SourceBlue's sales of the Accused Product and its infringement of the '427 Patent.  A copy of the letter, which is incorporated herein by reference, is attached to SourceBlue's original Complaint and portions filed under seal.  (Dkt. No. 1, Ex. 2 (filed under seal); Dkt. No. 10, Ex. 2 (redacted version).)

22.     In its subsequent correspondence, including its April 30, 2021 letter, SourceBlue alleged that the Solidian® RDCC Installation Instructions, which showed diagrams outlining the structure of the Solidian® RDCC, differed from the actual Accused Product but refused to provide specifics.  SourceBlue also refused

to provide NICOR's outside attorneys with documents supporting SourceBlue's contentions or a sample of the Accused Product, which is not publicly available.

23.     On May 14, 2021, NICOR filed a patent infringement action against SourceBlue in the U.S. District Court for the District of Delaware (Case No. 1:21-cv-00698) that was subsequently transferred, by agreement of the Parties, to the Central District of California on July 20, 2021 and now forms part of this consolidated action, along with *Infinilux v. NICOR, Inc.* (former Case No. 2:21-cv-5300 ("Related Action")).

24.     NICOR subsequently learned that SourceBlue purchased the Accused Products from Infinilux when Infinilux filed the Related Action.  Prior to Infinilux's filing, NICOR did not know that Infinilux supplied the Accused Products. SourceBlue never mentioned that it obtained the Accused Products from Infinilux in any of its correspondence to NICOR.

25.     On information and belief, SourceBlue had actual or constructive knowledge of NICOR's rights and the '427 Patent when it sold or otherwise supplied the Accused Product.

26.     Despite such knowledge, SourceBlue has directly and willfully infringed and continues to willfully infringe the '427 Patent by manufacturing, importing, selling, offering for sale, and/or using the Accused Product.

27.     Further, SourceBlue has induced and/or contributed to the infringement by one or more third-parties, including Infinilux, by instructing, directing, and/or requiring them to infringe the '427 Patent, either literally or under the doctrine of equivalents.

## COUNT I

### (Infringement of the '427 Patent)

28.    NICOR incorporates the above paragraphs herein by reference.

29.    NICOR owns and possesses the exclusive right and standing to prosecute the present actions for infringement and to collect damages for all relevant times against infringers of the '427 Patent.

30.    SourceBlue has had actual knowledge of the '427 Patent since at least as early as November 12, 2020 when NICOR sent a letter to SourceBlue regarding the '427 Patent.

31.    Upon information and belief, SourceBlue infringes, literally or under the doctrine of equivalents, at least claims 1-7 of the '427 Patent by its manufacture, importation, offer for sale, sale, and/or use of its Accused Product marketed under its Solidian® brand.

32.    For example, and without limitation, SourceBlue's Accused Product includes each and every limitation of at least claims 1-7 of the '427 Patent, either literally or under the doctrine of equivalents, as shown in the claim chart attached as Exhibit 3 to NICOR's original Complaint and filed under seal (Dkt. No. 1, Ex. 3 (under seal); Dkt. No. 10, Ex. 3 (redacted version)), and which is incorporated herein by reference in its entirety.  For at least these reasons, the Accused Product infringes claims 1-7 of the '427 Patent.

33.    Upon information and belief, SourceBlue has also induced infringement of the '427 Patent by instructing and inducing one of its suppliers, Infinilux, and customers to infringe the '427 Patent.  SourceBlue actively induces such infringement by, for example, providing installation instructions, and other instruction materials for its Accused Product that induce its customers to use the Accused Product in a way that infringes the '427 Patent.

1    34.    SourceBlue performed these acts of infringement with knowledge of

2    the '427 Patent and with the knowledge or willful blindness that the induced acts

3    constitute direct infringement by SourceBlue's suppliers and customers.

4    35.    NICOR has not licensed SourceBlue to practice the '427 Patent and

5    SourceBlue has no license or authority to practice, or license others to practice, the

6    '427 Patent.

7    36.    SourceBlue has directly infringed and continues to infringe at least

8    claims 1-7 of the '427 Patent by making, using, offering for sale within the United

9    States, and/or importing into the United States, its Accused Product in violation of

10   35 U.S.C. §§ 271 (a), (b), and/or (c).

11   37.    SourceBlue's infringement of the '427 Patent is willful and deliberate,

12   and entitles NICOR to enhanced damages pursuant to 35 U.S.C. § 284.

13   SourceBlue's wrongful conduct also constitutes an exceptional case entitling

14   NICOR to attorneys' fees and cost incurred in prosecuting this action pursuant to 35

15   U.S.C. § 285.

16   38.    NICOR has been damaged by SourceBlue's infringement of the '427

17   Patent.   SourceBlue's infringement has caused, and will continue to cause,

18   irreparable harm to NICOR, for which NICOR has no adequate remedies at law,

19   unless and until SourceBlue's wrongful acts are enjoined by this Court.

20   **<u>COUNT II</u>**

21   **(Intentional Interference with Prospective Economic Relations)**

22   39.    NICOR incorporates the above paragraphs herein by reference.

23   40.    Facebook initially awarded NICOR the contracts to provide lighting

24   systems for the Facebook data centers at NAO5 and NAO6.  NICOR is informed

25   and believes that each data center was to incorporate thousands of LED lighting

26   fixtures and hundreds of LCU products that would have resulted in significant

27   product sales to NICOR.

28

41.     In addition, NICOR is informed and believes that selection of its lighting system for the NAO5 and NAO6 data center would have resulted in NICOR's products being listed on the Facebook master specification and used at additional Facebook data centers, resulting in additional economic benefit to NICOR.

42.     NICOR had a reasonable expectation that it would receive sales revenue for supplying its lighting systems, including its patented LCU product, to the Facebook data centers.

43.     NICOR is informed and believes that SourceBlue knew, or should have known, that NICOR had been awarded the Facebook contracts to provide lighting systems at the NAO5 and NAO6 data centers or otherwise knew, or should have known, of NICOR's business relationship with Facebook.

44.     NICOR is informed and believes that SourceBlue maliciously and intentionally copied NICOR's LCU product to create the Accused Product for the improper purpose of interfering with NICOR's Facebook data center contracts, thus misappropriating the Facebook data center contracts for itself.

45.     In addition, SourceBlue engaged in wrongful and improper conduct by manufacturing, offering to sell, selling, and/or using the Accused Product, which infringes NICOR's '427 Patent.

46.     On information and belief, SourceBlue intended to interfere with NICOR's Facebook data center contracts.

47.     Through its unlawful conduct, SourceBlue intentionally interfered with NICOR's prospective economic relationship with Facebook.  As a direct and proximate result of SourceBlue's wrongful conduct, NICOR lost the contracts to supply its lighting system, including the LCU product, to the Facebook data centers.

48.     NICOR has suffered injury and compensable damages in an amount to be proven at trial, but in excess of $75,000, as a result of SourceBlue's wrongful conduct.

49.     SourceBlue's wrongful conduct is also causing substantial, continuous and irreparable harm to NICOR, which if not enjoined by this Court will continue to NICOR's detriment.

50.     SourceBlue's malicious and intentional conduct was made in conscious disregard for NICOR's rights, entitling NICOR to punitive and exemplary damages in an amount to be proven at trial.  SourceBlue's wrongful conduct supports a finding that this is an exceptional case, entitling NICOR to an award of its attorneys' fees.

## COUNT III

## (Unfair Competition)

51.     NICOR incorporates the above paragraphs herein by reference.

52.     Through its wrongful acts alleged above, SourceBlue has engaged in unfair competition under California Business & Professions Code § 17200, *et seq.,* and California common law.

53.     SourceBlue's wrongful conduct injures competition and consumers in California and elsewhere.

54.     As a direct and proximate cause of SourceBlue's improper conduct, NICOR has suffered, and will continue to suffer, irreparable harm for which NICOR has no adequate remedy at law.  Until SourceBlue's wrongful conduct is enjoined, NICOR will continue to engage in the wrongful conduct, including infringement of the '427 Patent.

55.     NICOR is entitled to injunctive relief and/or restitution.

## PRAYER FOR RELIEF

WHEREFORE, NICOR prays for entry of a judgment in its favor and against SourceBlue as follows:

(a)     Entry of judgment that SourceBlue has infringed one or more claims of the '427 Patent, either directly or indirectly;

1    (b)    Entry of judgment that SourceBlue has tortuously interfered with

2    NICOR's prospective economic relations;

3    (c)    Entry of judgment that SourceBlue has engaged in acts of unfair

4    competition under Cal. Bus. & Prof. Code § 17200, *et seq.,* and/or common law;

5    (d)    Entry of judgment that preliminarily and/or permanently enjoins

6    SourceBlue, its officers, directors, employees, agents, parents, divisions,

7    subsidiaries, licensees, successors, assigns, and any and all persons acting in privity

8    or in concert with SourceBlue, from further acts of:  (i) infringement of the '427

9    Patent under 35 U.S.C. § 283; (ii) tortious interference with NICOR's prospective

10   economic relations; and/or (iii) engaging in acts of unfair competition.

11   (e)    An award of compensatory damages to NICOR adequate to compensate

12   NICOR for SourceBlue's infringement of the '427 Patent, the extent to which will be

13   determined at trial, but in no event less than a reasonable royalty, together with pre-

14   and post-judgment interest, pursuant to 35 U.S.C. § 284;

15   (f)    A determination that SourceBlue's acts of infringement of one or more

16   claims of the '427 Patent have been, and continue to be, egregious and/or willful, and

17   that NICOR is entitled to an award of enhanced damages of up to three times the

18   amount of actual damages pursuant to 35 U.S.C. § 284;

19   (g)    A determination that this case is exceptional under 35 U.S.C. § 285, and

20   that NICOR be awarded its reasonable attorneys' fees;

21   (h)    An award of compensatory, punitive and other damages for

22   SourceBlue's tortious interference with NICOR's prospective economic relations;

23   (i)    Restitution for SourceBlue's unfair competition;

24   (j)    An award of NICOR's costs and expenses incurred in this action; and

25   (k)    Such further relief as the Court deems just and proper.

26

27

28

1

## **JURY DEMAND**

2          Pursuant to Rule 38 of the Federal Rules of Civil Procedure, NICOR hereby

3   demands a trial by jury on all issues so triable.

4

5

6    Dated:  February 4, 2022                    Respectfully submitted,

7                                               LOZA & LOZA, LLP.

8                                               By: _____

9                                                   Lena N. Bacani

10                                              Attorneys for Plaintiff, NICOR, Inc.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT A

US010824427B2

(12) **United States Patent**
Brown et al.

(10) Patent No.: **US 10,824,427 B2**
(45) Date of Patent: **Nov. 3, 2020**

(54) **METHOD AND SYSTEM FOR POWER SUPPLY CONTROL**

(71) Applicant: **Nicor, Inc**, Albuquerque, NM (US)

(72) Inventors: **David Brown**, Rio Rancho, NM (US); **Trevor Shaw**, Albuquerque, NM (US); **Jorge Alfredo Gomez Martinez**, Albuquerque, NM (US)

(73) Assignee: **NICOR, INC.**, Albuquerque, NM (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 146 days.

(21) Appl. No.: **16/169,856**

(22) Filed: **Oct. 24, 2018**

(65) **Prior Publication Data**
US 2019/0121640 A1    Apr. 25, 2019

**Related U.S. Application Data**

(60) Provisional application No. 62/576,877, filed on Oct. 25, 2017, provisional application No. 62/668,642, filed on May 8, 2018, provisional application No. 62/764,678, filed on Aug. 15, 2018.

(51) **Int. Cl.**
*G06F 9/30* (2018.01)
*G06F 1/26* (2006.01)
*G06F 1/16* (2006.01)
*G05B 15/02* (2006.01)

(52) **U.S. Cl.**
CPC ......... *G06F 9/30083* (2013.01); *G05B 15/02* (2013.01); *G06F 1/1684* (2013.01); *G06F 1/266* (2013.01)

(58) **Field of Classification Search**
CPC .... G06F 9/30083; G06F 1/1684; G06F 1/266; G05B 15/02

USPC ........................................................ 713/300
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 3,069,518 A | * | 12/1962 | Soos | H01H 50/323 335/161 |
| 3,757,131 A | * | 9/1973 | Krutz | B67D 7/222 307/64 |
| 3,778,633 A | * | 12/1973 | DeVisser | H01H 3/264 307/64 |
| 4,157,461 A | * | 6/1979 | Wiktor | H01H 9/26 200/18 |
| 4,208,593 A | * | 6/1980 | Sullivan | H02H 3/033 307/126 |

(Continued)

FOREIGN PATENT DOCUMENTS

WO    2013126965 A1    9/2013

OTHER PUBLICATIONS

International Search Report for International Application No. PCT/US18/57391, dated Jan. 4, 2019, 2 pages.
(Continued)

*Primary Examiner* — Paul R. Myers
(74) *Attorney, Agent, or Firm* — Loza & Loza LLP; Kevin L. Soules

(57) **ABSTRACT**

A system and apparatus comprise at least one power supply connected to a terminal bloc, an I/O system configured to receive instructions provided to the control system, a control block connected to the I/O system wherein the instructions provided to the I/O system are converted to a serial output; and a puck connected to the serial output and configured to receive power from the terminal block, to process the serial output, and to output a current.

**7 Claims, 9 Drawing Sheets**



Legend
100 Computer system
400 Power supply and control system
405 Case
410 Rail
415 Power Supply
416 Power Supply
420 Fan
421 Fan
425 Filter
426 Filter
430 Control header
431 Control header
435 Terminal Block
440 Wire
441 Wire
442 Wire
443 Wire
445 Output
450 I/O System
451 Input cable
452 Mains power input
455 Control system
460 I/O block
465 Power supply
470 Switch
475 Surge protector

# US 10,824,427 B2

Page 2

(56) **References Cited**

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,392,187 A | | 7/1983 | Bornhorst |
| 4,398,097 A | * | 8/1983 | Schell .................... H01H 3/26 |
| | | | 307/64 |
| 4,423,336 A | * | 12/1983 | Iverson .................... H01H 3/26 |
| | | | 307/64 |
| 4,672,227 A | * | 6/1987 | Lagree .................... H02J 9/061 |
| | | | 307/64 |
| 5,003,227 A | | 3/1991 | Nilssen |
| 5,204,963 A | * | 4/1993 | Noya ...................... G06F 1/30 |
| | | | 365/229 |
| 5,357,170 A | | 10/1994 | Luchaco et al. |
| 5,420,482 A | | 5/1995 | Phares |
| 5,475,360 A | | 12/1995 | Guidette et al. |
| 5,652,416 A | * | 7/1997 | Sharaf .................... H01H 1/54 |
| | | | 200/47 |
| 6,175,201 B1 | | 1/2001 | Sid |
| 6,266,084 B1 | * | 7/2001 | Sakata .............. H01B 11/1891 |
| | | | 174/32 |
| 6,388,399 B1 | | 5/2002 | Eckel et al. |
| 6,400,103 B1 | | 6/2002 | Adamson |
| 6,548,967 B1 | | 4/2003 | Dowling et al. |
| 6,680,586 B1 | * | 1/2004 | Chen .................... H05B 47/155 |
| | | | 315/291 |
| 6,967,565 B2 | | 11/2005 | Lingemann |
| 7,259,528 B2 | | 8/2007 | Pilz |
| 7,599,171 B1 | * | 10/2009 | Remmert ................ H02J 9/062 |
| | | | 307/64 |
| 8,458,307 B2 | * | 6/2013 | Seelman .............. H04L 12/2807 |
| | | | 709/221 |
| 9,465,348 B2 | * | 10/2016 | Maekawa ................ H02J 5/00 |
| 9,869,611 B1 | * | 1/2018 | Ryan ...................... F24F 11/62 |
| 2002/0027510 A1 | * | 3/2002 | Jones .................... G08G 1/095 |
| | | | 340/907 |
| 2002/0145394 A1 | | 10/2002 | Morgan et al. |
| 2003/0011538 A1 | | 1/2003 | Lys et al. |
| 2003/0036807 A1 | | 2/2003 | Fosler |
| 2003/0046452 A1 | * | 3/2003 | Andrewartha ........ G06F 1/185 |
| | | | 710/2 |
| 2003/0057890 A1 | | 3/2003 | Lys et al. |
| 2004/0033712 A1 | * | 2/2004 | Parsadayan ........ H01R 25/006 |
| | | | 439/341 |
| 2004/0122930 A1 | | 6/2004 | Pasternak |
| 2004/0194387 A1 | * | 10/2004 | Hom .................... E01F 13/048 |
| | | | 49/49 |
| 2004/0262997 A1 | * | 12/2004 | Gull ...................... H02J 9/08 |
| | | | 307/64 |
| 2005/0035717 A1 | | 2/2005 | Adamson et al. |

| | | | |
|---|---|---|---|
| 2005/0183868 A1 | * | 8/2005 | Taylor .................... A62C 37/44 |
| | | | 169/51 |
| 2005/0213352 A1 | | 11/2005 | Lys |
| 2005/0248299 A1 | | 11/2005 | Chemel et al. |
| 2006/0071605 A1 | | 4/2006 | Diederiks |
| 2006/0125426 A1 | | 6/2006 | Veskovic et al. |
| 2006/0187081 A1 | | 8/2006 | Gloisten et al. |
| 2007/0018783 A1 | | 1/2007 | Erhardt |
| 2008/0042492 A1 | * | 2/2008 | Gleason .................... H02J 9/062 |
| | | | 307/66 |
| 2008/0136334 A1 | | 6/2008 | Robinson et al. |
| 2008/0176444 A1 | * | 7/2008 | Chan .................... G06F 1/266 |
| | | | 439/505 |
| 2008/0215279 A1 | | 9/2008 | Salsbury et al. |
| 2008/0265799 A1 | | 10/2008 | Sibert |
| 2009/0015072 A1 | * | 1/2009 | Bauer .................... G08G 1/095 |
| | | | 307/80 |
| 2009/0058322 A1 | * | 3/2009 | Toma .................... H05B 45/37 |
| | | | 315/297 |
| 2009/0102396 A1 | | 4/2009 | Petrucci et al. |
| 2009/0235208 A1 | * | 9/2009 | Nakayama ........ H05B 45/10 |
| | | | 716/100 |
| 2009/0314541 A1 | * | 12/2009 | Jones .................... H02G 3/086 |
| | | | 174/559 |
| 2011/0014501 A1 | * | 1/2011 | Scheucher .............. B60L 53/14 |
| | | | 429/7 |
| 2011/0131455 A1 | | 6/2011 | Law et al. |
| 2011/0248835 A1 | | 10/2011 | Speegle et al. |
| 2013/0085609 A1 | * | 4/2013 | Barker .................... G05B 15/02 |
| | | | 700/276 |
| 2014/0345645 A1 | * | 11/2014 | Hoinkis .............. H01J 37/321 |
| | | | 134/1.1 |
| 2015/0008844 A1 | | 1/2015 | Wilson |
| 2015/0084433 A1 | * | 3/2015 | Shah .................... H02J 3/381 |
| | | | 307/112 |
| 2015/0115807 A1 | | 4/2015 | Schroder et al. |
| 2015/0130368 A1 | | 5/2015 | Harbers |
| 2016/0278230 A1 | | 9/2016 | Mielnik et al. |
| 2016/0323979 A1 | * | 11/2016 | Hu .......................... H04L 69/08 |
| 2017/0019971 A1 | * | 1/2017 | Hashimoto ............ H05B 45/24 |
| 2017/0272027 A1 | * | 9/2017 | Fujimoto ............ B23Q 17/09 |
| 2017/0353015 A1 | * | 12/2017 | Stevens ................ H05K 7/1492 |
| 2019/0204393 A1 | * | 7/2019 | Yamada ................ H02J 7/0021 |

### OTHER PUBLICATIONS

International Written Opinion for International Application No. PCT/US18/57391, dated Jan. 4, 2019, 7 pages.

* cited by examiner



FIG. 1



FIG. 2



FIG. 3

U.S. Patent          Nov. 3, 2020          Sheet 4 of 9          US 10,824,427 B2



FIG. 4



Legend

445 Output
505 Puck
506 Puck
507 Puck
508 Puck
515 Output
520 LED light bar

FIG. 5



Legend

100 Computer system
130 GUI
400 Control System
505 Puck
520 LED light bar
605 Warehouse
610 Power main
615 Remote client

FIG. 6



Legend

100 Computer system
400 Control system
445 Output
452 Mains power input
505 Puck
520 LED light bar
705 Input controller
710 Output bus
715 Switch
720 Sensor

FIG. 7





FIG. 8

Legend

900 Control system
905 Barrier
910 Jacks
915 Voltage switch
920 PCB
925 Jack for cold aisle normal power
930 Jack for hot aisle normal power
935 Control unit
940 Network Bridge
945 Terminal block
946 Mains power

950 Terminal block
951 Mains power
955 Driver
960 Driver
965 Terminal block
970 Terminal block
975 Surge protector
980 Controller
985 Barrier
990 Remote application
995 Ethernet cable

FIG. 9

US 10,824,427 B2

1

# METHOD AND SYSTEM FOR POWER SUPPLY CONTROL

## CROSS REFERENCE TO RELATED PATENT APPLICATIONS

This patent application claims the priority and benefit under 35 U.S.C. § 119(e) of U.S. Provisional Patent Application Ser. No. 62/576,877 filed Oct. 25, 2017, entitled "LUMINAIRE POWER BANK." U.S. Provisional Patent Application Ser. No. 62/576,877 is herein incorporated by reference in its entirety.

This patent application also claims the priority and benefit under 35 U.S.C. § 119(e) of U.S. Provisional Patent Application Ser. No. 62/668,642 filed May 8, 2018, entitled "METHOD AND SYSTEM FOR POWER SUPPLY CONTROL." U.S. Provisional Patent Application Ser. No. 62/668,642 is herein incorporated by reference in its entirety.

This patent application also claims the priority and benefit under 35 U.S.C. § 119(e) of U.S. Provisional Patent Application Ser. No. 62/764,678 filed Aug. 15, 2018, entitled "METHOD AND SYSTEM FOR POWER SUPPLY CONTROL." U.S. Provisional Patent Application Ser. No. 62/764,678 is herein incorporated by reference in its entirety.

## TECHNICAL FIELD

Embodiments are generally related to the field of power systems. Embodiments are also related to the field of lighting. Embodiments are further related to the field of control systems. Embodiments are also related to the field of power and control systems for lighting. Embodiments are also related to methods, systems, and devices for bulk power supply systems with individual mode control capability.

## BACKGROUND

In typical lighting environments, it is common to have an arrangement of individual power lines and control lines servicing each light. An exemplary case, is an LED lighting configuration in a warehouse, where a large number of lights require both control and power. Prior art approaches require that each LED light be serviced by a unique power supply and dedicated control lines. This approach makes it very difficult to manage the lighting system because each light must be serviced individually.

Accordingly, there is a need in the art for methods and systems that provide bulk control of power supplied to one or more applications, such as commercial, residential, industrial, and warehouse lighting systems.

## SUMMARY

The following summary is provided to facilitate an understanding of some of the innovative features unique to the embodiments disclosed and is not intended to be a full description. A full appreciation of the various aspects of the embodiments can be gained by taking the entire specification, claims, drawings, and abstract as a whole.

It is, therefore, one aspect of the disclosed embodiments to provide lighting systems and methods.

It is another aspect of the disclosed embodiments to provide control systems and methods.

It is another aspect of the disclosed embodiments to provide power systems and methods.

2

It is another aspect of the disclosed embodiments to provide power control systems and methods.

It is another aspect of the disclosed embodiments to convert incoming AC power into low voltage DC power, in order to serve power to, and control, multiple downline applications.

It is another aspect of the disclosed embodiments to provide systems and methods for providing power to, and control of, lighting systems.

It is another aspect of the disclosed embodiments to provide methods, systems, and devices for bulk power supply systems with individual mode control capability. For example, in the embodiments disclosed herein a method and system include at least one power supply connected to a terminal block, an I/O system configured to receive instructions provided to the control system, a control block connected to the I/O system wherein the instructions provided to the I/O system are converted to a serial output, and a puck connected to the serial output and configured to receive power from the terminal block, to process the serial output, and to output a current. The at least one power supply can comprise a plurality of power supplies, wherein power that is output from each of the plurality of power supplies is summed at the terminal block. The plurality of power supplies can comprise a total power from 0 Watts to 4000 Watts.

In certain embodiments, the I/O system is configured to operate according to BACnet/IP protocol. The control block is configured to operate according to DALI protocol. In certain embodiments an independent power supply can be configured to provide power to the I/O system and the control block.

The system can further comprise a housing and a rail configured in the housing, the rail configured to hold the I/O system and the control block. The system can further comprise an output cable, the output cable further comprising a power line, a power return line, a first output associated with the serial output and a second output associated with the serial output. In certain embodiments a luminaire can be connected to the puck. In other embodiments a plurality of luminaires can be connected wherein each of the luminaires is connected to an associated puck.

## BRIEF DESCRIPTION OF THE FIGURES

The accompanying figures, in which like reference numerals refer to identical or functionally-similar elements throughout the separate views and which are incorporated in and form a part of the specification, further illustrate the embodiments and, together with the detailed description, serve to explain the embodiments disclosed herein.

FIG. **1** depicts a block diagram of a computer system which is implemented in accordance with the disclosed embodiments;

FIG. **2** depicts a graphical representation of a network of data-processing devices in which aspects of the present embodiments may be implemented;

FIG. **3** illustrates a computer software system for directing the operation of the data-processing system depicted in FIG. **1**, in accordance with an example embodiment;

FIG. **4** depicts a control and power system in accordance with the disclosed embodiments;

FIG. **5** depicts an embodiment of a distributed set of applications that can be controlled with a control system in accordance with the disclosed embodiments;

FIG. **6** depicts another embodiment of a control system in accordance with the disclosed embodiments;

<table>
<tr><td>3</td><td>4</td></tr>
</table>

FIG. **7** depicts another embodiment of a control system in accordance with the disclosed embodiments;

FIG. **8** depicts a flow chart illustrating steps associated with a method for controlling and providing power to a set of applications in accordance with the disclosed embodiments; and

FIG. **9** depicts another embodiment of a control system in accordance with the disclosed embodiments.

DETAILED DESCRIPTION

The particular values and configurations discussed in the following non-limiting examples can be varied and are cited merely to illustrate one or more embodiments and are not intended to limit the scope thereof.

Example embodiments will now be described more fully hereinafter with reference to the accompanying drawings, in which illustrative embodiments are shown. The embodiments disclosed herein can be embodied in many different forms and should not be construed as limited to the embodiments set forth herein; rather, these embodiments are provided so that this disclosure will be thorough and complete, and will fully convey the scope of the embodiments to those skilled in the art. Like numbers refer to like elements throughout.

The terminology used herein is for the purpose of describing particular embodiments only and is not intended to be limiting. As used herein, the singular forms "a", "an", and "the" are intended to include the plural forms as well, unless the context clearly indicates otherwise. It will be further understood that the terms "comprise" and/or "comprising," when used in this specification, specify the presence of stated features, integers, steps, operations, elements, and/or components, but do not preclude the presence or addition of one or more other features, integers, steps, operations, elements, components, and/or groups thereof.

Throughout the specification and claims, terms may have nuanced meanings suggested or implied in context beyond an explicitly stated meaning. Likewise, the phrase "in one embodiment" as used herein does not necessarily refer to the same embodiment and the phrase "in another embodiment" as used herein does not necessarily refer to a different embodiment. It is intended, for example, that claimed subject matter include combinations of example embodiments in whole or in part.

Unless otherwise defined, all terms (including technical and scientific terms) used herein have the same meaning as commonly understood by one of ordinary skill in the art. It will be further understood that terms, such as those defined in commonly used dictionaries, should be interpreted as having a meaning that is consistent with their meaning in the context of the relevant art and will not be interpreted in an idealized or overly formal sense unless expressly so defined herein.

It is contemplated that any embodiment discussed in this specification can be implemented with respect to any method, kit, reagent, or composition of the invention, and vice versa. Furthermore, compositions of the invention can be used to achieve methods of the invention.

It will be understood that particular embodiments described herein are shown by way of illustration and not as limitations of the invention. The principal features of this invention can be employed in various embodiments without departing from the scope of the invention. Those skilled in the art will recognize or be able to ascertain using no more than routine experimentation, numerous equivalents to the specific procedures described herein. Such equivalents are considered to be within the scope of this invention and are covered by the claims.

The use of the word "a" or "an" when used in conjunction with the term "comprising" in the claims and/or the specification may mean "one," but it is also consistent with the meaning of "one or more," "at least one," and "one or more than one." The use of the term "or" in the claims is used to mean "and/or" unless explicitly indicated to refer to alternatives only or the alternatives are mutually exclusive, although the disclosure supports a definition that refers to only alternatives and "and/or." Throughout this application, the term "about" is used to indicate that a value includes the inherent variation of error for the device, the method being employed to determine the value, or the variation that exists among the study subjects.

As used in this specification and claim(s), the words "comprising" (and any form of comprising, such as "comprise" and "comprises"), "having" (and any form of having, such as "have" and "has"), "including" (and any form of including, such as "includes" and "include") or "containing" (and any form of containing, such as "contains" and "contain") are inclusive or open-ended and do not exclude additional, unrecited elements or method steps.

The term "or combinations thereof" as used herein refers to all permutations and combinations of the listed items preceding the term. For example, "A, B, C, or combinations thereof" is intended to include at least one of: A, B, C, AB, AC, BC, or ABC, and if order is important in a particular context, also BA, CA, CB, CBA, BCA, ACB, BAC, or CAB. Continuing with this example, expressly included are combinations that contain repeats of one or more item or term, such as BB, AAA, AB, BBC, AAABCCCC, CBBAAA, CABABB, and so forth. The skilled artisan will understand that typically there is no limit on the number of items or terms in any combination, unless otherwise apparent from the context.

All of the compositions and/or methods disclosed and claimed herein can be made and executed without undue experimentation in light of the present disclosure. While the compositions and methods of this invention have been described in terms of preferred embodiments, it will be apparent to those of skill in the art that variations may be applied to the compositions and/or methods and in the steps or in the sequence of steps of the method described herein without departing from the concept, spirit and scope of the invention. All such similar substitutes and modifications apparent to those skilled in the art are deemed to be within the spirit, scope and concept of the invention as defined by the appended claims.

FIGS. **1-3** are provided as exemplary diagrams of data-processing environments in which embodiments of the present invention may be implemented. It should be appreciated that FIGS. **1-3** are only exemplary and are not intended to assert or imply any limitation with regard to the environments in which aspects or embodiments of the disclosed embodiments may be implemented. Many modifications to the depicted environments may be made without departing from the spirit and scope of the disclosed embodiments.

A block diagram of a computer system **100** that executes programming for implementing parts of the methods and systems disclosed herein is shown in FIG. **1**. A computing device in the form of a computer **110** configured to interface with controllers, peripheral devices, and other elements disclosed herein may include one or more processing units **102**, memory **104**, removable storage **112**, and non-removable storage **114**. Memory **104** may include volatile memory

US 10,824,427 B2

5

106 and non-volatile memory 108. Computer 110 may include or have access to a computing environment that includes a variety of transitory and non-transitory computer-readable media such as volatile memory 106 and non-volatile memory 108, removable storage 112 and non-removable storage 114. Computer storage includes, for example, random access memory (RAM), read only memory (ROM), erasable programmable read-only memory (EPROM) and electrically erasable programmable read-only memory (EEPROM), flash memory or other memory technologies, compact disc read-only memory (CD ROM), Digital Versatile Disks (DVD) or other optical disk storage, magnetic cassettes, magnetic tape, magnetic disk storage, or other magnetic storage devices, or any other medium capable of storing computer-readable instructions as well as data including image data.

Computer 110 may include, or have access to, a computing environment that includes input 116, output 118, and a communication connection 120. The computer may operate in a networked environment using a communication connection 120 to connect to one or more remote computers, remote sensors and/or controllers, detection devices, handheld devices, multi-function devices (MFDs), speakers, mobile devices, tablet devices, mobile phones, Smartphone, or other such devices. The remote computer may also include a personal computer (PC), server, router, network PC, RFID enabled device, a peer device or other common network node, or the like. The communication connection may include a Local Area Network (LAN), a Wide Area Network (WAN), Bluetooth connection, or other networks. This functionality is described more fully in the description associated with FIG. 2 below.

Output 118 is most commonly provided as a computer monitor, but may include any output device. Output 118 and/or input 116 may include a data collection apparatus associated with computer system 100. In addition, input 116, which commonly includes a computer keyboard and/or pointing device such as a computer mouse, computer track pad, or the like, allows a user to select and instruct computer system 100. A user interface can be provided using output 118 and input 116. Output 118 may function as a display for displaying data and information for a user, and for interactively displaying a graphical user interface (GUI) 130.

Note that the term "GUI" generally refers to a type of environment that represents programs, files, options, and so forth by means of graphically displayed icons, menus, and dialog boxes on a computer monitor screen. A user can interact with the GUI to select and activate such options by directly touching the screen and/or pointing and clicking with a user input device 116 such as, for example, a pointing device such as a mouse, and/or with a keyboard. A particular item can function in the same manner to the user in all applications because the GUI provides standard software routines (e.g., module 125) to handle these elements and report the user's actions. The GUI can further be used to display the electronic service image frames as discussed below.

Computer-readable instructions, for example, program module or node 125, which can be representative of other modules or nodes described herein, are stored on a computer-readable medium and are executable by the processing unit 102 of computer 110. Program module or node 125 may include a computer application. A hard drive, CD-ROM, RAM, Flash Memory, and a USB drive are just some examples of articles including a computer-readable medium.

FIG. 2 depicts a graphical representation of a network of data-processing systems 200 in which aspects of the present

6

invention may be implemented. Network data-processing system 200 can be a network of computers or other such devices, such as mobile phones, smart phones, sensors, controllers, speakers, tactile devices, and the like, in which embodiments of the present invention may be implemented. Note that the system 200 can be implemented in the context of a software module such as program module 125. The system 200 includes a network 202 in communication with one or more clients 210, 212, and 214. Network 202 may also be in communication with one or more devices 204, servers 206, and storage 208. Network 202 is a medium that can be used to provide communications links between various devices and computers connected together within a networked data processing system such as computer system 100. Network 202 may include connections such as wired communication links, wireless communication links of various types, and fiber optic cables. Network 202 can communicate with one or more servers 206, one or more external devices such as device 204, and a memory storage unit such as, for example, memory or database 208. It should be understood that device 204 may be embodied as a control system as disclosed herein.

In the depicted example, device 204, server 206, and clients 210, 212, and 214 connect to network 202 along with storage unit 208. Clients 210, 212, and 214 may be, for example, personal computers or network computers, handheld devices, mobile devices, tablet devices, smart phones, personal digital assistants, printing devices, recording devices, speakers, MFDs, etc. Computer system 100 depicted in FIG. 1 can be, for example, a client such as client 210 and/or 212 and/or 214.

Computer system 100 can also be implemented as a server such as server 206, depending upon design considerations. In the depicted example, server 206 provides data such as boot files, operating system images, applications, and application updates to clients 210, 212, and/or 214. Clients 210, 212, and 214 and device 204 are clients to server 206 in this example. Network data-processing system 200 may include additional servers, clients, and other devices not shown. Specifically, clients may connect to any member of a network of servers, which provide equivalent content.

In the depicted example, network data-processing system 200 is the Internet, with network 202 representing a worldwide collection of networks and gateways that use the Transmission Control Protocol/Internet Protocol (TCP/IP) suite of protocols to communicate with one another. At the heart of the Internet is a backbone of high-speed data communication lines between major nodes or host computers consisting of thousands of commercial, government, educational, and other computer systems that route data and messages. Of course, network data-processing system 200 may also be implemented as a number of different types of networks such as, for example, an intranet, a local area network (LAN), or a wide area network (WAN). FIGS. 1 and 2 are intended as examples and not as architectural limitations of different embodiments of the present invention.

FIG. 3 illustrates a software system 300, which may be employed for directing the operation of the data-processing systems such as computer system 100 depicted in FIG. 1. Software application 305, may be stored in memory 104, on removable storage 112, or on non-removable storage 114 shown in FIG. 1, and generally includes and/or is associated with a kernel or operating system 310 and a shell or interface 315. One or more application programs, such as module(s) or node(s) 125, may be "loaded" (i.e., transferred from removable storage 114 into the memory 104) for execution by the data-processing system 100. The data-processing

US 10,824,427 B2

7

system 100 can receive user commands and data through user interface 315, which can include input 116 and output 118, accessible by a user 320. These inputs may then be acted upon by the computer system 100 in accordance with instructions from operating system 310 and/or software application 305 and any software module(s) 125 thereof.

Generally, program modules (e.g., module 125) can include, but are not limited to, routines, subroutines, software applications, programs, objects, components, data structures, etc., that perform particular tasks or implement particular abstract data types and instructions. Moreover, those skilled in the art will appreciate that elements of the disclosed methods and systems may be practiced with other computer system configurations such as, for example, hand-held devices, mobile phones, smart phones, tablet devices multi-processor systems, microcontrollers, printers, copiers, fax machines, multi-function devices, data networks, micro-processor-based or programmable consumer electronics, networked personal computers, minicomputers, mainframe computers, servers, medical equipment, medical devices, and the like.

Note that the term "module" or "node" as utilized herein may refer to a collection of routines and data structures that perform a particular task or implements a particular abstract data type. Modules may be composed of two parts: an interface, which lists the constants, data types, variables, and routines that can be accessed by other modules or routines; and an implementation, which is typically private (accessible only to that module) and which includes source code that actually implements the routines in the module. The term module may also simply refer to an application such as a computer program designed to assist in the performance of a specific task such as word processing, accounting, inventory management, etc., or a hardware component designed to equivalently assist in the performance of a task.

The interface 315 (e.g., a graphical user interface 130) can serve to display results, whereupon a user 320 may supply additional inputs or terminate a particular session. In some embodiments, operating system 310 and GUI 130 can be implemented in the context of a "windows" system. It can be appreciated, of course, that other types of systems are possible. For example, rather than a traditional "windows" system, other operation systems such as, for example, a real-time operating system (RTOS) more commonly employed in wireless systems may also be employed with respect to operating system 310 and interface 315. The software application 305 can include, for example, module(s) 125, which can include instructions for carrying out steps or logical operations such as those shown and described herein.

The following description is presented with respect to embodiments of the present invention, which can be embodied in the context of, or require the use of, a data-processing system such as computer system 100, in conjunction with program module 125, and data-processing system 200 and network 202 depicted in FIGS. 1-3. The present invention, however, is not limited to any particular application or any particular environment. Instead, those skilled in the art will find that the system and method of the present invention may be advantageously applied to a variety of system and application software including database management systems, word processors, and the like. Moreover, the present invention may be embodied on a variety of different platforms including Windows, Macintosh, UNIX, LINUX, Android, Arduino and the like. Therefore, the descriptions of the exemplary embodiments, which follow, are for purposes of illustration and not considered a limitation.

8

In an embodiment, a system and method for power supply and control 400 is illustrated. The system 400 can include a case 405. In general, case 405 comprises a metal case configured to house electronic components. A rail 410 can be incorporated in case 405, with standardized connection points for connection with various sub-components of the system 400. The case 405 can be fitted with fans 420 and 421, and filters 425 and 426, and additional fans if necessary, to cool and condition the air in the case 405.

The case 405 houses a set of independent power supplies 415-416. In an embodiment, independent power supplies 415-416 can be configured to provide up to 2000 watts at up to 58 volts. It should be appreciated that in other embodiments, more or fewer power supplies, essentially equivalent to those illustrated in FIG. 4 can be employed, without departing from the scope of the present disclosure. In addition, in other embodiments, the power supply output parameters can be selected according to design considerations. The values provided herein are exemplary.

In still other embodiments, the power supplies 415-416 can be selected to be controllable and/or programmable, such that they can be controlled and programed using a modular control system as disclosed herein. In certain embodiments, each of the power supplies can be fitted with a respective control header 430-431. The control headers 430-431 provide a control interface for the power supply via connection pins configured therein.

The case 405 can be equipped with apertures for the introduction of power lines and data transmission (i.e. control) input via cabling. In an embodiment, a terminal block 435 configured on or near the rail 410 accepts mains power 452 (e.g. 120 VAC, 220 VAC, etc.) from an external source (e.g. a main power source associated with the facility), along with data input via cable 451. In certain embodiments, the terminal block 435 can comprise multiple terminal blocks according to design considerations. A surge protector 475 can be inserted inline, in case 405. The surge protector 475 can condition incoming power to protect all downstream components from damage in the event of a surge in power.

The terminal block 435 directs the mains power 452 to each of the power supplies 415-416. The outputs from the independent power supplies 415-416 can be combined at terminal block 435.

The system is configured for power conversion from the AC mains power (e.g. 120-277 VAC) to low voltage DC power for distribution to a set of one or more external devices (e.g. luminaries, switches, sensors, etc.). As a result, in an exemplary embodiment, each power supply 415-416 can produce up to 2000 Watts, at up to 58 volts, the output power available at the terminal block 435 can be 4000 Watts at 58 volts DC, and can be provided as an output from terminal block 435. In an embodiment, the output comprises the combined power from the terminal block 435 provided on two wires, wire 440 and wire 441, within a single cable 445 held at a constant voltage by the power supplies and terminal block 435.

This configuration offers the advantage that if one of power supplies 415-416 malfunctions, fusing in the terminal block 435 or in an individual power supply 415-416, prevents the other respective power supplies 415-416 from also malfunctioning. Furthermore, each power supply 415-416 can be independently turned on and off via control lines connected to its respective control header 430-431.

The rail mounted components can include an I/O system 450 connected to rail 410. The I/O system 450 can comprise, for example, a Phoenix Contact I/O System ICL 191,

US 10,824,427 B2

9

WAGO-I/O system, or other such I/O system. The I/O system **450** can be modular, and is configured to receive signals from, for example, sensors, or other external devices and interface that input with control systems. The I/O system **450** can operate using BACnet/IP protocol or other such protocol. The I/O system **450** receives external input from an ethernet line (e.g. input cable **451**) connected to a controlling computer system such as computer system **100**.

Building Automation and Control Networks (BACnet) is a protocol used for communication between control systems and building automation applications. For example, BACnet is used to control lighting systems, heating and cooling systems, emergency alert systems, security systems and the like, in accordance with the embodiments disclosed herein. The BACnet protocol includes protocol services, some of which provide application discovery and others of which provide data sharing. In short, BACnet is protocol for building control. BACnet/IP, in which BACnet is delivered over an IP network, provides a communication protocol to allow automation or control software to communicate over IP with a building application or module, for example an LED light system (or other such building system), and to provide control commands to the system.

In certain embodiments, the I/O system **450** can interface with a computer system, such as computer system **100**. The computer system **100** can provide a user interface for providing input to, and receiving information from, the I/O system **450**. In certain embodiments the connection between the computer system **100** and the I/O system **450** can be wired only, thus providing a layer of security by requiring a wired connection (e.g. via an Ethernet connection such as cable **451**) to modify information provided to and received from the I/O system **450**. In other embodiments the I/O system **450** can be configured with wireless connection communication capability, such that a remote computer system can communicate wirelessly with the I/O system **450** over a wireless network. The computer system **100** can be used to provide user provisioning capabilities for the systems disclosed herein.

The I/O system **450** can serve as one part of a modular control system. In certain embodiments, the modular control system can also comprise a DALI control system **455** configured for controlling, for example, lighting or other such building systems. In certain embodiments, this could include the 0-10 protocol. The control system can include a serial protocol (e.g. "transmit" and "receive"). For example, two outputs from the DALI control system **455** can be provided, one being a plus control output and the other being a minus control output. The DALI control system **455** can connect to multiple DALI pucks, as further disclosed herein.

The I/O system **450** (e.g. Phoenix Contact I/O System ICL 191) and the DALI control system **455** in combination, can form a BACnet/IP ↔ DALI bridge because one side of the combination communicates via BACnet/IP while the other communicates via DALI.

The DALI protocol allows a controller to specifically address controlled things. For example, in an embodiment, each light in a warehouse can have a DALI address. The DALI protocol allows the controller to directly communicate serial instructions such as "turn on" and "turn off" to the specifically assigned DALI address (i.e. a specific light). In other embodiments, other components can also be controlled via the DALI protocol.

The system **400** thus includes a single four wire cable **455** output from the metal case. Two wires **442** and **443** in the cable are the outputs from the DALI control system **455**, optionally passed through the terminal block **435**, for con-

10

trolling applications, and the other two wires **440** and **441** are power and return lines from the summed power supplies. Thus, the output **445** from the system **400** comprises control signals and significant DC power that can be distributed to external applications (e.g. a series of lights). It should be appreciated that this single cable design along with the large power supply provided from the terminal block, allows the system **400** to serve power, and control, to multiple downline applications, reducing the spider web of cabling necessary for power and control of systems endemic to prior art approaches.

An additional digital I/O block **460** can also be connected to the rail system **410** provided in the case **405**. Individual rail mounted blocks (e.g. **450**, **455**, **460**, **465**) can be modular components designed to interconnect with one another and to communicate with one another when pressed side-to-side, as is typically the situation when they are mounted on a common mounting rail. The digital I/O block **460** can be used to turn other parts of the system **400** (e.g. the DALI control system **455** and the I/O system block **450**) on and off. The digital I/O block **460** can be controlled over IP via I/O block **450**. This is useful for resetting various components in the system **400** if they are operating improperly, fail, or simply need a hard reboot for any reason. The control blocks can be used to control the fans and maintain proper operating conditions in the case **405**.

A power supply **465** for the various control blocks **450**, **455**, **460** can also be connected to the rail **410** in the case **405**. The power supply **465** provides a separate power source for the various control modules in system **400** and is intended to power the control blocks independently of the summed power supplies. A manual switch **470** can be connected to power supply **465** to provide a manual on/off switch for the power supply **465**, and in turn the remaining connected control blocks. It can be advantageous in some situations, such as maintenance or trouble shooting, for the control blocks to be powered while the power supplies are off. The separate supply also shields the control system from mishaps involving power lines **440**, **441**. Alternative embodiments may power the control blocks **450**, **455**, **460** from one of the main output supplies such as power supplies **415**-**416**.

The control headers **430**-**431** (as described above) can be controlled via the I/O system **450**, which is to say that they can accept input from the I/O system **450** or digital I/O block **460**, and can be used to turn off any combination of power supplies **415**-**416**. Typically, Digital I/O **460** provides binary on/off signals to control block **430**-**431**. This is important because if one of the power supplies **415**-**416** malfunctions, it can be independently shut down, without affecting the power supply provided by the remaining operational power supplies **415**-**416**. Furthermore, individual supplies can be powered on as needed for supplying addition power, for testing individual supplies, or for failover where a supply is held in reserve in case another supply fails.

FIG. **5** illustrates pucks **505**-**508**. Pucks **505**-**508** can comprise a circuit configured to provide, among other things, a constant current supply to LED light bars **520**. The pucks **505**-**508** are configured to send and receive control commands in DALI via input cable **445** which provides constant voltage DC power and DALI control signals. Any number of equivalent pucks can be used in other embodiments. Here pucks **505** and **506** are shown daisy chained while pucks **505**, **507**-**508** are using more of a bus topology. Star topologies are created when one puck provides input cables **445** directly to other puck. In all cases, cable **445** only needs to have four wires, two for power, two for control. The

US 10,824,427 B2

11

pucks **505-508** can have a voltage rating of, for example 5-58 VDC. The pucks **505-508** can accept input power via input **445**. The input power can be any voltage in the rated range and is ideally constant voltage. The output provided via output **515** can be a constant current for driving devices, such as an LED bar **520**, or other such device.

Pucks **505-508** typically include a CV/CI driver that accepts nominally constant DC voltage (hence the 5-58V DC input range—slow minor fluctuations of the input DC power have negligible effects on the constant current output of the puck). The CV/CI driver is typically controlled by a DALI chip within the puck. Other implementations exist, but conceptually the driver-controller generalization is sufficient for the purposes of this disclosure.

In certain embodiments each device **520** in a facility can be controlled by its own puck **505**. For example, each light in a light bar fixture **520** can be controlled by its own puck **505**. The puck **505** receives input via input **445** that comprises a voltage, and DALI instruction. If the puck **505** is addressed via the DALI protocol, the puck **505** can initiate a serial command (e.g. turn-on or turn-off the associate LED) and can supply requested current to the LED.

A control interface is required to provide a user control. A computer system, such as computer system **100** can interface with the I/O system **450** via BACnet/IP. The computer system **100** can include a GUI that allows the user to select, control, and or provision the desired application.

For example, in an embodiment, a layout of a warehouse or other such facility can be provided by the GUI. The GUI can provide a status of each light in the warehouse (i.e. whether each light is on, off, dimmed by a percentage, etc.). The GUI can provide controls that allow the user to selectively turn on, turn off, dim, brighten, or change the color temperature of a given light in the warehouse. The GUI can match the controller to an actual physical location in the warehouse. The GUI can further provide provisioning steps where necessary, indicating for example, what controllers exist and where they are in the warehouse.

The computer system **100** can receive input via the GUI **130** and translate the instructions to BACnet/IP. The instructions can be communicated via BACnet/IP to the I/O system **450** via input **451** and optionally terminal block **435**. The I/O system **450** is in turn connected to the DALI control system **455**. The DALI control system **455** is further connected to the pucks **505-508** via wires **442** and **443** in cable **445**. The DALI protocol can be used to instruct the pucks to supply current to a light and turn lights on or off. The system can further be configured via an API running on a remote server in contact with the system **400**, allowing mobile clients to interact with the GUI and control the applications in the warehouse.

FIG. **6** illustrates an exemplary implementation of a control system **600** for a warehouse **605**. Mains power can be provided from a power main **610** associated with the warehouse **605** to control system **400** where a summed main power supply is provided to a number of pucks **505**. The pucks **505** supply current to each individual device **520** (e.g. LED lighting) in the warehouse **605** and each LED fixture (or fixture element) **520** can be controlled by a GUI **130** associated with computer system **100** or remote client **615**. In certain embodiments, the GUI **130** can relate to a browser operating on the computer system **100** that is executing instructions configured in the control system **400**. This provides an additional layer of security. The computer system **100** can connect to the control system **400** via wired connection, or wireless connection according to design considerations. Notably, there is no need to specifically

12

configure each device **520**, and the relatively high voltage output from control system **400** allows power to be provided a long distance from the control system **400**. The DALI protocol provides the ability to control devices **520** that are wired in serial as shown (daisy chained). In other words, the 4-wire cable exiting the system **400** can connect to a first puck **505** which is associated with a first light **520** and can then be output from the puck and connect to the next puck and associated light in the facility, and so on.

DALI provides for discovery of connected devices. During initial system configuration or when a new puck is added, the control system **400** can initiate discovery and obtain a list of every connected puck. Each puck can then be associated with a named light fixture or a location on a map or building schematic.

As further illustrated in FIG. **6**, a device star can be provided where one central puck **505** and light **520** can be connected to multiple additional puck and light configurations. These embodiments obviate the need for a dedicated wire from the central control system **400** to each light. It is not required that a puck lie at the center of the star, a terminal block can do the job.

FIG. **7** illustrates another embodiment of the invention. In this embodiment mains power is provided to a control system **400** via mains power input **452**. It should be understood that the control system **400** can incorporate features as illustrated in FIG. **4**.

The control system **400** includes 4-wire cable **445**, that provides power and control. The cable **445** connects to input controller **705**. The input controller **705** can comprise a DALI input controller (or other such controller). The input controller receives power and control via the wires in cable **445** exiting the control system **400**. The input controller **705** can provide DALI control of low voltage device **715**, which can be any device, including a switch, sensor, or other such device. The input controller **705** can be powered via a bus **710**. That is to say, the input controller **705** includes an output bus **710**, that can be configured as a DALI bus, or other such bus, wherein power and control are all provided in the single line.

In embodiments, where the device **715** comprises a switch. The input controller **705** is connected to the switch **715**, which can be embodied as an LV switch or other such switch. In certain embodiments, the switch **715** can comprise a push button switch. The push button switch can be manipulated to control downline devices via the DALI protocol.

In other embodiments, the switch **715** can comprise a smart switch. The smart switch can comprise a capacitive touch panel with a glass, or other such touch display. The switch **715** can be configured to provide control of luminaires using the DALI standard and can be powered via the DALI bus **710**. Thus, in certain embodiments, the device **715** can serve as a master switch to turn all downline applications on or off. It should be appreciated that multiple input controls **705** and switches **715** may be used in various design topologies.

The cable **445** can be further connected to one or more downline applications **520**. In the embodiment, disclosed in FIG. **7**, three downline applications **520** are illustrated, each of which can comprise, for example, a luminaire, equipped with a puck **505**. The cable **445** is connected to each application such that power is supplied to the application, along with a connection for control via the control system **400**.

The cable **445** can further connect to a second input control **705** connected via bus **710** to a sensor **720**. The

US 10,824,427 B2

13

sensor **720** can comprise a motion sensor, light sensor, etc. the input controller **705** can receive input from the sensor **720** and use the received input to control the one or more of the applications **520**, such as luminaires. It should be appreciated that multiple input controls **705** and sensors may be used in various design topologies.

It should finally be appreciated, that the system can be controlled via computer system **100**, equipped with a user interface, as disclose herein, that allows a user to provision and control one or more of the applications **520**, input controllers **705**, switches **715**, and sensors **720**, with control system **400**.

FIG. **8** illustrates a method **800**, for controlling and providing power to a system of applications in accordance with the disclosed embodiments. The method starts at **805**.

At block **810** the control system **400** can be configured as illustrated in the embodiments presented herein. The power supply is provided from a terminal block which can be connected to one or more power supplies, as illustrated at block **815** so that the terminal block is ready to provide power to downline applications.

Instructions can be provided, as shown at block **820**, to an I/O system from a control system. The instructions provided to the I/O system can be converted to a serial output as shown at **825**, with the control block connected to the I/O system. Once the instructions are converted, downline applications (e.g. a luminaire) can be controlled as shown at step **830**, via a puck which accepts the serial instructions. The puck is configured to receive power from the terminal block, process the serial output, and output a current to the associated application. The method ends at step **835**.

FIG. **9** illustrates an alternative embodiment of a lighting control system **900**, in accordance with the disclosed embodiments. The lighting control system **900** is configured to provide remote AC to DC power conversion, and can be used to convert alternating current input power (for example 120-277 VAC) to a low voltage DC output, which enables reliable distribution to remote applications, such as dimmable LEDs.

As illustrated in FIG. **9**, the lighting control system **900**, comprises a standard case **905**. Case **905** can comprise a metal case configured to house electronic components. A barrier **985** can be configured in the case **905** to separate emergency and normal power sides of the system **900**. The barrier **985** can comprise an 18 gauge (or other necessary strength) galvanized steel barrier. A rail can be incorporated in case **905**, with standardized connection points for connection with various sub-components of the system **900**. The case **905** can include one or more knockouts for the introduction of power cables, ethernet cables, and other such cables. In certain embodiments, the case **905** can be fabricated from steel with louvered back and side panels.

The case **905** can house jacks **910** for cold aisle emergency fixtures. A low voltage switch **915** is provided on PCB **920**, along with a jack for cold aisle normal power **925**, and a jack for hot aisle (non-emergency) power **930**. The PCB **920** is connected to digital network bridge **940**. Digital network bridge **940** provides a network connection between one or more network devices. The digital network bridge **940** serves as a means for connecting network connected devices which can then be managed remotely. Thus, in certain embodiments, remote control of applications **990** can be accomplished with the system **900**. A standard emergency lighting control unit **935** (e.g. a "Wattstopper") can be included in the case **905** and is configured to provide control

14

of emergency application sand normal applications (e.g. lighting) in the environment in which the applications are disposed.

AC mains power can be routed through terminal block **945** which is configured to handle normal power, and terminal block **950** to handle emergency power. Separate mains power **946** and mains power **951** can be provided to the terminal block **945** and terminal block **950** respectively. As such, terminal block **945** can be connected to the components on PCB **920** and controlled by switch **910** via driver **955**, which serves as the application driver for normal power operations. Likewise, driver **960** serves as the driver for emergency power operations.

Terminal block **965** serves as the terminal block for the low voltage emergency circuit. Terminal block **970** serves as a terminal block for the low voltage normal power circuit. A surge protector **975** can be provided inline to prevent damage to the downline components.

A controller **980**, which can be, for example, a Wattstopper LMRC-112 series room controller, can be connected to the terminal block **970**. The controller **980** includes relays to switch a current. An alternating power supply, with multiple outputs per relay is provided for control of one or more application **990**, including but not limited to, dimmable LEDs and associated drivers.

The system **900** can thus be used to provide control and power to remote power over ethernet (PoE) application (e.g. application **990**), which can include dimmable LED luminaires. Specifically, ethernet cable **995** can be provided from case **905** to one or more applications **990**. Instructions for control of the application **990** can be provided via a remote device connected to a network.

The system **900** enables simple, cost-effective lighting installations and reduces the need for thermal management at the fixture. The system **900** provides individual power and programmable drive current for as many as 14 applications (e.g. LED drivers).

Based on the foregoing, it can be appreciated that a number of embodiments, preferred and alternative, are disclosed herein. It will be appreciated that variations of the above-disclosed and other features and functions, or alternatives thereof, may be desirably combined into many other different systems or applications. Also, it should be understood that various presently unforeseen or unanticipated alternatives, modifications, variations or improvements therein may be subsequently made by those skilled in the art which are also intended to be encompassed by the following claims.

What is claimed is:

1. A system comprising:

a distributed DC power output system comprising:

    a case with a normal power side and an emergency power side;

    a barrier separating the normal power side and the emergency power side;

    a normal mains AC power input configured to accept 120-277 volts AC;

    a second mains AC power input configured to accept 120-277 volts AC;

    at least one normal power supply driver configured on the normal power side;

    at least one emergency power supply driver configured on the emergency power side;

    a terminal block configured on the normal power side to accept normal mains AC power input and distribute normal DC power at constant current;

US 10,824,427 B2

15

a second terminal block configured on the emergency power side to accept second mains AC power input and to distribute emergency DC power at constant current;

a controller connected to the terminal block wherein the controller controls at least one application; and

a cable provided from said distributed DC power output system, wherein the system can provide control and the DC power at constant current, to the at least one application via the cable.

**2**. The system of claim **1** wherein the terminal block distributes the normal DC power from the at least one normal power supply driver.

**3**. The system of claim **2** further comprising:

a surge protector connected to the terminal block for distributing mains power on the normal power side.

**4**. The system of claim **1** further comprising:

at least one jack on the emergency power side for connecting the system to applications.

**5**. The system of claim **1** further comprising:

at least one jack for cold aisle normal power operation.

**6**. The system of claim **1** further comprising:

an ethernet connection wherein the system can provide control and the DC power at constant current to applications via the ethernet connection.

**7**. The system of claim **1** wherein the at least one application comprises at least two applications, each of which comprise LED lights powered and controlled by the DC power at constant current from the cable.

\* \* \* \* \*

16