Lena N. Bacani (SBN 213556)
lena.bacani@lozaip.com
LOZA & LOZA, LLP
305 N. Second Ave., Ste. 127
Upland, CA 91786
Telephone: (877) 406-5164
Facsimile: (213) 394-3625

Gordon E. Gray (SBN 175209)
geg@grayiplaw.com
THE GRAY LAW FIRM
4401 N. Atlantic Blvd., 2nd Fl.
Long Beach, CA 90807
Tel: (562) 984-2020

Attorneys for Plaintiff,
NICOR, INC.

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| NICOR, INC., <br><br> Plaintiff, <br><br> v. <br><br> SOURCEBLUE, LLC, f/k/a TURNER LOGISTICS, LLC, <br><br> Defendant. | Case No. 2:21-cv-05876-AB-KS <br><br> **STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW IN SUPPORT OF NICOR, INC.'S MOTION FOR PARTIAL SUMMARY JUDGMENT** <br><br> Hon. André Birotte, Jr. |
| INFINILUX CORPORATION <br><br> Plaintiff, <br><br> v. <br><br> NICOR, INC. <br><br> Defendant. | Hearing Date: May 26, 2023 <br> Time: 10:00 a.m. <br> Courtroom: 7B |

NICOR, Inc. ("NICOR") respectfully submits this Statement of Uncontroverted Facts and Conclusions of Law ("SUF") in Support of its Motion for Partial Summary Judgment pursuant to Fed. R. Civ. P. 56, L.R. 56-1 and the Standing Order of the Court.

## I.    UNCONTROVERTED FACTS

U.S. Patent No. 10,824,427 ("the '427 Patent") cited below is the Patent-in-Suit.

| No. | Undisputed Fact | Supporting Evidence |
|-----|----------------|---------------------|
| Uncontroverted Facts Showing Infringement | | |
| 1. | NICOR, Inc. is a New Mexico corporation with its principal place of business at 2200 Midtown Place NE, Suite A, Albuquerque, NM 87107. | Dkt. 55, First Amended Complaint ("FAC"), ¶ 2; Dkt. 16, NICOR's Counterclaims (Case No. 2:21-cv-5300, later consolidated in present action), ¶ 2. |
| 2. | SourceBlue, LLC, formerly known as Turner Logistics, is a limited liability company organized and existing under the State of Delaware and has its principal place of business at 3 Paragon Dr., #1, Montvale, NJ  07645. | Dkt. 56, SourceBlue's Answer to FAC, ¶ 3. |
| 3. | SourceBlue is a wholly-owned subsidiary of Turner Construction. | |
| 4. | Infinilux Corporation is a California corporation with its principal place of business at 180 E. Selandia Lane, Carson, CA  90746. | Dkt. 2, Infinilux Complaint (Case No. 2:21-cv-5300), ¶ 4. |

| 5. | NICOR, Inc. is the assignee of all rights in and title to the '427 Patent, including the right to enforce the claims of the '427 Patent and collect damages for infringement. | Dkt. 55, FAC, ¶ 8; Dkt. 16, NICOR's Counterclaims (Case. 2:21-cv-5300), ¶ 8. |
|---|---|---|
| 6. | The '427 Patent issued on November 3, 2020 from U.S. Patent Application No. 16/169,856 that was filed on October 24, 2018. | Dkt. 55, FAC, ¶ 7, Ex. A (face of '427 Patent); Dkt. 16, NICOR's Counterclaims (Case. 2:21-cv-5300), ¶ 7. |
| 7. | The '427 Patent claims priority to Provisional Application No. 62/576,877, filed on October 25, 2017. | Dkt. 55, FAC, ¶ 7, Ex. A (face of patent); Dkt. 16, NICOR's Counterclaims (Case. 2:21-cv-5300), ¶ 7. |
| 8. | In 2017, NICOR developed its LCU product which provides DC power at constant current to remotely located LED luminaires. | Dkt. 55, FAC, ¶14. Bacani Decl., at ¶ 8, Ex. 6 at 43-44 (excerpts of deposition of David Brown) |
| 9. | NICOR's LCU is covered by the claims of the '427 Patent. | Dkt. 55, FAC, ¶14 |
| 10. | NICOR installed its LCU in several Facebook datacenters. | Dkt. 55, FAC, ¶¶ 9, 15 |
| 11. | Infinilux contracted with SourceBlue to provide various lighting equipment, including LED luminaires and the Accused Product. | Bacani Decl., at ¶¶ 18-19, Exs. 16, 17 |
| 12. | SourceBlue contracted with Turner Construction to provide lighting | Bacani Decl., at ¶¶ 18-19, Exs. 16, 17 |

| | | |
|---|---|---|
| | systems for select Facebook datacenters. | |
| 13. | Infinilux developed a product called the DRCC that was designed to house drivers that would provide power to remote LED luminaires. | Bacani Decl., at ¶ 10, Ex. 8 (excerpts of deposition of Devesh Patel) at 55-59; ¶16, Exs. 14. |
| 14. | The Infinilux DRCC product was rejected by Facebook. | Bacani Decl., at ¶ 10, Exs.8 (excerpts of deposition of Devesh Patel), at 60-61. |
| 15. | SourceBlue took photographs of NICOR's LCU product that was installed in one of the Facebook datacenters and sent the photographs to Infinilux. | Bacani Decl., at ¶¶ 11-17, Exs. 9-15. |
| 16. | Infinilux copied the design of NICOR's patented LCU product to create the Solidian® RDCC. | Bacani Decl., at ¶¶ 11-17, Exs. 9-15 |
| 17. | According to Infinilux, the RDCC is "exactly the same" as NICOR's LCU. | Bacani Decl., ¶14, Ex. 12 (INFX 021475). |
| 18. | The Accused Product is the Solidian® RDCC system (excluding configurations that have no emergency drivers). | Dkt. 55 at ¶ 10. |
| 19. | The Accused Product is an electric power supply system that provides power to luminaires, such as LED | Bacani Decl., ¶5, Ex. 3 |

STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW IN SUPPORT OF NICOR'S MOT. FOR SUMM. J. OF INFRINGEMENT

| | | |
|---|---|---|
| | light fixtures, that are remotely located from, but connected to, the RDCC unit. | ("Moss Rebuttal Report"), ¶ 186 at 99; ¶ 4, Ex. 2 ("Schubert Supp. Report"), at 15-16. |
| 20. | The Shanghai Moons LED drivers found in the Accused Product are dimmable constant current LED drivers that output DC constant current. | Bacani Decl., ¶1-3, Ex. 12 Schubert Supp. Rep. at 18 |
| 21. | The Accused Product provides DC constant current to the LED luminaires. | Schubert Supp. Rep. at 18 |
| 22. | The Accused Product has a metal case. | Schubert Supp. Rep. at 16. |
| 23. | The Accused Product incorporates normal LED drivers. | Schubert Supp. Expert Report at 22; RDCC Installation Instructions (2021) (wiring diagram)) |
| 24. | With the exception of the models RDCC1.1220000, RDCC1.2110000 and RDCC1.2220000, the Accused Product incorporates emergency LED drivers. | Schubert Supp. Expert Report at 22; RDCC Installation Instructions (2021) at (wiring diagram)) Moss Rebuttal Report, ¶ 190. |
| 25. | With the exception of the models RDCC1.1220000, RDCC1.2110000 and RDCC1.2220000, the Accused Product has a normal and emergency power side. | Schubert Supp. Expert Report at 22; RDCC Installation Instructions (2021) (wiring diagram)) Moss Rebuttal Report, ¶ 190. |

STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW IN
SUPPORT OF NICOR'S MOT. FOR SUMM. J. OF INFRINGEMENT

| 26. | LED drivers that distribute normal power are physical separated from drivers that distribute emergency power in the Accused Product. | Schubert Supp. Rep. at 25-27. (INFX-SB 001507-1518, "Emergency Power Partition") |
| 27. | The Accused Product includes a physical barrier that separates the LED drivers that distribute normal power from drivers that distribute emergency power. | Schubert Suupp. Rep. at 24-27 INFX-SB-004189 |
| 28. | Normal AC mains power is "alternating current" power that comes typically in from the electrical grid. | 'Schubert Supp. Rep. at 28-30. |
| 29. | Direct current, or "DC" power is more suitable than AC power to power and control LED luminaires. | '427 Pat. at 2:3-6; Fig. 9; Schubert Supp. Rep. at 28-30. |
| 30. | The Accused Product is configured to accept normal mains power at a range of between 120-277 volts AC. | Schubert Supp. Expert Rep. at 30. INFX-SB004188 |
| 31. | The Accused Product has a mains AC power input. | Schubert Supp. Expert Rep. at 30. Moss Reb. Rep.¶ 255. INFX-SB004188 |
| 32. | The Accused Product has a second mains AC power input. | Schubert Supp. Expert Rep. at 30. INFX-SB004188 |
| 33. | The second mains AC power input is configured to accept 120-277 volts AC. | Schubert Supp. Report at 31-33. INFX-SB 004188 |

| | | |
|---|---|---|
| 34. | The Accused Product incorporates at least one LED driver on the normal power side. | Schubert Supp. Rep. at 34-36 |
| 35. | The LED drivers on the normal power side are configured to accept power from the mains AC power input. | Schubert Supp. Rep. at 34-36 |
| 36. | The Accused Product has at least one LED driver configured to accept emergency AC power on the emergency power side. | Schubert Supp. Rep. at 33-39 |
| 37. | A person of ordinary skill in the art ("POSITA") in 2017 would understand that a terminal block can be divided into multiple subblocks to accomplish the same number of connections. | Schubert Initial Rep. at Schubert Supp. Rep. at 4-5 Moss Reb. Rep., ¶ 226. |
| 38. | A person of ordinary skill in the art ("POSITA") in 2017 would understand that a multiple terminal blocks can be used to accomplish the same number of connections as a single terminal block. | Schubert Initial Rep. at 7-10; Schubert Supp. Rep. at 5, 39-41; Moss Rebuttal Rep. at 19-22 (like Lego)) |
| 39. | The '427 Patent discloses terminal block 945 as configured to handle normal power. | Dkt. 1, Ex. A (hereafter "'427 Pat.") at Fig. 9; 14:4-18. |

STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW IN SUPPORT OF NICOR'S MOT. FOR SUMM. J. OF INFRINGEMENT

| | | |
|---|---|---|
| 40. | The '427 Patent discloses terminal block 970 as configured to handle low voltage normal power. | '427 Pat. at Fig. 9; 14:4-18. |
| 41. | The '427 Patent discloses terminal block 946 as configured to handle emergency power. | '427 Pat. at Fig. 9; 14:4-18. |
| 42. | The '427 Patent discloses terminal block 965 as configured to handle low voltage emergency power. | '427 Pat. at Fig. 9; 14:4-18. |
| 43. | The '427 Patent discloses a preferred embodiment in Figure 9. | '427 Pat. at Fig. 9; 14:4-18. |
| 44. | Figure 9 of the '427 Patent corresponds to NICOR's LCU product. | Dkt. 55, FAC, ¶14 |
| 45. | The Accused Product has a "Normal Power Distribution Block" that is a terminal block that accepts normal AC mains power. | Schubert Supp. Report at 39; 2021 RDCC Installation Instructions |
| 46. | The Accused Product has a Normal Power LED Light Fixture Distribution Block, that is a terminal block that outputs constant current DC power to the LED light fixtures. | Schubert Supp. Report at 39-41; 2021 RDCC Installation Instructions) |
| 47. | The Accused Product has an "Emergency Power Distribution Block" [3], that is a terminal block that accepts second (also referred to | Schubert Supp. Report at 41-43; (2021 RDCC Installation Instructions) Moss Rough Depo. Tr. 195:16-196:3. |

| | | |
|---|---|---|
| | as "emergency") AC mains power input. | |
| 48. | The Accused Product also has an "Emergency Power LED Light Fixture Distribution Block" on the emergency side of the RDCC, which is a terminal block, that outputs emergency power to the light fixtures at constant DC current. | Bacani Decl., ¶¶ 5 ("Moss Rebutal Rep."); 7 ("Moss Depo. Tr."): Moss Depo. Tr. 195:16-196:3. Moss Reb. Rep. ¶ 236 ("second mains AC power received at the emergency AC power distribution block"); ¶ 237 ("Subsequently, the DC power output from the emergency power supply drivers is routed to the emergency LED light fixture distribution block and fed out of the Solidian® RDCC to provide DC power to a low voltage DC light fixture."); Schubert Supp. Rep. at 41-43. |
| 49. | The DC power output from the emergency power supply drivers is routed to the emergency LED light fixture distribution block and fed out of the Accused Product to provide DC power to a low voltage DC light fixture. | Moss Rough Depo. Tr. 195:16-196:3. |
| 50. | The Accused Product has a Legrand LMRC-212-M, LMRC-213-M, or similar controller, which is connected to a terminal block. | Schubert Supp. Report at 46-48; Moss Depo Rough Tr. at 130:19-25 |

STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW IN
SUPPORT OF NICOR'S MOT. FOR SUMM. J. OF INFRINGEMENT

| | | |
|---|---|---|
| 51. | The LMRC controller in the Accused Product provides power to the LED luminaires. | Schubert Supp. Rep. at 46-47; Moss Depo. Tr. 197:22-198:12 |
| 52. | The Accused Product can control the brightness of the LED luminaires by varying the level of the DC current. | Schubert Supp. Rep. at 46-47; Moss Depo. Tr. 197:22-198:12 |
| 53. | The Accused Product connects to the LED luminaires via a conductor. | Moss Rebutal. Rep. ¶¶ 246, 249 |
| 54. | The Accused Product connects to the remote LED fixtures via a cable. | Schubert Supp. Rep. at 48-51; Moss Depo. Tr. 82:12-22 (cable is just group of wires) |
| 55. | The Accused Product includes "Conduit Connections" to connect to the LED fixture cables. | Schubert Supp. Rep. at 48-51 |
| 56. | The Accused Product includes a terminal block that distributes normal DC power from at least one normal power supply driver. | Schubert Supp. Rep. at 34-39 |
| 57. | The Accused Product has a "Normal Power LED Light Fixture Distribution Block," which is a terminal block, and multiple "Normal Lighting Power Supplies," which are LED drivers on the normal side of the Accused Product. | Schubert Supp. Rep. at 34-39 |
| 58. | The normal LED drivers provide and distribute their low-voltage DC | Schubert Supp. Rep. at 52-55; INFX-SB 004189 |

STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW IN SUPPORT OF NICOR'S MOT. FOR SUMM. J. OF INFRINGEMENT

| | | |
|---|---|---|
| | power to the terminal block which in turn serves as a connection point for cables that are routed from the Accused Product to the LED lighting fixtures. | |
| 59. | The Accused Product includes a surge protector. | Moss Rough Depo. Tr. 194:13-15 |
| 60. | The Accused Product includes a surge protector connected to a terminal block on the normal power side. | Moss Rough Depo. Tr. 194:13-15 |
| 61. | The Accused Product provides DC power to remote LED light fixtures. | Schubert Supp. Rep. at 48-49, 52-55; |
| 62. | The Accused Product controls the brightness and dimming of the LED fixtures. | Schubert Supp. Rep. at 48-49, 52-55; |
| 63. | The Accused Product may vary the brightness of the LED luminaires by varying the level of DC current output to the luminaires. | Schubert Supp. Rep. at 48-49, 52-55; |
| **Uncontroverted Facts Showing No Tort Liability** | | |
| 64. | On November 12, 2020, NICOR sent a cease and desist letter to Turner Logistics LLC (which later changed its name to SourceBlue, LLC), accusing SourceBlue of infringing the '427 Patent and | Dkt. 010-1 (Infinilux action) |

STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW IN SUPPORT OF NICOR'S MOT. FOR SUMM. J. OF INFRINGEMENT

| | | |
|---|---|---|
| | demanding that SourcBlue stop selling the Accused Product. | |
| 65. | Facebook owns the datacenters in which NICOR's LCU and Defendants' Accused Product have been installed. | Dkt. 55 at ¶10. |
| 66. | Cupertino Electric is an electrical contractor involved with several Facebook datacenters where NICOR's LCU, the commercial embodiment of the invention claimed in the '427 Patent, has been installed. | |
| 67. | Environmental Systems Design, Inc. is subcontractor involved with the Facebook datacenters. | |
| 68. | On May 14, 2021, NICOR filed the present lawsuit against SourceBlue for infringement of the '427 Patent in the District of Delaware. | Dkt. 1 |
| 69. | On July 1, 2021, Infinilux filed an action in this District against NICOR, alleging claims for declaratory judgment of no infringement and invalidity of the '427 Patent, as well as several state tort claims. | Dkt. 2 (Complaint in Infinilux action) |

STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW IN SUPPORT OF NICOR'S MOT. FOR SUMM. J. OF INFRINGEMENT

| | |
|---|---|
| 70. The District of Delaware action was subsequently transferred to this District and consolidated with the Infinilux action. | Dkt. 51 (Order Consolidating Cases) |
| 71. SourceBlue has asserted state law counterclaims against NICOR for: (1) Unfair Competition; (2) Tortious Interference with Prospective and/or Contractual Economic Relations; and (3) Slander of Title/Trade Libel. | Dkt. 56, , ¶¶ 110-132. |
| 72. Infinilux has asserted state law claims against NICOR for (1) Unfair Competition; (2) Tortious Interference with Prospective and/or Contractual Economic Relations; (3) Slander of Title/Trade Libel; and (4) Abuse of Process. | Dkt. 2 (Infinilux action) |
| 73. SourceBlue's Unfair Competition counterclaim is based on NICOR's assertion that the Accused Product infringes the '427 Patent. | Dkt. 56, ¶¶ 110-115. |
| 74. SourceBlue's Tortious Interference with Prospective and/or Contractual Economic Relations counterclaim is based on NICOR's assertion that Accused Product infringes the '427 Patent. | Dkt. 56, ¶¶ 116-125. |

STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW IN SUPPORT OF NICOR'S MOT. FOR SUMM. J. OF INFRINGEMENT

| 75. | SourceBlue's Slander of Title/Trade Libel counterclaim is based on NICOR's assertion that Accused Product infringes the '427 Patent. | Dkt. 56, ¶¶ 126-132. |
|---|---|---|
| 76. | Infinilux's Unfair Competition claim is based on NICOR's assertion that the Accused Product infringes the '427 Patent. | Dkt. 2 (Infinilux action), ¶¶55-60. |
| 77. | Infinilux's Tortious Interference with Prospective and/or Contractual Economic Relations claim is based on NICOR's assertion that Accused Product infringes the '427 Patent. | Dkt. 2 (Infinilux action), ¶¶ 61-70. |
| 78. | Infinilux's Slander of Title/Trade Libel claim is based on NICOR's assertion that Accused Product infringes the '427 Patent. | Dkt. 2 (Infinilux action), ¶¶83-89. |
| 79. | Infinilux's Abuse of Process claim is based on NICOR's assertion that Accused Product infringes the '427 Patent. | Dkt. 2 (Infinilux action), ¶¶71-82. |

## II.    CONTENTIONS OF LAW

### A. Summary Judgment

1.      The Court should grant a motion for summary judgment where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact

1  and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P.
2  56(c).

3      2.      Summary judgment "is properly regarded not as a disfavored
4  procedural shortcut, but rather as an integral part of the Federal Rules as a whole,
5  which are designed 'to secure the just, speedy and inexpensive determination of every
6  action.'" *Avia Group International, Inc. v. L.A. Gear California, Inc.*, 853 F.2d 1557,
7  1560 (Fed. Cir. 1988) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986)
8  (additional internal quotations and citations omitted)).

9      3.      "The process of summary judgment is a salutary means of avoiding an
10  unnecessary trial when the movant is clearly entitled to judgment as a matter of law."
11  *Quad Envtl. Techs. Corp. v. Union Sanitary Dist.*, 946 F.2d 870, 872 (Fed. Cir.
12  1991).

13      4.      If the moving party has demonstrated an absence of material fact, the
14  nonmoving party then "must come forward with 'specific facts showing that there is
15  a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475
16  U.S. 574, 587 (quoting Fed. R. Civ. P. 56(e)).

17      5.      The mere existence of some evidence in support of the nonmoving party
18  will not be sufficient for denial of a motion for summary judgment. There must be
19  enough evidence to enable a jury reasonably to find for the nonmoving party on that
20  issue. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

21      6.      If the nonmoving party fails to make a sufficient showing on an
22  essential element of its case with respect to which it has the burden of proof, the
23  moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*,
24  477 U.S. 317, 322 (1986).

25      **B. Summary Judgment of Literal Patent Infringement**

26      7.      "Where the facts underlying the issue of infringement are undisputed,
27  the function of applying claims to the accused device" is a question of law for the
28  court." *Martin v. Barber*, 755 F.2d 1564, 1567 (Fed.Cir.1985).

8.    Summary judgment of infringement in patent cases should be granted when no reasonable jury could return a verdict for the non-moving party. *See Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004).

9.    The patentee bears the burden of proving infringement by a preponderance of the evidence. *See SmithKline Diagnostics, Inc. v. Helena Lab. Corp.*, 859 F.2d 878, 889 (Fed. Cir. 1988).

10.    A literal infringement analysis involves two steps. "First, the claim must be properly construed to determine its scope and meaning. Second, the claim as properly construed must be compared to the accused device or process." *CAE Screen-plates v. Heinrich Fiedler GmbH & Co. KG*, 224 F.3d 1308, 1316 (Fed. Cir. 2000).

**C. Claim Construction**

11.    Claim construction is an issue of law to be decided by the Court. *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 372 (1996).

12.    "It is a 'bedrock principle' of patent law that the 'claims of a patent define the invention to which the patentee is entitled the right to exclude.'" *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc).

13.    "Only those terms need be construed that are in controversy, and only to the extent necessary to resolve the controversy." *Eon Corp. IP Holdings v. Silver Spring Networks*, 815 F.3d 1314, 1318-19 (Fed. Cir. 2016).

14.    In determining the proper construction of a claim, a court should first look to the language of the claims themselves. *See Allergan Sales, LLC v. Sandoz, Inc.*, 935 F.3d 1370, 1373 (Fed. Cir. 2019) ("[C]laim construction must begin with the words of the claims themselves.").

15.    Claim terms "are generally given their ordinary and customary meaning" which "is the meaning that the term would have to a person of ordinary

skill in the art [("POSITA")] in question at the time of the invention." *Phillips*, 415 F.3d at 1312-13.

16.    If the meaning of the term is not readily apparent, the court must look to "those sources available to the public that show what a [POSITA] would have understood disputed claim language to mean." *Id.* at 1314. "Those sources include 'the words of the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence.'" *Id*.

17.    The court should construe claims "in view of the specification, of which they are a part." *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995).

18.    However, "[t]he written description part of the specification does not delimit the right to exclude. That is the function and purpose of claims." *Markman*, 52 F.3d at 980; *accord Arlington Indus., Inc. v. Bridgeport Fittings, Inc.*, 632 F.3d 1246, 1256 (Fed. Cir. 2011).

19.    "[I]t is improper to read limitations from a preferred embodiment described in the specification—even if it is the only embodiment—into the claims absent a clear indication in the intrinsic record that the patentee intended the claims to be so limited." *Dealertrack, Inc. v. Huber*, 674 F.3d 1315, 1327 (Fed. Cir. 2012).

20.    "A claim construction that excludes a preferred embodiment is rarely, if ever correct and would require highly persuasive evidentiary support." *Kaufman v. Microsoft Corp.*, 34 F.4th 1360, 1372 (Fed. Cir. 2022).

21.    In addition to the claim language and the specification, the patent's prosecution history may be considered. *Phillips*, 415 F.3d at 1317. The prosecution history "consists of the complete record of the proceedings before the PTO and includes the prior art cited during the examination of the patent." *Id.*

22.    "Where the intrinsic record is ambiguous, and when necessary," district courts may "rely on extrinsic evidence, which 'consists of all evidence external to the patent and prosecution history, including expert and inventor testimony,

dictionaries, and learned treatises.'" *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 711 F.3d 1348, 1360 (Fed. Cir. 2013).

### D. Doctrine of Equivalents

23.    "Under the doctrine of equivalents, "a product or process that does not literally infringe . . . the express terms of a patent claim may nonetheless be found to infringe if there is 'equivalence' between the elements of the accused product or process and the claimed elements of the patented invention." *Warner– Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 21 (1997); *accord Eagle Pharms. Inc. v. Slayback Pharma LLC*, 958 F.3d 1171, 1175 (Fed. Cir. 2020).

24.    The Federal Circuit "applies two articulations of the test for equivalence." *Voda v. Cordis Corp.*, 536 F.3d 1311, 1326 (Fed. Cir. 2008) (citing *Warner–Jenkinson*, 520 U.S. at 21); *see UCB, Inc. v. Watson Lab'y Inc.*, 927 F.3d 1272, 1284 (Fed. Cir. 2019).

25.    Under the insubstantial differences test, "[a]n element in the accused device is equivalent to a claim limitation if the only differences between the two are insubstantial." *UCB*, 927 F.3d at 1284 (quoting *Voda*, 536 F.3d at 1326).

26.    "Alternatively, under the function-way-result test, an element in the accused device is equivalent to a claim limitation if it 'performs substantially the same function in substantially the same way to obtain substantially the same result.'" *Voda*, 536 F.3d at 1326; *see Ajinomoto Co. v. Int'l Trade Comm'n*, 932 F.3d 1342, 1356 (Fed. Cir. 2019).

27.    The Federal Circuit has stated that the "function-way-result test" is preferable when analyzing equivalence of mechanical devices.    *See, Crown Packaging Tech., Inc. v. Rexam Beverage Can Co.*, 559 F.3d 1308, 1312 (Fed. Cir. 2009); *see also, Warner-Jenkinson,* 520 U.S. at 39.

### E. Litigation Privilege

28.    In California, the litigation privilege applies to any communication "(1) made in judicial or quasi-judicial proceedings; (2) by litigants or other participants

authorized by law; (3) to achieve the objects of the litigation; and (4) that [has] some connection or logical relation to the action.  Cal. Civ. Code § 47(b); *Rubin v. Green*, 4 Cal. 4th 1187, 1194 (1993) (acknowledging that communications with some relation to an anticipated lawsuit are within the privilege); *Lerette v. Dean Witter Org'n, Inc.,* 60 Cal. App. 3d 573, 575, 577-78 (1976) (holding that demand letter such as that sent by defendant was "fully privileged . . . as preliminary to a judicial proceeding"; demand letter stated that, unless settlement could be reached, defendant planned to sue plaintiff for violation of federal and state securities laws and for fraud and misrepresentation).

29.     The litigation privilege is not limited to statements made during a trial or other proceedings, but may extend to steps taken prior thereto, or afterwards. *Weiland Sliding Doors & Windows, Inc. v. Panda Windows & Doors*, LLC, 814 F. Supp. 2d 1033, 1040 (S.D. Cal. 2011), *citing Action Apartment Ass'n, Inc. v. City of Santa Monica*, 41 Cal.4th 1232, 1241, 63 Cal.Rptr.3d 398, 163 P.3d 89 (Cal.2007) (internal quotations and citations omitted).

30.     The litigation privilege can apply to out-of-court statements "to nonparties who have a substantial interest in the outcome of the pending litigation." *Castaline v. Aaron Mueller Arts*, 2010 WL 583944, at *4 (N.D.Cal. Feb. 15, 2010) (internal citations and quotations omitted).

31.     The California Supreme Court has ruled that the only tort not subject to the litigation privilege is malicious prosecution.  *Silberg v. Anderson, supra*, 50 Cal.3d at p. 216; *Ribas v. Clark*, 38 Cal.3d 355, 364 (1985);  *Pacific Gas Electric Co. v. Bear Stearns Co.*, 50 Cal.3d 1118, 1132-33 (Cal. 1990).

32.     The policy of encouraging free access to the courts is so important that the litigation privilege extends beyond claims of defamation to claims of abuse of process, intentional infliction of emotional distress, negligent misrepresentation, invasion of privacy, fraud, and to the torts alleged here: interference with contract and prospective economic advantage. In fact, the privilege applies to any action

except one for malicious prosecution. *Pacific Gas Electric Co. v. Bear Stearns Co.*, 50 Cal.3d 1118, 1132-33 (Cal. 1990) (emphasis added) (Hereinafter "PG&E").

33.    Claims for Unfair Competition under California Business & Professions Code § 17200 and the Common Law are not malicious prosecution claims and therefore subject to the litigation privilege. *See PG&E, id; see also Sengchanthalangsy v. Accelerated Recovery Specialists, Inc*., 473 F. Supp. 2d 1083, 1089 (S.D. Cal. 2007) (dismissing 17200 claim on the basis of litigation privilege).

34.    Claims for Tortious Interference with Prospective and/or Contractual Economic Relations are subject to the litigation privilege. *PG&E*, 50 Cal.3d 1132-33 ("The policy of encouraging free access to the courts is so important that the litigation privilege extends beyond claims of defamation . . . to the torts alleged here: interference with contract and prospective economic advantage.").

35.    Claims for abuse of process, are expressly ruled to be subject to the litigation privilege. *PG&E*, 50 Cal.3d 1132-33 ("The policy of encouraging free access to the courts is so important that the litigation privilege extends beyond claims of defamation to claims of abuse of process. . . .").

36.    Claims for Slander of Title/Trade Libel [Count V (sic)], are not the same as malicious prosecution, and are subject to the litigation privilege. *See PG&E*, 50 Cal.3d 1132-33 ("In fact, the privilege applies to any action except one for malicious prosecution.").

37.    Courts have expressly ruled that the litigation privilege bars claims for slander of title. *See Bighorn Capital, Inc. v. Sec. Nat'l Guaranty, Inc*., Case No: C15-03083 SBA, at *6 (N.D. Cal. Dec. 29, 2015) (dismissing slander of title claim based on litigation privilege).

38.    Courts have barred recovery for trade libel based on the litigation privilege. *See I & U, Inc. v. Publishers Sols. Int'l*, 652 F. App'x 558, 2-3 (9th Cir. 2016) (unpublished, affirming dismissal of trade libel claim based on litigation privilege).

39.    In the context of a patent assertion, Courts in California have ruled that the litigation privilege prohibits essentially all tort claims against the patent holder. *Visto Corp. v. Sproqit Technologies, Inc.*, 360 F. Supp. 2d 1064, 1065 (N.D. Cal. 2005).

### F.  Preemption of Tort Claims by Patent Law

40.    Federal Circuit law governs whether federal patent law preempts a state law claim. *Ultra-Precision Mfg., Ltd. v. Ford Motor Co*., 411 F.3d 1369, 1376 (Fed. Cir. 2005) (*citing Midwest Indus., Inc. v. Karavan Trailers, Inc*., 175 F.3d 1356, 1361 (Fed. Cir. 1999)).

41.    Tort claims under state law are not preempted by federal patent law where they include additional elements not found in federal patent law claims. *Dow Chemical Co. v. Exxon Corp*., 139 F.3d 1470, 1473 (Fed. Cir. 1998).

42.    To determine whether these state law torts are in conflict with federal patent law and accordingly preempted, the Court assess a defendant's allegedly tortious conduct. If a plaintiff bases its tort action on conduct that is protected or governed by federal patent law, then the plaintiff may not invoke the state law remedy, which must be preempted for conflict with federal patent law. Conversely, if the conduct is not so protected or governed, then the remedy is not preempted. *Hunter Douglas Inc. v. Harmonic Design*, 153 F.3d 1318, 1335 (Fed. Cir. 1998).

43.    The Federal Circuit provides *Noerr* immunity from state-law liability based on the Petition Clause and federal patent law preemption. *See Globetrotter Software, Inc. v. Elan Computer Grp., Inc.*, 362 F.3d 1367, 1377 (Fed. Cir. 2004). (*citing Coastal States Mktg., Inc. v. Hunt*, 694 F.2d 1358, 1367 (5th Cir. 1983); *A.D. Bedell Wholesale Co. v. Philip Morris, Inc.*, 263 F.3d 239, 252-53 (3d Cir. 2001); *Primetime 24 Joint Venture v. Nat' Broad. Co*., 219 F.3d 92, 100 (2d Cir. 2000); *McGuire Oil Co. v. Mapco, Inc.*, 958 F.2d 1552, 1560 (11th Cir. 1992)).

44.    A patent holder must be allowed to inform potential infringers of infringing activity so long as the infringement claim is made without objective bad

STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW IN SUPPORT OF NICOR'S MOT. FOR SUMM. J. OF INFRINGEMENT

faith. *Globetrotter Software, Inc. v. Elan Computer Grp., Inc.*, 362 F.3d 1367, 1377 (Fed. Cir. 2004) *(citing Virtue v. Creamery Package Mfg. Co.,* 227 U.S. 8, 37-38 (1913).).

Dated:  April 25, 2023

Respectfully submitted,

LOZA & LOZA, LLP.

By: *Lena Bacani*

Lena N. Bacani

Attorneys for Plaintiff NICOR, Inc.

STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW IN SUPPORT OF NICOR'S MOT. FOR SUMM. J. OF INFRINGEMENT