1  David A. Randall (SBN 156722)
2  dave@orbitip.com
   Ehab M. Samuel (SBN 228296)
3  esamuel@orbitip.com
   Thomas J. Brindisi (SBN 175587)
4  tom@orbitip.com
   ORBIT IP, LLP
5  10900 Wilshire Blvd., Suite 300
   Los Angeles, CA 90024
6  Tel.:  (310) 887-1333
   Fax:  (310) 887-1334
7

8  *Attorneys for SourceBlue, LLC and*
9  *Infinilux Corporation*

10              **UNITED STATES DISTRICT COURT**
11             **CENTRAL DISTRICT OF CALIFORNIA**
                      **WESTERN DIVISION**
12

| | |
|---|---|
| 13  NICOR, INC.,<br>              Plaintiff,<br>14<br>15  v.<br>16  SOURCEBLUE, LLC f/k/a<br>17  TURNER LOGISTICS, LLC<br>18              Defendant.<br>19  Consolidated for all purposes with:<br>20<br>21  INFINILUX CORPORATION<br>              Plaintiff,<br>22<br>23  v.<br>24  NICOR, INC.,<br>25              Defendant.<br>26 | CASE Nos.: 2:21-cv-05876-AB(PDx) and<br>2:21-cv-5300-AB(PDx)<br><br>**SOURCEBLUE, LLC'S AND INFINILUX CORPORATION'S OPPOSITION TO NICOR'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>Honorable André Birotte Jr.<br>Ctrm:  7B, 350 West 1st Street,<br>Los Angeles, CA 90012<br>Hearing Date: May 26, 2023<br>Hearing Time:  10:00 a.m.<br><br>Complaint Filed:  May 14, 2021<br>Trial Date:  August 8, 2023 |

27

28

**TO THE COURT, THE PARTIES, AND COUNSEL OF RECORD:**

**PLEASE TAKE NOTICE** that on May 26, 2023, at 10:00 a.m. or as soon thereafter as the matter may be heard, in Courtroom 7B of the Ronald Reagan United States Courthouse, located at 350 West First Street, Los Angeles, California, SourceBlue LLC ("SourceBlue") and Infinilux Corporation ("Infinilux") (collectively, "the SourceBlue Parties") will and do move the Court to deny NICOR, Inc.'s Motion for Partial Summary Judgment (Dkts. 107 & 119, "NICOR's MPSJ")[1] and, on the ground that there is no genuine issue as to any material fact, instead find that the SourceBlue Parties are entitled to summary judgment, or alternatively, summary adjudication as to one or more of the claims raised in NICOR's MPSJ under Federal Rule of Civil Procedure 56(f).

NICOR's first claim for relief for infringement of the '427 patent fails, and the SourceBlue Parties are entitled to summary judgment, for the following reasons:

1. The SourceBlue Parties' Accused RDCC Products do not infringe the asserted claims of the '427 patent, literally or under the doctrine of equivalents, because the RDCC products do not include the following elements recited in the asserted claims:

   a. AC Mains Power Inputs;

   b. First and Second Terminal Blocks;

   c. Controller Connected to the Terminal Block;

   d. Simultaneous Distribution of Normal and Emergency Power;

   e. DC Power Output Cable; or

   f. Ability To "Provide Control."

---

[1] By the SourceBlue Parties' count, NICOR's MPSJ brief comprises 7,384 words (not including Figures and their captions or annotations), despite L.R. 11-6.1's 7,000-word limit; and it lacks the Certification required by L.R. 11-6.2.

2. The SourceBlue Parties do not indirectly infringe the '427 patent for the reasons set forth in Infinilux's Motion for Partial Summary Judgment, and because, no matter how connected by other parties, the RDCC cannot "provide control" of applications as recited in the asserted claims.

NICOR's second claim for relief against the SourceBlue Parties' state tort claims based on Litigation Privilege defense fails, and the SourceBlue Parties are entitled to summary judgment, for the following reasons:

1. NICOR failed to meet its burden in applying the four-factor test for litigation privilege;

2. NICOR's statements and conduct are not privileged;

3. NICOR statements and conduct are not reasonably related to the action for a legitimate purpose; and

4. NICOR cannot establish honest belief that NICOR had a viable legal claim or that NICOR seriously proposed or contemplated litigation against SourceBlue and Infinilux.

NICOR's third and fourth claims for relief against the SourceBlue Parties' state tort claims based on preemption, First Amendment and the Petitioning Clause fail, and the SourceBlue Parties are entitled to summary judgment, for the following reasons:

1. State tort claims directed to fraudulent conduct before the USPTO or have rendered the application process a sham are not preempted;

2. State tort claims based on publicizing a patent in the marketplace where the patentee acted in bad faith are not preempted; and

3. SourceBlue Parties have alleged and will offer evidence of NICOR's bad faith and fraudulent conduct.

1    Counsel for the parties have met and conferred as required by L.R. 7-3.  While

2    counsel engaged in a meaningful discussion, they were unable to reach a resolution

3    eliminating the need for this motion. This motion is therefore made following the

4    conference of counsel, which took place on April 14, 2023.

5    This motion will be based on this Notice of Motion and Motion, the

6    accompanying Memorandum of Points and Authorities, the accompanying

7    Declaration of David A. Randall in support, the concurrently-filed Statement of

8    Material Facts in Response to NICOR's Amended Statement of Uncontroverted

9    Facts, the [Proposed] Order; the pleadings and papers on file in this matter, and the

10   arguments of counsel at the hearing on this motion.

11

12

13

14                                    Respectfully submitted,

15   DATED:  May 8, 2023            ORBIT IP, LLP

16                                    By:  /s/ Ehab M. Samuel

17                                    David A. Randall (SBN 156722)
                                     Ehab Samuel (SBN 228296)
18                                    Thomas J. Brindisi (SBN 175587)

19
                                     *Attorneys for SourceBlue, LLC and*
20                                    *Infinilux Corporation*

21

22

23

24

25

26

27

28

1

## TABLE OF CONTENTS

2

I.      INTRODUCTION ........................................................................................... 1

II.     BACKGROUND ............................................................................................. 1

III.    ARGUMENT ................................................................................................. 3

      A.      The SourceBlue Parties Are Entitled to Summary Judgment of No Infringement ...................................................................................................... 3

        1.   The SourceBlue Parties Do Not Provide the Claimed System [1A] ......... 3

        2.   The Accused RDCC Products Have No Normal or Second Mains AC Power Inputs (Claim Elements [1E], [1F]) ......................................... 4

        3.   No "Terminal Block Configured on the Normal Power Side to Accept Normal Mains AC Power Input and Distribute Normal DC Power at Constant Current" (Claim Element [1I]) ..................................... 5

        4.   The RDCC Lacks the Second Terminal Block Element (Claim Element [1J]) ................................................................................... 9

        5.   No Controller Connected to the Terminal Block Wherein the Controller Controls (Claim Element [1K]) ................................................ 9

        6.   The Terminal Block Limitations [1I] and [1K] Require a Particular "Configuration" Rather Than Mere Capability ........................................ 9

        7.   The RDCC Does Not Include a "Cable Provided from Said Distributed DC Power Output System" and Cannot "Provide Control" (Claim Element [1L]) .............................................................. 12

        8.   The Accused RDCC Products Lack a "Barrier Separating" the Normal and Emergency Power Sides (Claim Element [1C]) ................. 15

        9.   Dependent Claims 2-7 ................................................................................ 15

      B.      The SourceBlue Parties Are Entitled to Summary Judgment Against NICOR on its Litigation Privilege Defense ......................................................... 15

        1.   NICOR Fails to Apply the Four-Factor Test for Litigation Privilege ..... 15

2.   NICOR's Statements to Nonparticipants Are Not Privileged Nor Is
Its Tortious Conduct ................................................................ 16

3.   NICOR's Conduct Is Not Reasonably Related to the Action for a
Legitimate Purpose ................................................................ 18

4.   No Evidence Supporting Honest Belief That NICOR Had a Viable
Legal Claim or That NICOR Seriously Proposed or Contemplated
Litigation Against SourceBlue and Infinilux ........................................... 19

5.   NICOR's Cases Are Readily Distinguishable ........................................ 21

C.       SourceBlue Parties' State Law Claims Are Not Preempted or Barred .... 22

IV.   CONCLUSION ............................................................................ 24

# TABLE OF AUTHORITIES

## CASES

*Acco Brands, Inc. v. ABA Locks Mfrs. Co. Ltd.*, 501 F.3d 1307 (Fed. Cir. 2007) .... 10

*Action Apartment Assn, Inc. v. City of Santa Monica*, 41 Cal.4th 1232 (2007) .. 16, 19

*Ball Aerosol and Specialty Container, Inc. v. Limited Brands, Inc.*, 555 F.3d 984
(Fed. Cir. 2009) ..................................................................................... 10

*Bighorn Capital, Inc. v. Sec. Nat'l Guaranty, Inc.*, C 15-03083 SBA,
2015 WL 9489897 (N.D.Cal. Dec. 29, 2015) ........................................ 21

*BLM Prods. v. Covves, LLC*, 2:17-cv-06224 RGK, 2017 U.S. Dist. LEXIS 222229
(C.D.Cal. Oct. 26, 2017)......................................................................... 23

*Code Rebel, LLC v. Aqua Connect, Inc.*, CV-13-4539 RSWL, 2013 U.S. Dist.
LEXIS 137937 (C.D.Cal. Sept. 24, 2013).............................................. 23

*Convolve, Inc. v. Compaq Computer Corp.*, 812 F.3d 1313 (Fed. Cir. 2016) ........ 6, 7

*Dow Chem. Co. v. Exxon Corp.*, 139 F.3d 1470 (Fed. Cir. 1998)............................ 22

*Duncan Parking Techs. v. IPS Grp.*, 914 F.3d 1347 (Fed. Cir. 2019) ..................... 14

*Eisenberg v. Alameda Newspapers, Inc.*, 74 Cal.App.4th 1359 (2000) ................... 20

*Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushi Co.*, 535 U.S. 722 (2002) ........ 8, 14

*Globetrotter Software Inc. v. Elan Computer Grp., Inc.*,
362 F.3d 1367 (Fed. Cir. 2004) ....................................................... 22, 23

*Glovia Int'l Inc. v. La Cie Ltd.*, CV 09-00408 SJO (RZx),
2009 WL 10672325 (C.D.Cal. June 30, 2009)...................................... 21

*Golan v. Pingel Enter., Inc.*, 310 F.3d 1360 (Fed. Cir. 2002).................................. 22

*Golden Eye Media USA, Inc. v. Trolley Bags UK Ltd.*, 525 F. Supp.3d 1145

   (S.D.Cal. 2021) .................................................................................... 22

*Herzog v. "a" Co.*, 138 Cal.App.3d 656 (1982) ................................ 18, 20

*Huawei Techs. Co. Ltd. v. Verizon Comm'ns, Inc., 2:20-cv-00030-JRG, 2021 WL*

   *150442 (E.D. Tex. Jan. 15, 2021)* ...................................................... 9

*Hunter Douglas v. Harmonic Design*, 153 F.3d 1318 (Fed. Cir. 1998). .................. 22

*I & U, Inc. v. Publishers Sols. Int'l*, 652 F.App'x 558, 559 (9th Cir. 2016) ............. 21

*In re Varma*, 816 F.3d 1352 (Fed. Cir. 2016) ....................................... 6, 7, 8

*Lerette v. Dean Witter Org.*, 60 Cal.App.3d 573 (1976) ................................ 18

*Lockheed Martin Corp. v. Space Sys./Loral, Inc.*, 324 F.3d 1308 (Fed.Cir. 2003) ... 14

*MM&R Prods. v. Stitch N'Genius, Inc.*, CV 09-4082-VBF,

   2009 U.S. Dist. LEXIS 141212 (C.D. Cal. Sept. 10, 2009) ....................... 22

*Nuance Commc'ns, Inc. v. MModal LLC*, 17-1484-MN-SRF,

   2018 U.S. Dist. LEXIS 216709 (D.Del. Dec. 27, 2018) ........................... 23

*Nutri-Metics Int'l, Inc. v. Carrington Labs.*, 981 F.2d 1259,

   1992 WL 389246 (9th Cir. 1992) ................................................. 18, 20

*P6 LA MF Holdings SPE, LLC v. Shekhter*, 738 F.App'x 563 (9th Cir. 2018) .. 19, 20

*Pacific Gas Electric Co. v. Bear Stearns Co.*, 50 Cal.3d 1118, 1138 n.12 (1990) .... 21

*Premier Commc'ns Network v. Fuentes*, 880 F.2d 1096 (9th Cir. 1989) ................. 19

*Rothman v. Jackson*, 49 Cal. App.4th 1134 (1996) ................................ 17, 19

*Salazar v. AT&T Mobility LLC*, 2023 U.S. App. LEXIS 8071,

   65 F.4th 1311 (Fed. Cir. April 5, 2023) ........................................ 6, 7, 8

*Sengchanthalangsy v. Accelerated Recovery Specialists, Inc.*,

473 F.Supp.2d 1083 (S.D. Cal. 2007) ...................................................... 21

*Silberg v Anderson*, 50 Cal.3d 205 (1990) ........................................ 17, 21

*Southwall Techs., Inc. v. Cardinal IG Co.*, 54 F.3d 1570 (Fed.Cir. 1995)............... 12

*Visto Corp. v. Sproqit Techs. Inc.*, 360 F. Supp.2d 1064 (N.D. Cal. 2005) ............. 21

*Zenith Elec. Corp. v. Exzec, Inc.*, 182 F.3d 1340 (Fed. Cir. 1999) .......................... 23

S<span>TATUTES</span>

35 U.S.C. § 103 ............................................................................................. 23

35 U.S.C. § 112 ............................................................................................. 23

# I.   INTRODUCTION

To obtain the asserted claims, NICOR submitted a preliminary amendment with a new set of claims sixteen months after filing its non-provisional application. The new claims—which were directed at the SourceBlue Parties' accused RDCC— were filed within three weeks of NICOR obtaining draft installation instructions for the accused RDCC product and completely shifted the focus of what was being claimed in the application. NICOR obtained the instructions from its distributor after SourceBlue had provided the information for Facebook's consideration. Despite attempting to draft claims covering the RDCC product, the RDCC does not infringe any of the extensively amended claims. NICOR's constructions are inconsistent with the plain language and intrinsic evidence. Even if the Court accepts NICOR's proposed construction, the RDCC lacks claim elements, and therefore, cannot infringe literally or under the doctrine of equivalents.  Indeed, application of the doctrine of equivalents is a question of law amenable to summary judgment, and here its application is precluded by NICOR's amendment of the asserted claims during prosecution. Therefore, the SourceBlue Parties are entitled to summary judgment of noninfringement.

NICOR's challenges to the SourceBlue Parties' state law claims fare no better.  NICOR failed to establish the elements of the litigation privilege defense.  It has not shown how its challenges applied to all the tortious conduct alleged. The state law claims rely on allegations that NICOR's conduct was made in bad faith to disparage and harm its competitor.  The Federal Circuit and district courts have repeatedly held that the additional element of bad faith precludes litigation privilege and preemption of these kinds of tort claims by the Patent Act.

# II.   BACKGROUND

Facebook has several lighting and electrical specifications ("Facebook Specifications") that contractors must comply with. *See* SourceBlue's and

1    Infinilux's Statement of Material Facts in Response to NICOR's Amended

2    Statement of Uncontroverted Facts ("SMF)" at ¶80. NICOR and the SourceBlue

3    Parties indirectly compete to supply lighting systems for Facebook's data centers,

4    and each developed their lighting control units (LCU) to meet the Facebook

5    Specification. *Id.*, ¶81. An LCU is a device containing power supply drivers used to

6    remotely supply power to light fixtures. *Id.*, ¶82. In 2017, NICOR developed its

7    LCU remote driver unit and filed a provisional patent application, No. 62/576,877

8    on October 25, 2017.  *Id.*, ¶83. NICOR and the SourceBlue Parties competed to

9    provide the lighting systems for Facebook's data center in New Albany, Ohio

10    designated as NAO3. On or about January 9, 2020, after the SourceBlue Parties had

11    submitted their proposal for NAO3, Mr. Rocklan Lawrence, NICOR's President and

12    CEO, asked for SourceBlue Parties' bid materials, including the accused Solidian®

13    RDCC product installation instructions. *Id.*, ¶84. NICOR's distributor then emailed

14    Mr. Lawrence a copy of draft installation instructions for the Solidian® lighting

15    system. *Id.*, ¶85.

16        On January 27, 2020, with the benefit of the SourceBlue Parties' materials,

17    NICOR filed a preliminary amendment to its pending patent application, introducing

18    newly drafted patent claims 21-27. *Id.*, ¶86. NICOR did not disclose to the patent

19    office SourceBlue Parties' installation instructions or the Facebook Specification. *Id.*

20    ¶87. NICOR later withdrew its original claims, and its new claims issued as claims

21    1-7 in the '427 patent. *Id.*, ¶88. NICOR amended and narrowed its new claims to

22    overcome two rejections by the Patent Examiner for obviousness. *Id.*, ¶89. NICOR

23    added a new limitation to its independent claim requiring two AC mains but did not

24    disclose that this limitation was already a requirement in the Facebook Specification,

25    or that Facebook was already using the recited configuration in its data centers. *Id.*,

26    ¶90.

27

28

The '427 patent issued on November 3, 2020. *Id.*, ¶91. On November 12, 2020, NICOR's counsel sent a letter to Turner Logistics (SourceBlue) asserting that the Solidian® RDCC infringed the newly issued '427 patent. *Id.*, ¶92. The letter also accused SourceBlue of intentionally copying NICOR's lighting fixtures. *Id.*, ¶93. NICOR's counsel copied Turner Construction, Cupertino Electric, Inc., Environmental Systems Designs, Inc., and Facebook. *Id.*, ¶94.

When NICOR sent its letter, Facebook was considering adding the SourceBlue Parties' lighting fixtures and RDCC products to the master lighting specification for datacenter projects. *Id.*, ¶96. But NICOR's letter crippled the SourceBlue Parties' ability to get their products on Facebook's master specification and damaged their reputation. *Id.*, ¶97.

SourceBlue promptly responded to NICOR's letter. *Id.*, ¶98. SourceBlue explained that the terminal blocks NICOR identified as those recited in the claims do not meet the limitations requiring that each terminal block be "configured…to accept mains AC power input and distribute… DC power at constant current." *Id.*, ¶99. NICOR did not respond until March 11, 2021, when it asserted a new infringement theory. *Id.*, ¶100.  As explained in Infinilux's Motion for Partial Summary Judgment (Dkt. 105 at 4), NICOR has now changed its infringement theory at least three times, evincing NICOR's inability to establish infringement and bad faith conduct in support of SourceBlue Parties' state law claims.

## III.   ARGUMENT

**A. The SourceBlue Parties Are Entitled to Summary Judgment of No Infringement**

### 1.   The SourceBlue Parties Do Not Provide the Claimed System [1A]

The system [1A] of claim 1 requires a fully installed and operational lighting system having a distributed DC power output system [1B] in which two separate AC mains inputs [1E], [1F] are connected to the normal side and emergency side

terminal blocks [1I], [1J], respectively. SMF, ¶106. Claim 1 also requires an application (e.g., an LED light fixture) to be connected to the DC power output system of claim 1 via a cable and controlled by the controller within the distributed DC power output system that forms part of the system of claim 1. *Id.*, ¶¶106-08. It is undisputed that the SourceBlue Parties do not provide such a system. *Id.*, ¶¶109-12.

### 2. The Accused RDCC Products Have No Normal or Second Mains AC Power Inputs (Claim Elements [1E], [1F])

The normal and second mains AC power inputs of claim elements [1E] and [1F] are power cables delivering 120-277 Volts AC mains power. SMF, ¶113. This is field wiring that is part of the building electrical system that must be connected to the RDCC products when they are installed. *Id.*, ¶114. Until NICOR's present motion, NICOR and its Expert agreed. *Id.*, ¶¶115-16, 122. In pre-suit correspondence and its pleadings, NICOR identified the claimed mains AC power inputs [1E], [1F] as the building's AC mains power cables shown in the Figure below. *Id.*, ¶115.



The above construction is consistent with the intrinsic record. SMF, ¶117. When sold, offered for sale, and imported, the accused RDCC products have no

normal or second mains AC power input. *Id.*, ¶118. Nor can they. *Id.*, ¶119. Thus, the SourceBlue Parties cannot directly infringe claim 1.

Contrary to its clear judicial admissions, its expert's opinions, and the intrinsic record, NICOR now asserts that the knock-out openings shown in Figure 2 of its MSJ are the claimed mains AC power inputs. Dkt. 119 at 7. Not only does an opening not conduct AC voltage at 120-277 volts AC, but openings cannot connect to the claimed terminal blocks (claim elements [1I], [1J]), as is required by those elements of claim 1. SMF, ¶120-21. Dr. Schubert also admitted that the knock-out openings shown in Figure 2 of NICOR's MSJ are to allow the mains AC power cables to be routed and connected to their respective terminal block within the RDCC and are not the claimed mains AC power inputs. *Id.*, ¶122.

Further, there are no uncovered openings when an RDCC product is imported or shipped to a Facebook datacenter. *Id.* ¶123. "Knock-outs," by definition, are closed by a knock-out plug or cover plate when the RDCC products are made and imported. *Id.*, ¶123-25. An installer would need to determine which knockouts/plates should be opened at the time of installation. *Id.*, ¶125. Accordingly, the accused products do not satisfy claim elements [1E], [1F] under either party's construction.

### 3. No "Terminal Block Configured on the Normal Power Side to Accept Normal Mains AC Power Input <u>and</u> Distribute Normal DC Power at Constant Current" (Claim Element [1I])

Regardless of the construction, the accused products do not satisfy the normal side terminal block limitation. The crux of the claim construction dispute is whether the normal side terminal block element [1I] requires one terminal block configured to both (1) accept normal mains AC power input, <u>**and**</u> (2) distribute normal DC power at constant current, or whether it is sufficient to have separate terminal blocks

perform each function.[2] NICOR contends a correct claim construction would encompass one terminal block performing one function and another terminal block performing the other function. NICOR is wrong. Its proposed construction violates Federal Circuit precedent and would vitiate the claim limitation.

The Federal Circuit has repeatedly rejected claim construction similar to what NICOR now advances. *See, e.g., Salazar*, 2023 U.S. App. LEXIS 8071, at *4-14 (conducting extensive review of Federal Circuit cases construing "a" and holding the district court properly interpreted "a microprocessor for generating . . . , said microprocessor creating . . . , a plurality of parameter sets retrieved by said microprocessor . . . , said microprocessor generating . . ." to mean "one or more microprocessors, at least one of which is configured to perform the generating, creating, retrieving, and generating functions."); *Convolve, Inc. v. Compaq Computer Corp.*, 812 F.3d 1313, 1321 (Fed. Cir. 2016) (construing "a processor" to require a single processor to work with a claimed user interface in performing all of the claim steps due to the reference back to "the processor"). In *In re Varma*, 816 F.3d 1352 (Fed. Cir. 2016), the Federal Circuit reversed the PTAB's holding that "a statistical analysis request corresponding to two or more selected investments" could be satisfied even if two statistical analysis requests were required to analyze the "two or more selected investments. *Id.* at 1362-63. In reversing the Board's decision, the Court explained:

> [T]he question is whether "a" can serve to negate what is required by
> the language following "a": a "request" (a singular term) that

---

[2] Although the SourceBlue Parties include "single" in their proposed construction, the SourceBlue Parties recognize that the claimed system can include multiple terminal blocks on the normal side; however, at least one of them must be configured to accept normal mains AC power input **and** distribute normal DC power at constant current. *See, e.g., Salazar v. AT&T Mobility LLC*, 2023 U.S. App. LEXIS 8071, at *4-9, 65 F.4th 1311 (Fed. Cir. April 5, 2023).

"correspond[s]" to "two or more selected investments." It cannot. For a dog owner to have "a dog that rolls over and fetches sticks," it does not suffice that he have two dogs, each able to perform just one of the tasks. In the present case, no matter how many requests there may be, no matter the variety of the requests the system may receive, the system must be adapted to receive a request that itself corresponds to at least two investments.

*Id.* at 1363.

Similar to *Salazar* and *Convolve,* the claims here repeatedly refer back to "the terminal block" as a reference to the normal side terminal block. SMF, ¶127. Further, "terminal block" is a singular term as in *Varma*. *Id.*, ¶105. Accordingly, the claims themselves dictate that a single "terminal block" be configured to perform both of the recited functions in the terminal block element. *Id.* In addition, the claimed terminal block also must have a controller connected to the terminal block as specified in element [1K]. *Id.*, ¶¶105, 127.

The intrinsic record supports the SourceBlue Parties' construction. *Id.*, ¶131. The '427 patent Fig. 4 embodiment discloses a single terminal block 435 that has AC mains power in, DC power out, and a controller connected to it. *Id.*, ¶132. On the other hand, the Fig. 9 embodiment of the patent only shows a terminal block 945 having AC mains power in and a separate terminal block 970 for 0-10 Volt control signals. *Id.*, ¶133. No terminal block for DC power out, much less DC power out at a constant current is shown or described in connection with Fig. 9. *Id.*, ¶134.

The prosecution history also supports it. *Id.*, ¶135. In its preliminary amendment, NICOR added new claims 21-27, which eventually became claims 1-7 of the '427 patent. *Id.*, ¶136. Claim 21 included the claim element "a terminal block configured to distribute normal power." *Id.* ¶137. Meanwhile, its dependent claim 22 claimed "a [second] terminal block configured to receive mains power on the normal

power side." *Id.*, ¶138. But in response to the Examiner's rejection, NICOR amended claim 21 to combine the terminal blocks and their respective functions into a single terminal block:

> a terminal block configured to accept mains AC power input and distribute normal DC power at constant current;

*Id.*, ¶139. NICOR also touted the advantages of the claimed terminal block with its combined configuration to perform two functions and argued that the prior art does not disclose such terminal block. *Id.*, ¶140-41. NICOR also argued over the prior art that a single terminal block cannot be broken into sub terminal blocks. *Id.*, ¶142. Because NICOR's amendment narrowed the claim scope, prosecution history estoppel precludes application of the doctrine of equivalents. *See Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushi Co.*, 535 U.S. 722, 740-41 (2002).

Now NICOR ignores the claim language itself, the teachings of the specification, the prosecution history, and binding Federal Circuit precedent to arrive at its unreasonable claim construction. As *Varma* emphasized¸ "[f]or a dog owner to have 'a dog that rolls over and fetches sticks,' it does not suffice that he have two dogs, each able to perform just one of the tasks." 816 F. 3d at 1363. NICOR is attempting to confuse the Court and have two dogs each able to perform just one task. But "[h]ere it does not suffice to have multiple [terminal blocks], each able to perform just one of the recited functions; the claim language requires at least one [terminal block] cable of performing each of the recited functions." *See Salazar*, 2023 U.S. App. LEXIS 8071, at *15. Accordingly, the RDCC products do not satisfy claim element [1I] literally or under the doctrine of equivalents.  Even under NICOR's construction, part of the RDCC's terminal block is on both the normal and emergency side, thus failing to satisfy this limitation. SMF, ¶143.

### 4. The RDCC Lacks the Second Terminal Block Element (Claim Element [1J])

The second terminal block element [1J] is also configured to perform two-recited functions. SMF, ¶105. For the same reasons discussed above, the RDCC products do not satisfy this claim element literally or under the doctrine of equivalents. *See supra* III.A.3. NICOR's proposed construction vitiates the claim language and attempts to end run prosecution history estoppel. Its infringement theory—based on multiple terminal blocks each configured to perform a separate function—improperly rewrites the term "configured" to "capable of being configured" to perform one of the recited functions. *See Huawei Techs. Co. v. Verizon Comm'ns, Inc.*, 2:20-cv-00030-JRG, 2021 WL 150442, *18 (E.D. Tex. Jan. 15, 2021) (rejecting patentee's claim construction for "configured to" as denoting a mere capability to perform a recited function but not in a state to perform that function).

### 5. No Controller Connected to the Terminal Block Wherein the Controller Controls (Claim Element [1K])

Claim element [1K] requires a "controller controls at least one [LED lighting] application." SMF, ¶105. Because the sold/delivered RDCC is not connected to any light fixture, the LMRC Controller does not control any light fixtures. *Id.*, ¶145-46. Thus, the SourceBlue parties do not directly infringe. This element is also not satisfied by the RDCC because the 0-10V dimming control signals of the LMRC controller are not connected to the terminal block of claim element [1I]. *Id.*, 147-48.

### 6. The Terminal Block Limitations [1I] and [1K] Require a Particular "Configuration" Rather Than Mere Capability

The claim language specifies a particular configuration for the terminal block limitation on the normal and emergency power sides, rather than mere capability. Specifically, element [1I] requires a terminal block **configured** on the normal power side to receive the mains AC power input and distribute normal DC power, while

element [1K] requires a second terminal block on the emergency power side **configured** to receive a second mains AC power input and distribute emergency DC power. SMF, ¶105. There is no claim language qualifying "configured" that suggests mere capability satisfies these elements. Where, as here, the claim language requires a particular configuration rather than drawn to capability, a showing that a product is "capable of" infringement is insufficient to support a finding of infringement. *Ball Aerosol and Specialty Container, Inc. v. Limited Brands, Inc.*, 555 F.3d 984, 994-95 (Fed. Cir. 2009) (explained that the patent required a "particular configuration" of elements rather than mere capability of operation and "remand[ed] to the court with instructions to issue a summary judgment of noninfringement.")

Here, the claimed terminal blocks are required to be configured to operate in a manner that meet their respective functions at the same time for there to be infringement. Because mere capability does not satisfy the terminal block limitations, NICOR "must either point to specific instances of direct infringement or show that the accused device necessarily infringes the patent in suit." *Id.* NICOR has not identified anyone that has used the RDCC product in an infringing manner. Further, [b]ecause the accused device can be used at any given time in a noninfringing manner, the accused device does not necessarily infringe the [] patent." *Acco Brands, Inc. v. ABA Locks Mfrs. Co. Ltd.*, 501 F.3d 1307, 1313 (Fed. Cir. 2007).

Here, each side of the accused RDCC is indifferent as to the type of AC power it receives, so long as it is 120-277 volts AC. *Id.*, ¶149. Assuming an RDCC is connected per Facebook's Specifications, during normal operation, it would receive normal mains AC power through both the normal and emergency power cables. *Id.*, 150. In such instance, the power distribution terminal blocks on the normal and emergency sides are **configured to receive normal mains AC power and distribute normal mains AC power**. *Id.*, 151. This normal AC power is then

converted to normal DC power by the power supply drivers on the emergency and normal power sides, respectively. *Id.*, ¶152. Consequently, during the RDCC's normal operation, the normal power and the emergency power LED light fixture distribution terminal blocks are **configured to receive and distribute normal DC power** on the normal and emergency sides, respectively. *Id.*, ¶153. The emergency power LED light fixture distribution block cannot distribute emergency power during normal operation of the Facebook lighting system. *Id.*, ¶154. Thus, the RDCC products do not infringe claim 1 during normal operation.

The Accused RDCC products also do not infringe during emergency operation.[3] If normal power fails, a switch upstream of the emergency power input for the RDCC switches the emergency power circuit over to emergency AC power from normal AC power. *Id.*, ¶155. Emergency AC power is then delivered to the emergency power distribution block of the RDCC via the emergency power cable. *Id.*, ¶156. However, no AC power is transmitted to the RDCC's normal power side. *Id.*, ¶157. As a result, during a power failure, the normal power distribution block is ***not configured*** (i.e., not in a state) to receive and distribute normal mains AC power. *Id.*, ¶158. Likewise, during power failure, the normal power LED light fixture distribution block ***cannot*** receive or distribute normal DC power. *Id.*, ¶159. Further, during power failure, the RDCC's LMRC controller does not control any application because there are no normal AC mains transmitted to the normal power side. *Id.*, ¶160.

Accordingly, the RDCC Products are never configured to distribute normal DC power and emergency DC power simultaneously from the normal and emergency LED light fixture distribution blocks as claimed. *Id.*, ¶161. Nor can the RDCC's LMRC controller control at least one application when the emergency LED

---

[3] NICOR has introduced no evidence that any RDCC product installed in a Facebook datacenter has undergone emergency operation.

light distribution block is configured to distribute emergency DC power. *Id.*, ¶162. Thus, the RDCC does not infringe literally or under the doctrine of equivalents.

### 7. The RDCC Does Not Include a "Cable Provided from Said Distributed DC Power Output System" and Cannot "Provide Control" (Claim Element [1L])

The RDCC does not include any cable provided from a distributed DC power output system. SMF, ¶¶163-64. To the contrary, neither SourceBlue nor Infinilux has ever sold or otherwise provided an RDCC to a customer with a cable (or wires) for distributing DC power output, nor has either ever even *separately* sold or provided such a cable (or wires) to a customer for use with an RDCC. SMF, ¶165. This undisputed fact forecloses a finding of direct infringement by either of the SourceBlue parties and mandates a finding of no direct infringement in their favor.

To avoid this missing limitation, NICOR simply declares: "the plain and ordinary meaning of the claim language ***does not require that Defendants provide the cable***." Motion at 15:20-22 (emphasis added). *But see Southwall Techs., Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1575 (Fed.Cir. 1995) ("To establish literal infringement, every limitation set forth in a claim must be found in an accused product, exactly."). Citing diametrically contradictory evidence,[4] NICOR omits the "cable provided from" part of the limitation and asserts it indisputable that literal infringement of the limitation by the Accused Product need not require meeting the limitation. Motion at 15:24-27; SMF, ¶169.

---

[4] This citation followed other misrepresentations. SMF, ¶¶166-68.

1    NICOR's infringement reports similarly can only point to *blocks*, *conduits*

2    (i.e., hollow tubes), and *knockouts* (i.e., holes) in lieu of "cables." SMF, ¶170.

3    ³ The middle opening is covered by a removable cover plate that is attached to the case by means of four (4) screws.

  

**Cable opening for normal AC input power**      **Cable opening for normal DC output power**      **Cable openings for emergency AC input and DC output power**

Figure caption: INFX-SB 004175, INFX-SB 004176 and INFX-SB 004177, excerpted and annotated.

What NICOR's expert points out in RDCC for the claims' recited "cable"

15    NICOR argues that something could be connected to the RDCC outputs (by a

16   third party) in place of the missing recited cable, and further that a POSA would use

17   the terms "cable" and "wire" interchangeably. Motion at 15:12-19. NICOR provides

18   no rationale or evidence for such an interpretation, however, and regardless, is

19   incorrect. SMF, ¶182.

20    Additionally, NICOR never alleges or even suggests that the RDCC "can

21   ***provide control* and** the DC power … via the cable," as the claim requires. A POSA

22   would understand that the '427 patent uses the term "control" to mean the sending of

23   control *signals*, which when received are interpreted and acted upon to effect

24   changes in the operation of connected applications, e.g., "lighting systems, heating

25   and cooling systems, emergency alert systems, security systems and the like." SMF

26   ¶¶171, 173. A POSA would not have understood the '427 patent's Fig. 9

27   embodiment disclosure to teach or suggest that such a device can provide control

28

-13-

1  signals to connected applications via the same current *powering* the applications.
2  SMF ¶172. A POSA further would have understood that any control *signals* sent
3  from such a device to connected applications must be sent *separately* from the
4  device's supply of power to the applications. *Id.*

5       The RDCC cannot output any control signals. SMF, ¶174. No matter what is
6  connected to its output—it cannot provide DC power output and *control* via a cable
7  (or anything else connected to its output) as recited in the asserted claims of the '427
8  patent. SMF, ¶175.

9       Nor can the RDCC meet this limitation under the doctrine of equivalents
10 ("DOE"). The DOE "is limited by two doctrines: (1) prosecution history estoppel
11 and (2) the 'all elements' rule." *Lockheed Martin Corp. v. Space Sys./Loral, Inc.*,
12 324 F.3d 1308, 1318 (Fed.Cir. 2003). The applicability of these DOE-limiting
13 doctrines is a question of law. *Id.*

14      Prosecution history estoppel presumptively precludes application of the DOE
15 to the cable limitation, which NICOR added by an amendment to overcome a prior
16 art rejection. SMF, ¶181; *see Festo*, 535 U.S. at 741. And NICOR's DOE analysis
17 simply ignores the claims' recited "provide control" limitation. "But the [DOE]
18 cannot be used to effectively read out a claim limitation." *Duncan Parking Techs. v.*
19 *IPS Grp.*, 914 F.3d 1347, 1362 (Fed.Cir. 2019).

20      Regardless, even if the DOE applies, NICOR fails to apply the function-way-
21 result test to the "provide control" element of the cable limitation.  Indeed, no
22 equivalence analysis could plausibly deem the mere outputting of a selected level of
23 DC power by the RDCC to an application to perform substantially the same function
24 SMF ¶178, in substantially the same way SMF ¶179, or with substantially the same
25 results SMF ¶180, as the claimed "provide control" function. SMF ¶¶176-77. Thus,
26 the RDCC does not infringe the cable limitation either literally or under the DOE.

27
28

SOUCEBLUE PARTIES' OPPOSITION
TO NICOR'S MPSJ AND CROSS-MPSJ
Nos.: 2:21-cv-05876-AB(PDx) and 2:21-cv-5300-AB(PDx)

### 8. The Accused RDCC Products Lack a "Barrier Separating" the Normal and Emergency Power Sides (Claim Element [1C])

The undisputed facts establish that the normal and emergency power circuits of the Accused RDCC products are ***not separated***, rather the two circuits are connected. SMF, ¶183. This is illustrated in the annotated picture NICOR uses to establish the presence of a barrier, which is reproduced below. It is also shown in the circuit diagrams for the accused RDCC. *Id.*, ¶184. Because the partition in the Accused RDCC products does not separate the normal and emergency power sides/circuits, they lack the claimed barrier.



Figure 1   Figure caption: INFX-SB 004189, excerpted and annotated.

### 9. Dependent Claims 2-7

The SourceBlue Parties do not infringe dependent claims 2-7 for at least the same reasons claim 1 is not infringed.

### B. The SourceBlue Parties Are Entitled to Summary Judgment Against NICOR on its Litigation Privilege Defense

#### 1. NICOR Fails to Apply the Four-Factor Test for Litigation Privilege

As NICOR notes, but fails to apply, the litigation privilege protects any communication: "(1) made in judicial or quasi-judicial proceedings; (2) by litigants or other participants authorized by law; (3) to achieve the objects of the litigation; and (4) that [has] some connection or logical relation to the action." *Action*

*Apartment Assn, Inc. v. City of Santa Monica*, 41 Cal.4th 1232, 1251 (2007); *see also* Motion at 19:9-12. While NICOR refers to its "communications pertaining to assertion of its rights in the '427 Patent" (Motion at 20:17-18), it fails to establish that these communications meet the four-factor test. Indeed, the record is devoid of evidence that NICOR's communications meet all four factors, including that they were related to the litigation contemplated in good faith and under serious consideration. Thus, the SourceBlue Parties respectfully request the Court to deny NICOR's motion and grant their cross-motion against NICOR on its litigation privilege defense.

### 2. NICOR's Statements to Nonparticipants Are Not Privileged Nor Is Its Tortious Conduct

As explained above, the parties developed their respective products to conform to Facebook's lighting specifications. *See supra* II. With the benefit of the SourceBlue Parties' then confidential materials, NICOR filed a preliminary amendment to its pending patent application, introducing newly-drafted patent claims 21-27 that were intended to cover the Solidian RDCC product. *See* SMF, ¶86. NICOR did not disclose to the USPTO the Solidian RDCC materials. *Id.*, ¶87. Nor did it disclose Facebook's lighting specifications. *Id.*

After the patent issued, on November 12, 2020, NICOR's counsel sent a letter to Turner Logistics (SourceBlue) and copies to: Turner Construction, Cupertino Electric, Inc., Environmental Systems Designs, Inc., and Facebook. *Id.*, ¶¶92-94. This letter baselessly alleged that SourceBlue "intentionally *copied* NICOR's patented invention, *as well as several NICOR lighting fixtures, after obtaining access to … other equipment installed at Facebook's data center (NAO) sites*." *Id.*, ¶93. NICOR does not explain how such communication with third parties could have been protected by the litigation privilege. None of these entities are participants or litigants in the present case nor are there any witnesses from these entities that has

testified in the present case. NICOR fails to offer any evidence that these third parties had an interest in NICOR's infringement claims. Motion at 18. Hence, NICOR's communication to the third parties is not protected by the litigation privilege. *See Silberg v Anderson*, 50 Cal.3d 205, 219 (1990) (statements to "nonparticipants in the action" are not protected by the litigation privilege); *see also Rothman v. Jackson*, 49 Cal. App. 4th 1134, 1141 (1996) (same). As the California Supreme Court observed, even defamatory statements are actionable if communicated to nonparticipants to the action. *Silberg*, 50 Cal.3d at 217.

The damage caused by Ms. Bacani's demand letter was significant. At the time, Facebook was considering adding the SourceBlue Parties' products to the master lighting specification on all Facebook datacenter projects. SMF, ¶96. But NICOR's demand letter crippled the SourceBlue Parties' ability to get their products on the master specification and damaged their reputation. *Id.*, ¶97.

The SourceBlue Parties' state law claims are not merely limited to NICOR's communications alleging patent infringement. Motion at 20:17-18. They are also based on other communications (including baseless accusations on the SourceBlue Parties' light fixtures) as well as wrongful, unfair, and/or abusive conduct. Dkt. 2 at p. 20, ¶ 57; Dkt. 13 at p. 26, ¶ 56. For example, they are based, in part, on "the prosecution of patent claims directed at [the SourceBlue Parties'] RDCC unit using confidential proprietary information of Infinilux and SourceBlue." *Id*. NICOR does not explain how its conduct or communications with the USPTO are protected under the litigation privilege. The state law claims are also based, in part, on NICOR's "acts of patent misuse [] to improperly reduce or eliminate competition in the market place and interfere with the established business relationship between [the SourceBlue Parties] and/or SourceBlue's customers." *Id*. Again, NICOR does not explain how its conduct of patent misuse is protected under the litigation privilege.

Because NICOR has not shown that the litigation privilege defense protects all its conduct alleged in the state law claims, it is not entitled to summary judgment on those claims based on the privilege.

### 3. NICOR's Conduct Is Not Reasonably Related to the Action for a Legitimate Purpose

In a case cited by NICOR, the California Court of Appeal expressed an important caveat to prelitigation communication: "We recognize that the fact that a suit eventually is filed does not protect all defamatory communications made prior to the filing.  But most potential abuse of this privilege for prelitigation communications can be prevented by enforcement of the relevancy requirement …" *Lerette v. Dean Witter Org.*, 60 Cal.App.3d 573, 578 n. 6 (1976). The Court of Appeal later emphasized that "a communication not related to a potential judicial action contemplated for legitimate purposes" is not protected by the litigation privilege. *Herzog v. "a" Co.*, 138 Cal.App.3d 656, 662 (1982) (demand letter exceeded any legitimate purpose when it threatened former employee and his future employers with suit based merely upon the fact of employment); *see also Nutri-Metics Int'l, Inc. v. Carrington Labs.*, 981 F.2d 1259, 1992 WL 389246, *6 (9th Cir. 1992) (unpublished opinion) (prelitigation demand letter to competitor's supplier was not a legitimate means and cannot be used to "induce a breach of a competitor's contract in order to gain an advantage.")

Here, NICOR failed to explain how its letter communicated to the third-party nonparticipants was reasonably related to the litigation and advanced its legitimate purpose. For the litigation privilege to apply, a communicative act "must function as a necessary or useful step in the litigation process and must serve its purposes." *Id.* This requirement "cannot be satisfied by communications which only serve interest that happen to parallel or complement a party's interests in the litigation …" *Id.* Like *Nutri-Metics*, NICOR's communication to third parties was neither necessary to the

litigation nor did it serve its purpose. It casted doubt on the SourceBlue Parties'
ownership of, and right to use, their RDCC and lighting fixture products. NICOR
sought to gain an economic advantage by undermining the SourceBlue Parties'
ability to get their products on the master specification and damaging their
reputation. SMF, ¶97. It also interfered with the SourceBlue Parties' ability to meet
their legal obligations under their contracts. *Id.* Thus, NICOR's prelitigation
statements to third parties are unprotected.

Moreover, NICOR's deceptive communications with the USPTO are not
reasonably related to the action for a legitimate purpose. A mere "similarity, or even
identity, of subject matter is not a 'connection or logical relation' between litigation
and a communication," and thus, insufficient to trigger the litigation privilege.
*Rothman*, 49 Cal.App.4th at 1146. NICOR fails to explain how its communications
with the USPTO were reasonably related to the litigation and advanced its legitimate
purpose. Consequently, these communications, which is one of the bases supporting
the SourceBlue Parties' state law claims, are not privileged.

### 4. No Evidence Supporting Honest Belief That NICOR Had a Viable Legal Claim or That NICOR Seriously Proposed or Contemplated Litigation Against SourceBlue and Infinilux

"A prelitigation communication is privileged only when it relates to litigation
that is contemplated in good faith and under serious consideration…. Whether a
prelitigation communication relates to litigation that is contemplated in good faith
and under serious consideration is an issue of fact." *Action Apartment*, 41 Cal.4th at
1251; *see also Premier Commc'ns Network v. Fuentes*, 880 F.2d 1096, 1103 (9th
Cir. 1989). Where, as here, there is no evidence of good faith belief of a viable legal
claim or that the lawsuit was seriously contemplated, the litigation privilege defense
fails. *P6 LA MF Holdings SPE, LLC v. Shekhter*, 738 F.App'x 563, 565 (9th Cir.
2018) (unpublished opinion) (affirming district court's denial of a motion to strike
tortious interference and slander of title claims).

NICOR argues "[i]t is undeniable that NICOR's threat of patent litigation was made in good faith since NICOR did, in fact, bring the litigation." Motion at 23:12-14. But the filing of a lawsuit is insufficient to show that a plaintiff contemplated litigation in good faith and under serious consideration when it sent its demand letter. *Shekhter*, 738 F.App'x at 565; *see also Herzog*, 138 Cal.App.3d at 662 ("The bare possibility that the proceeding might be instituted is not to be considered as a cloak to provide immunity for defamation when the possibility is not seriously considered.") Further, NICOR has not sued on its accusation that SourceBlue Parties copied NICOR's light fixtures, and thus, offered no good faith basis for that accusation.

NICOR's attorney argument is not a substitute for evidence on summary judgment. Because NICOR failed to submit a declaration supporting its good faith contention, there is no evidence of NICOR's purported good faith belief that it had a viable legal claim or that it was seriously contemplating imminent litigation against SourceBlue and Infinilux. *See Shekhter*, 738 F.App'x at 565 (affirming denial of motion to strike because defendant failed to submit any declarations supporting honest belief); *Eisenberg v. Alameda Newspapers, Inc.*, 74 Cal.App.4th 1359, 1381 (2000) (reversing summary judgment because record contained no declarations confirming good faith).

Indeed, there can be no genuine dispute that NICOR did not contemplate suing Infinilux. NICOR did not even direct its demand letter to Infinilux nor did it initiate a lawsuit against Infinilux. SMF, ¶101. Further, the "contemplated litigation must be *imminent*." *Eisenberg*, 74 Cal.App.4th at 1379 (emphasis in original). Here, it was not imminent because it took NICOR six months to sue SourceBlue after it sent the letter. The facts support the reasonable inference that NICOR sent a copy of the letter to Facebook to induce a breach of the SourceBlue Parties' contracts and gain an economic advantage. *See Nutri-Metics*, 1992 WL 389246, *6 (prelitigation

letter was an attempt to induce a breach of a competitor's contract in order to gain an advantage). At a minimum, NICOR's failure of proof leaves issues of fact precluding summary judgment. *See Glovia Int'l Inc. v. La Cie Ltd.*, CV 09-00408 SJO (RZx), 2009 WL 10672325, *2 (C.D.Cal. June 30, 2009) (denying motion to dismiss intentional interference and unfair competition because an issue of fact existed); *Eisenberg*, 74 Cal.App.4th at 1379 (trial court erred in granting summary judgment on the basis of the litigation privilege because triable issues of fact remained).

### 5. NICOR's Cases Are Readily Distinguishable

The cases cited by NICOR are inapplicable. *Pacific Gas Electric Co. v. Bear Stearns Co.*, 50 Cal.3d 1118, 1138 n.12 (1990) ("privilege does not apply to bar liability here, … because the gravamen of the complaint was not a communication but a course of conduct."); *Silberg*, 50 Cal.3d at 217-19 (statements to "nonparticipants in the action" or "not reasonably related to the action" are not protected by the litigation privilege); *Sengchanthalangsy v. Accelerated Recovery Specialists, Inc.*, 473 F.Supp.2d 1083, 1087-89 (S.D. Cal. 2007) (applying privilege where statements were made *after* the lawsuit was initiated, and were *related* to it); *Bighorn Capital, Inc. v. Sec. Nat'l Guaranty, Inc.*, C 15-03083 SBA, 2015 WL 9489897, at *6 (N.D.Cal. Dec. 29, 2015) (basis for slander of title was a recorded *lis pendens*, which was privileged as expressly stated in California Civil Code section 47(b)(4)); *I & U, Inc. v. Publishers Sols. Int'l*, 652 F.App'x 558, 559 (9th Cir. 2016) (unpublished opinion) (letter indicated that "potential litigation was more than 'a mere possibility' and was 'contemplated in good faith and under serious consideration.'").

Finally, in *Visto Corp. v. Sproqit Techs. Inc.* the court did not grant a motion to dismiss based on the litigation privilege. 360 F. Supp.2d 1064, 1069-73 (N.D. Cal. 2005). The court observed that a determination of good faith contemplation of a

lawsuit raises "a triable issue of fact" but dismissed without prejudice on other grounds. *Id.*; *see also Golden Eye Media USA, Inc. v. Trolley Bags UK Ltd.*, 525 F. Supp.3d 1145, 1236-37 (S.D.Cal. 2021) (discussing *Visto* and denying motion for summary judgment on tortious interference and unfair competition claim based on litigation privilege because an issue of fact existed as to good faith).

**C. SourceBlue Parties' State Law Claims Are Not Preempted or Barred**

Preemption analysis involves determining whether the state law cause of action requires an extra element, not shared by the federal law, which makes it "qualitatively different" from the federal claim. *Dow Chem. Co. v. Exxon Corp.*, 139 F.3d 1470, 1473 (Fed.Cir. 1998). The Federal Circuit has adopted conflict preemption as the relevant analytical framework. *Hunter Douglas v. Harmonic Design*, 153 F.3d 1318, 1332 (Fed.Cir. 1998). This requires assessing not just the cause of action but also the "allegedly tortious conduct." *MM&R Prods. v. Stitch N'Genius, Inc.*, CV 09-4082-VBF, 2009 U.S. Dist. LEXIS 141212, *13 (C.D.Cal. Sept. 10, 2009) (quoting *Hunter Douglas*, 153 F.3d at 1334).

In *Hunter Douglas*, the Federal Circuit concluded that there are two types of conduct where federal patent law does not preempt state tort claims. *Id.* at 1336-37. The first is for state claims based on fraudulent conduct before the USPTO or that have rendered the application process a sham. *Id.* The second is for state claims based on publicizing a patent in the marketplace where the patentee acted in bad faith. *Id.* More recently, the court explained: "our decision to permit state-law tort liability for only objectively baseless claims rests on both federal preemption and the First Amendment." *Globetrotter Software Inc. v. Elan Computer Grp.*, 362 F.3d 1367, 1377 (Fed. Cir. 2004) (re: First Amendment right to petition government). As described above, both types of conduct are present here. *See supra* II & III.B.2.

The bad faith standard includes both objective and subjective components. *Golan v. Pingel Enter., Inc.*, 310 F.3d 1360, 1371 (Fed. Cir. 2002). Objective bad

faith requires a showing that the infringement allegations were "objectively baseless." *Id.*; *see also Zenith Elec. Corp. v. Exzec, Inc.*, 182 F.3d 1340, 1354 (Fed. Cir. 1999) ("Obviously, if the patentee knows that the patent is invalid, unenforceable, or not infringed, but represents in the marketplace that a competitor is infringing the patent, a clear case of bad faith is made out."). Subjective bad faith focuses on whether a patentee uses enforcement activity as a weapon against competitors. *Globetrotter*, 362 F.3d at 1375; *see also Nuance Commc'ns, Inc. v. MModal LLC*, 17-1484-MN-SRF, 2018 U.S. Dist. LEXIS 216709, *6 (D. Del. Dec. 27, 2018) (bad faith focuses on "whether the baseless lawsuit conceals an attempt to interfere directly with the business relationships of a competitor."). District courts have followed those precedents, allowing tort claims to proceed where bad faith is alleged. *See, e.g., Code Rebel, LLC v. Aqua Connect, Inc.*, CV-13-4539 RSWL, 2013 U.S. Dist. LEXIS 137937, *9 (C.D.Cal. Sept. 24, 2013); *BLM Prods. v. Covves, LLC*, 2:17-cv-06224 RGK, 2017 U.S. Dist. LEXIS 222229, *17 (C.D.Cal. Oct. 26, 2017).

Here, the SourceBlue Parties have alleged facts showing NICOR's claims were both objectively baseless and brought to interfere with SourceBlue's business relationships. First, the SourceBlue Parties alleged that the asserted claims are invalid, among others, under 35 U.S.C. §§ 103 and 112. SMF, ¶102. Second, the SourceBlue Parties alleged that NICOR originally accused it of infringement based on out-of-date draft installation instructions that NICOR obtained surreptitiously and then used to try to draft claims that would cover SourceBlue Parties' product for its pending patent application. *Id.*, ¶103. NICOR's infringement position in its letter, copied to nonparticipant third parties, was "false, objectively unreasonable, and untenable." *Id.*, ¶104. It also cast doubt on the SourceBlue Parties' ownership of, and right to use, their own lighting fixture products—none of which is accused of patent infringement. *Id.*, ¶97. Finally, Infinilux alleged that in pre-suit

correspondence, it explained why NICOR's "terminal block" arguments are baseless, yet NICOR made the same arguments when it sued SourceBlue. *Id.*, ¶185. These allegations are all incorporated into Infinilux's state tort claims. *Id.* at ¶186. Infinilux further alleged that NICOR falsely informed SourceBlue and its customer that the '427 Patent was valid and infringed by the RDCC unit to dissuade the customer from using the RDCC products. *Id.* at ¶187.

Thus, the SourceBlue Parties' state law tort claims are not preempted or barred, and material issues of fact—with respect to NICOR's conduct before the USPTO and its knowledge that its patent is invalid and not infringed by the RDCC product—preclude summary judgment for NICOR on these claims.

## IV.   CONCLUSION

Based on the foregoing, the Court should deny NICOR's motion and grant the SourceBlue Parties' cross-motion. Due to the lack of evidence of direct infringement by anyone, and the RDCC's inability to directly infringe no matter how it is used, summary judgment of no direct or indirect infringement is appropriate. Further, because NICOR's prelitigation communication to third parties tortiously casted doubt on the SourceBlue Parties' ownership of, and right to use, their RDCC and lighting fixture products, as well as tarnished their reputation, its statements were not privileged, preempted, or barred.

DATED:  May 8, 2023                   ORBIT IP, LLP

By:  /s/ Ehab M. Samuel
David A. Randall (SBN 156722)
Ehab Samuel (SBN 228296)
Thomas J. Brindisi (SBN 175587)

*Attorneys for SourceBlue, LLC and
Infinilux Corporation*

1

## **Certification of Compliance with C.D. Cal. L.R. 11-6.2**

2     The undersigned, counsel of record for SourceBlue LLC and Infinilux

3  Corporation, certifies that this brief contains 6996 words, which complies with the

4  word limit of L.R. 11-6.1.

5

6   May 8, 2023                                    */s/ Ehab M. Samuel*

7                                                     Ehab M. Samuel

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28