Lena N. Bacani (SBN 213556)
lena.bacani@lozaip.com
LOZA & LOZA, LLP
305 N. Second Ave., Ste. 127
Upland, CA 91786
Telephone: (877) 406-5164
Facsimile: (213) 394-3625

Gordon E. Gray (SBN 175209)
geg@grayiplaw.com
THE GRAY LAW FIRM
4401 N. Atlantic Blvd., 2nd Fl.
Long Beach, CA 90807
Tel: (562) 984-2020

Attorneys for Plaintiff,
NICOR, INC.

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| NICOR, INC.,<br><br>                    Plaintiff,<br><br>v.<br><br>SOURCEBLUE, LLC, f/k/a TURNER LOGISTICS, LLC,<br><br>                    Defendant. | Case No. 2:21-cv-05876-AB-PDx<br><br>**NICOR'S OPPOSITION TO INFINILUX'S MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>Hon. André Birotte, Jr.<br><br>Hearing Date:  May 26, 2023<br>Time:  10:00 a.m.<br>Courtroom:  7B |
| INFINILUX CORPORATION<br><br>                    Plaintiff,<br><br>v.<br><br>NICOR, INC.<br><br>                    Defendant. | |

## TABLE OF CONTENTS

**PAGE**

I.   INTRODUCTION……………………………………………….  1

II.   LEGAL STANDARD……………………………………..  2

III.   A GENUINE DISPUTE OF MATERIAL FACT EXISTS REGARDING
DEFENDANTS' INDIRECT INFRINGEMENT OF THE '427
PATENT………………………………………………………..  2

    A.   DIRECT EVIDENCE SHOWS DEFENDANTS KNEW OF THE
"427 PATENT"……………………………………………  2

    B.   DIRECT EVIDENCE SHOWS DEFENDANTS KNEW PROVIDING
THE ACCUSED PRODUCT TO CUSTOMERS WOULD INFRINGE
THE '427
PATENT……………………………………………….. 4

        1.   DEFENDANTS INSTRUCTED CUSTOMERS ON HOW
TO INSTALL AND USE THE ACCUSED PRODUCT   4

        2.   DEFENDANTS' NONINFRINGEMENT ARGUMENTS
RELY ON AN OVERLY NARROW CLAIM
CONSTRUCTION OF "TERMINAL
BLOCK"………………………………………….. 5

    C.   THERE ARE NO SUBSTANTIAL NON-INFRINGING USES FOR
THE ACCUSED
PRODUCTS…………………………………………..   9

IV.   EVIDENCE IS SUFFICIENT TO CREATE A GENUINE DISPUTE
OF MATERIAL FACT REGARDING NICOR'S STATE TORT
CLAIMS………………………………………………..   10

    A.   NICOR'S TORT CLAIMS ARE NOT PREEMPTED BY PATENT
LAW………………………………………….   10

    B.   A GENUINE DISPUTE OF MATERIAL FACT EXISTS
REGARDING DEFENDANTS' INTENTIONAL INTERFERENCE

i

WITH NICOR'S PROSPECTIVE ECONOMIC
RELATIONS…………………………………….……..         12

1.    NICOR HAS SHOWN IT HAD AN ECONOMIC RELATIONSHIP
WITH FACEBOOK AND CUPERTINO ELECTRIC AND THAT IT
HAD A REASONABLE EXPECTATION THAT THE
RELATIONSHIP WOULD CONTINUE……………………         13

2.    DEFENDANTS KNEW OF NICOR'S RELATIONSHIPS WITH
FACEBOOK AND CUPERTINO ELECTRIC………………         15

3.    DEFENDANTS INTENTIONALLY AND WRONGFULLY
DISRUPTED NICOR'S ECONOMIC RELATIONSHIPS…..   16

4.    DEFENDANTS DISRUPTED NICOR'S ECONOMIC
RELATIONSHIPS WITH FACEBOOK AND CUPERTINO
ELECTRINC AND NICOR WAS HARMED AS A RESULT..16

C.    A GENUINE DISPUTE OF MATERIAL FACT EXISTS
REGARDING DEFENDANTS' UNFAIR COMPETITION….17

V.    SUMMARY JUDGMENT ON LOST PROFITS IS INAPPROPRIATE
BECAUSE NICOR OFFERS SUBSTANTIAL EVIDENCE SUPPORTING
THE PANDUIT FACTORS………………………………………….         18

A.    NICOR'S TORT CLAIMS ARE NOT PREEMPTED BY PATENT
LAW……………………………………………………….         18

B.    NICOR HAS SUBSTANTIAL EVIDENCE THAT THERE ARE NO
ACCEPTABLE NON-INFRINGING ALTERNATIVES TO ITS
PATENTED NICIR LCU…………………………………         18

C.    NICOR IS ENTITLED TO RECOVER ITS LOST PROFITS DUE
TO LOST SALES OF NICOR INTERNATIONAL…………         19

D.    NICOR IS ENTITLED TO RECOVER LOST PROFITS FOR NAO3
AND LCO DATACENTERS ON ITS IIPER CLAIM……….   20

VI.    CONCLUSION…………………………………………………         22

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anderson v. Liberty Lobby, Inc.*,
477 U. S. 242 (1986) ..................................................................................... 2

*Asahi Kasei Pharma Corp. v. Actelion Ltd.*,
222 Cal.App.4th 945 (2013) ......................................................................... 21

*C.R. Bard Inc. v. AngioDynamics, Inc.*,
979 F.3d 1372 (Fed. Cir. 2020) ...................................................................... 4

*Callaway Golf Company v. Acushnet Company*,
691 F. Supp.2d 566 (D. Del. 2010) .............................................................. 19

*Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.*
(1999) 20 Cal.4th 163 ................................................................................... 21

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) ........................................................................................ 2

*Dow Chemical Co. v. Exxon Corp.*,
139 F.3d 1470 (Fed. Cir. 1998) .................................................................... 10

*Grupe v. Glick*
(1945) 26 Cal.2d 680 ..................................................................................... 20

*Herd v. City of Fontana*,
5:17-CV-02545-ABSPX, 2019 WL 7841080 (C.D. Cal. Dec. 2,
2019) ................................................................................................................. 2

*Hunter Douglas Inc. v. Harmonic Design*,
153 F.3d 1318 (Fed. Cir. 1998) .................................................................... 11

*Inventist, Inc. v. Ninebot, Inc.*,
Civil Action 3:16-cv-5688-BJR (W.D. Wash. Jan. 18, 2023) ...................... 20

*Kaufman v. Microsoft Corp.*,
34 F.4th 1360 (Fed. Cir. 2022) ....................................................................... 8

*Kids' Universe v. In2Labs*,
95 Cal.App.4th 870 (Cal. Ct. App. 2002) ..................................................... 20

*Presidio Components, Inc. v. Am. Technical Ceramics Corp.*,
    702 F.3d 1351 (Fed. Cir. 2012) ............................................................ 18

*Reeves v. Hanlon*,
    33 Cal. 4th 1140 (2004) ......................................................................... 13

*Soremekun v. Thrifty Payless, Inc.*,
    509 F.3d 978 (9th Cir. 2007) ................................................................... 2

*Sybersound Records, Inc. v. UAV Corp.*,
    517 F.3d 1137 (9th Cir. 2008) ............................................................... 12

*Ultra-Precision Mfg., Ltd. v. Ford Motor Co.*,
    411 F.3d 1369 (Fed. Cir. 2005) ............................................................. 10

*Western Union Financial Services, Inc. v. First Data Corp.*,
    20 Cal.App.4th 1530 (1993) .................................................................. 12

*Wireless v. Solid Inc.*,
    No. 5:14-cv-03750-PSG (N.D. Cal. Sep. 16, 2015) ............................... 19

**Statutes**

35 U.S.C. §271(a) .......................................................................................... 4

35 U.S.C. §271(b) ...................................................................................... 3, 4

35 U.S.C. § 271(c) ......................................................................................... 9

35 U.S.C. §284 ............................................................................................. 20

Cal. Bus. & Prof. Code § 17044 ................................................................. 12

Cal. Bus. & Prof. Code §17200 .................................................................. 17

Cartwright Act ............................................................................................. 12

Code §17043 .......................................................................................... 12, 21

Unfair Practices Act ..................................................................................... 16

Unfair Practices Act (Cal. Bus. & Prof. Code §§ 17043 and 17044) ............ 1, 11, 17

**Other Authorities**

CACI 3903N ................................................................................................. 20

1

Fed. R. Civ. P. 56(c) ................................................................................................. 2

2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

NICOR'S OPP'N TO INFINILUX'S MOT. FOR PARTIAL SUMM. J.

# I.   **INTRODUCTION**

Infinilux's motion for partial summary judgment ("Inf-MSJ") of: (1) no liability for indirect infringement; and (2) no liability for state tort claims and certain types of damages (Dkt. 109-1), should be denied because there exist genuine issues of material fact on these issues.

NICOR brought this action to stop Defendants' infringement of NICOR's U.S. Patent No. 10,824,427 ("the '427 Patent"). NICOR installed its patented LCU product ("NICOR LCU") in several Facebook datacenters and later learned Defendants copied it after their own product was rejected by Facebook.[1]

Infinilux argues that NICOR has no evidence that Defendants knew providing their Solidian® RDCC system ("Accused Product") to customers would cause them to infringe the '427 Patent. However, emails produced by Defendants show SourceBlue: (i) obtained access to NICOR's LCU installed in a Facebook datacenter; (ii) opened it up to take detailed photographs of its components and structure; and (iii) sent those photographs to Infinilux so that it could create Defendants' Accused Product which is nearly identical to NICOR's LCU. Defendants did this despite the fact that SourceBlue's pictures clearly showed that NICOR's LCU was "PATENT PENDING." This and other evidence create a genuine issue of material fact as to whether Defendants indirectly infringed.

Infinilux's argument that NICOR has insufficient evidence to create a triable issue of fact for its state tort claims is similarly incorrect. Documents produced by Defendants show they conspired to interfere with NICOR's supply contracts and went so far as to sell the Accused Product at a loss in order to do so, in violation of the Unfair Practices Act (Cal. Bus. & Prof. Code §§ 17043 and 17044). Unfortunately, Defendants' efforts were successful and, as a direct and proximate

---

[1] NICOR filed a motion for partial summary judgment of literal infringement (Dkt. No. 107 and Dkt.119 (these are identical motions but Dkt. 119 includes a Corrected/Amended Statement of Undisputed Fact ("SUF").). NICOR will cite to Dkt. 119 in this brief for clarity.

result, NICOR suffered significant monetary damages, including loss of profits that NICOR would have received from supplying the Facebook datacenters. Because Defendants' wrongful conduct goes beyond their infringement of NICOR's '427 Patent, NICOR's state tort claims are not preempted by U.S. Patent Law. Therefore, Infinilux's motion should be denied in its entirety.

## II.    LEGAL STANDARD

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact, and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). To survive summary judgment, there must be evidence sufficient to allow a reasonable jury to return a verdict in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U. S. 242, 248 (1986).  The "Court must draw all reasonable inferences in the nonmoving party's favor." *Herd v. City of Fontana,* 5:17-CV-02545-ABSPX, 2019 WL 7841080, at *2 (C.D. Cal. Dec. 2, 2019) (citing *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010)).

"In judging evidence at the summary judgment stage, the court does not make credibility determinations or weigh conflicting evidence." *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007). "Rather, it draws all inferences in the light most favorable to the nonmoving party." *Id*.

## III.    A GENUINE DISPUTE OF MATERIAL FACT EXISTS REGARDING DEFENDANTS' INDIRECT INFRINGEMENT OF THE '427 PATENT
### A. Direct evidence shows Defendants Knew of the "427 Patent"

Infinilux argues that "[t]here is no evidence that either SourceBlue or Infinilux learned of the '427 patent before [NICOR's November 12, 2020 demand letter]." (Inf-MSJ, Dkt. 109-1 at 4.)  Infinilux's statement is false. As detailed below, there is evidence that Defendants were aware of NICOR's patent earlier and intentionally violated it.

Defendants have produced multiple emails describing how Defendants blatantly copied NICOR's LCU.  (NICOR's Disputed Statement of Fact in support of this Opposition to Inf-MSJ ("DSUF") at ¶¶ 113-120.)  As one example, a November 18, 2019 email from Turner Construction Company (the General Contractor on the Facebook NAO3 site and parent company of SourceBlue) to SourceBlue's manager, Michael Verbeek, explained how "[w]e are trying to get the LCU layout from the jobsite Team and have to redesign the RDCC."  (DSUF at ¶¶116-117 ("We went off NICOR's design for the box but it seems like they did it because they had 2 different power supplies…").)  Defendants had to redesign the RDCC system (the Accused Product) after it had been rejected by Facebook. (DSUF at ¶ 112.)

Additional documents show SourceBlue gained access to NICOR's LCU installed at Facebook datacenter NAO1/2, opened it up to take detailed pictures of its structure, and sent those pictures and layouts to Infinilux so it could copy them to create its Accused Product. (DSUF at ¶¶ 113-119.)  Infinilux admits that the Accused Product is just like the patented NICOR LCU.[2]  (DSUF at ¶ 115.)

While Defendants may argue that simply copying another's product does not satisfy the knowledge requirement of 35 U.S.C. §271(b), NICOR has additional evidence to establish its claim.  Emails produced by Defendants show that SourceBlue's pictures of the NICOR LCU not only detailed the device's structure, but also captured the installation instructions taped to its inside cover.  (DSUF at ¶¶ 119-120.)  The labels gave express notice that NICOR's LCU was "PATENT PENDING."  (*Id.*)  Therefore, there exists a genuine dispute as to the date Defendants learned of the '427 patent.

---

[2] The Accused Product literally infringes the '427 Patent for the reasons outlined in NICOR's Motion for Partial Summary Judgment ("NICOR-MSJ," Dkt. 119; Schubert Supp. Expert Report at Dkt. 119-2).

NICOR'S OPP'N TO INFINILUX'S MOT. FOR PARTIAL SUMM. J.

## B. <u>Direct evidence shows Defendants Knew Providing the Accused Product to Customers Would Infringe the '427 Patent</u>

Direct infringement of a patent occurs when "whoever without authority makes, uses, offers to sell, or sells any patented invention, within the United States or imports into the United States any patented invention during the term of the patent." 35 U.S.C. §271(a). "[W]here an alleged infringer designs a product for use in an infringing way and instructs others to use the product in an infringing way, there is sufficient [circumstantial] evidence for a jury to find direct infringement." *C.R. Bard Inc. v. AngioDynamics, Inc.,* 979 F.3d 1372, 1379 (Fed. Cir. 2020) (quoting *Toshiba Corp. v. Imation Corp.,* 681 F.3d 1358, 1365 (Fed. Cir. 2012)). "Whoever actively induces infringement of a patent shall be liable as an infringer." 35 U.S.C. §271(b).

### 1. *Defendants Instructed Customers on How to Install and Use the Accused Product*

As discussed in Section III.A. above, Defendants knew that NICOR's LCU was "patent pending" but copied it anyway to create their Accused Product. Defendants sold the Accused Product to Turner Construction for installation into the Facebook datacenters even *after* they learned that NICOR's '427 Patent had issued and were notified the Accused Product infringed. (DSUF at ¶¶ 122-123.)

As detailed in NICOR's MSJ (Dkt. 117), the Accused Product literally infringes the asserted claims of the '427 Patent. Defendants have argued that they do not *directly* infringe because they do not sell the Accused Product with cables and/or wires necessary to connect it to AC power or to the LED light fixtures. However, Defendants cannot deny that they sell the Accused Product and LED light fixtures specifically designed to connect to the Accused Product via a wire or cable. (DSUF at ¶¶1 128-129.) Defendants also cannot dispute that the Accused Product must be connected to AC power and LED light fixtures in order to work (i.e., provide lighting in the datacenters). (DSUF at ¶¶127-129.)

Defendants do not simply provide the Accused Product and compatible light fixtures for the customer's installation and use. Defendants also provide detailed Installation Instructions directing users to make these connections. (DSUF at ¶¶131-132.) In addition, there is evidence that the Accused Products were actually installed at NAO3, NAO5/6 and other Facebook datacenters. (DSUF at ¶130.)

For these reasons, there is a genuine dispute of material fact regarding whether Defendants knew that providing the Accused Product to customers would cause those customers to directly infringe the '427 Patent.

### 2. Defendants' noninfringement arguments rely on an overly narrow claim construction of "terminal block"

Defendants argue that they could not have known their customers' use of the Accused Product infringed because Defendants have consistently alleged they lack the claimed "terminal block element and the controller element." (Inf-MSJ at 4.) However, as detailed in NICOR's MSJ seeking summary judgment of literal infringement (Dkt. 119), Defendants' noninfringement arguments fail because they are entirely based on Defendants' overly narrow and improper construction of the claimed "terminal block." Defendants' expert, Richard Moss, testified:

> Q I hope so. Okay. And looking at -- going back up to page 7, does the RDCC disclosed there have a second terminal block configured on the emergency power side to accept second mains AC power input and distribute emergency DC power at constant current?
>
> A No.
>
> Q And why is that?
>
> A Because they're not combined into a single terminal block. They're scattered around separately.
>
> Q And is that the basis of your opinion finding that this claim element is not present in the RDCC?
>
> A Correct.

(Dkt 119-2 (NICOR's Amended SUF) at ¶47; Moss Rough Depo. Tr. 195:16-196:3.)

It is indisputable that the Accused Product has a controller.  (Dkt. 119-2 at ¶50, citing to Moss Rough Depo. Tr. at 130:19-25, 198:13-199:4 (Accused Product has a Legrand LMRC-212, LMRC-213, or similar controller and that the LMRC is connected to the terminal block).)  Defendants' argument that it is missing depends entirely on Defendants' incorrect construction of "terminal block."  Under the proper claim construction, there can be no dispute that the Accused Product[3] satisfies every claim limitation of Claim 1 of the '427 Patent, either literally or under the doctrine of equivalents, as detailed in NICOR's MSJ (Dkt. 119) at 4-15.  That analysis will not be repeated here.

Defendants argue that NICOR's pre-suit identification of the claimed terminal blocks, which were based on the RDCC Installation Instructions available before the lawsuit was filed, "morphed over time."  (Inf-MSJ at 6.)  Contrary to Defendants' assertion, NICOR has consistently held that the Accused Product – the RDCC system -- has the terminal blocks recited in the asserted claims of the '427 Patent.[4]  Dr. Schubert identified additional subblocks making up the claimed "terminal block" in both his initial and supplemental expert reports.  (Dkt. Nos. 119-4 at 9-10, 30-36; Dkt. 119-5 at 4-5, 39-43.)  Dr. Schubert based his opinion on RDCC installation instructions and his physical inspection of the Accused Product obtained during discovery.  (*Id*. at 6.)  This information was not available to NICOR at the time of NICOR's demand letter or Complaint, but was always available and known to Defendants.  Therefore, Defendants cannot reasonably argue that they did not know the Accused Product included the claimed terminal

---

[3] The Accused Product is the Solidian® RDCC system (excluding the three configurations that Defendants contend are sold with only normal power drivers and no emergency power drivers: RDCC1.1220000, RDCC1.2110000 and RDCC1.2220000. (Dkt. 119 at 5, fn. 1; SUF (Dkt. 119-2) at ¶ 18, 24, 25; Dkt. 119-6 (Moss Rebuttal Report), ¶ 190.)

[4] At the time of NICOR's pre-suit demand letter, NICOR had only the 2019 version of the RDCC Installation Instructions, which Defendants claimed did not correspond to the actual product. (Case No. 2:21-cv-05300, Dkt. 10-3 at Ex. D-0180.)  NICOR did not obtain access to later versions of the Installation Instructions and the Accused Product itself, until discovery.  (Bacani Decl. ISO Opp'n to Inf-MSJ at ¶ 3.)

NICOR'S OPP'N TO INFINILUX'S MOT. FOR PARTIAL SUMM. J.

blocks.  At the very least, Defendants' knowledge is a disputed fact that must be resolved by the fact finder, and not on summary judgment.

Moreover, Dr. Schubert's opinion is not a new theory requiring amendment of NICOR's pleadings.   NICOR's early infringement contentions disclosed that the claimed "terminal block" on the normal and emergency sides may be made up of *multiple terminal blocks*.  (Case. No. 2:21-cv-05300, Dkt. 10-3 at Ex. D-0180 at 1 ("A person of ordinary skill in the art will understand that the RDCC Product's Normal Power LED Light Fixture Distribution Block, shown on page 5a of the Instructions, forms part of the claimed Terminal Block and outputs DC power at constant current."). This understanding was, and is, consistent with the express disclosure in the '427 Patent.  (*See, e.g.,* Case No. 1:21-cv-00698, Dkt. 1, Ex. 1 ("the '427 Patent") at Fig. 9, 14:4-17.)

The '427 patent specification refers to *two* terminal blocks on the normal side, terminal block 945 and terminal block 970 as follows:

> AC mains power can be routed through **terminal block 945** which is configured to handle normal power, and terminal block 950 to handle emergency power. **Separate mains power 946 and mains power 951 can be provided to the terminal block 945** and terminal block 950 respectively. As such, terminal block 945 can be connected to the components on PCB 920 and controlled by switch 910 via driver 955, which serves as the application driver for normal power operations. Likewise, driver 960 serves as the driver for emergency power operations.
>
> Terminal block 965 serves as the terminal block for the low voltage emergency circuit. **Terminal block 970 serves as a terminal block for the low voltage normal power circuit.**

('427 Pat., 14:4-17) (emphasis added).

The use of multiple terminal blocks on each side is also entirely consistent with Dr. Schubert's infringement opinion.  (Dkt. Nos. 119-4 at 9-10, 30-36; 119-5 at 4-5, 39-43.)   A POSITA would understand that a terminal block simply provides a means of connecting two wires or cables and may consist of multiple blocks.  (*Id.*

7

1    at Dkt. 119-5 (Schubert Supp. Report) at 5; *see* Dkt. 119-8 at 82:19-22; 119-6

2    (Moss Rebutal Report) at ¶ 48.)  Defendants' own expert admits that a POSITA

3    would know that a requirement for 9 connections could be accomplished by a single

4    9-terminal block or three 3-terminal blocks.  (Dkt. 119-8 (Moss Depo. Tr.) at

5    72:11-75:14.)

6         Defendants' proposed construction is incorrect because it excludes the

7    preferred embodiment described in Figure 9 of the '427 Patent, and also NICOR's

8    own LCU product.  (Dkt 119-2 at ¶¶ 39-44.)  Any claim construction that would

9    exclude the preferred embodiment is usually incorrect. *Kaufman v. Microsoft Corp.*,

10   34 F.4th 1360, 1372 (Fed. Cir. 2022)("A claim construction that excludes a

11   preferred embodiment is rarely, if ever correct and would require highly persuasive

12   evidentiary support.").

13        Defendants' noninfringement arguments that they lack the claimed "terminal

14   blocks" and "controller" are based solely on their overly-narrow construction of

15   "terminal block" and have not changed.   (Dkt. 119-5 (Moss Depo. Tr.) at ¶¶

16   194:16-195:3; 197:22-198:12 (basing infringement opinion on fact that functions

17   are not combined in to a single terminal block).)

18        Defendants intentionally and blatantly copied NICOR's LCU, which is

19   covered under the asserted claims of the '427 Patent, to create the Accused Product

20   (Dkt 119-2 at ¶¶ 9, 44; NICOR's Disputed SUF at ¶¶ 113-115 (Infinilux has

21   "configured the RDCC as below. Its[sic] exactly the same as Nicor."), ¶¶120-121).

22   Defendants own documents show they knew the NICOR LCU was "patent

23   pending" when they copied it.  (DSUF ¶¶ 120-121.)  Evidence directed and

24   instructed customers to install the Accused Product to normal and emergency mains

25   AC power and with cable to remote LED luminaires that Defendants also provided,

26   with detailed installation instructions.  (DSUF ¶¶ 131-132.)  Indeed, it is undisputed

27   that the Accused Product was installed in several Facebook datacenters.  (DSUF ¶¶

28   130.)

For these reasons, Infinilux's MSJ must be denied because there exists a genuine dispute of material fact regarding whether Defendants knew that providing the Accused Product to customers would directly infringe the asserted claims of the '427 Patent.

### C. <u>There are No Substantial Non-Infringing Uses for the Accused Products</u>

35 U.S.C. § 271(c) states that "[w]hoever offers to sell or sells within the United States or imports into the United States a component of a patented machine, manufacture, combination or composition, or a material or apparatus for use in practicing a patented process, constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of such patent, and not a staple article or commodity of commerce suitable for substantial noninfringing use, shall be liable as a contributory infringer."

Infinilux argues that summary judgment of no contributory infringement is appropriate because Defendants allege the Accused Product has "substantial non-infringing uses." (Inf-MSJ at 8.) However, Defendants' assertion is false. Defendants base their argument on just three particular configurations of the RDCC that do not have emergency drivers to supply power to emergency LED fixtures. (*Id.*; Dkt. 119-2 at ¶ 24.) As detailed in NICOR's MSJ, these three configurations are excluded from the definition of "Accused Product" alleged by NICOR to infringe the '427 Patent. (Dkt. 119 at 5, fn. 1.) Defendants have admitted that the vast majority of RDCCs sold -- 19 out of 22 configurations -- supply both normal and emergency power. (DSUF at ¶ 135.) These are the products accused of infringing the '427 Patent and they do not have any substantially noninfringing uses.

Defendants argue they have substantial noninfringing use because the user can simply decide to connect only a portion of the box. (Bacani Decl. ISO Opp'n at Ex. 3 (Moss Depo. Tr.) at 219:13-220:5.) However, Defendants' argument lacks

NICOR'S OPP'N TO INFINILUX'S MOT. FOR PARTIAL SUMM. J.

1  merit.  It is undisputed that cost of the Accused Product varies depending on the

2  number of drivers.  (DSUF at ¶ 136.)  Defendants' argument would require the

3  customer to pay for drivers that it doesn't use because they would be there, but the

4  customer would not hook them up.  That is not a realistic assumption.  At the very

5  least, there exists a dispute of material fact regarding whether the Accused Product

6  (the vast majority of RDCCs, which have both normal and emergency drivers), has

7  a substantial noninfringing use.  Therefore, Infinilux's MSJ should be denied.

8  **IV.   EVIDENCE IS SUFFICIENT TO CREATE A GENUINE DISPUTE OF**
9  **MATERIAL FACT REGARDING NICOR'S STATE TORT CLAIMS**

10     **A. NICOR's Tort Claims Are Not Preempted by Patent Law**

11         As explained in Sections IV.B. and C, infra, NICOR's state tort claims for

12  Intentional Interference with Prospective Economic Relations and Unfair

13  Competition are based on Defendants' unlawful pricing practices and not on

14  Defendants' infringement of NICOR's '427 Patent.  While Defendants' willful

15  patent infringement is certainly wrongful, and is the subject of NICOR's MSJ (Dkt.

16  119) filed in this case, it is *not* the basis of NICOR's state tort claims.

17         As detailed in NICOR's MSJ, NICOR agrees that state tort claims brought

18  solely on the basis of patent infringement or noninfringement are preempted by

19  U.S. Patent Law.  *See, Ultra-Precision Mfg., Ltd. v. Ford Motor Co.*, 411 F.3d

20  1369, 1376 (Fed. Cir. 2005) (*citing Midwest Indus., Inc. v. Karavan Trailers, Inc.*,

21  175 F.3d 1356, 1361 (Fed. Cir. 1999)). Tort claims under state law are not

22  preempted by federal patent law where they include additional elements not found

23  in federal patent law claims. *Dow Chemical Co. v. Exxon Corp.*, 139 F.3d 1470,

24  1473 (Fed. Cir. 1998).

25         To determine whether these state law torts are in conflict with federal
26     patent law and accordingly preempted, we assess a defendant's
       allegedly tortious conduct. If a plaintiff bases its tort action on
27     conduct that is protected or governed by federal patent law, then the
       plaintiff may not invoke the state law remedy, which must be
28

preempted for conflict with federal patent law. Conversely, if the conduct is not so protected or governed, then the remedy is not preempted.

*Hunter Douglas Inc. v. Harmonic Design*, 153 F.3d 1318, 1335 (Fed. Cir. 1998).

Unlike Defendants' state law claims, which are based solely on NICOR's assertion of its '427 Patent rights,[5] and are, therefore, preempted by the Patent Act, NICOR's state tort claims against Defendants allege wrongful conduct other than Defendants' patent infringement.  (Dkt. 55 at ¶¶ 12, 15; Case No. 2:21-cv-05300, Dkt. 16 (NICOR counterclaims) at ¶¶ 12, 15.)  NICOR's state law claims are based on Defendants' unlawful bidding practices, in which Defendants obtained confidential NICOR pricing information for Facebook datacenter bids and undercut those prices, going so far as to offer the Accused Product at a dramatic loss, in order to secure the bid for Facebook datacenters NAO3, 5 and 6.  Defendants' under-cost price for the Accused Product was intentionally done to hurt NICOR and cut it out of supplying the other Facebook NAO datacenters.  (DSUF at ¶ 137.)

Defendants knew that they could make up the loss on sales of the Accused Product through their sales of the LED luminaires sold to operate with the Accused Product.  (*Id.* (explaining sells Accused Product at a loss because "our value is in the [LED] fixture, not the box.").)  Infinilux produced documents showing how it sold its Accused Product well below cost while still marking up its LED light fixtures in the same contract.  (*Id.*.)  At the time, Defendants were well aware that NICOR was supplying its patented NICOR LCU and LED light fixtures to Facebook datacenters NAO 1 and NAO2 and worked to undercut NICOR's prices and take the business away for themselves.

Defendants do not deny this conduct, but assert that it was not unlawful.  Defendants are wrong.  Such pricing practices are illegal and violate Cal. Bus. &

---

[5] (NICOR-MSJ (Dkt. 119) at 23-24.)

Prof. Code §§ 17043 and 17044 (the "Unfair Practices Act"). Section 17043 makes it unlawful to sell "sales below cost" by selling or offering to sell products at prices below the seller's cost in order to injure the competition. *See, e.g., Western Union Financial Services, Inc. v. First Data Corp.,* 20 Cal.App.4th 1530 (1993). Similarly, the Cartwright Act also bars "loss leader" sales, which are defined as sales that are: (i) below cost, (ii) to induce, promote, or encourage the purchase of other merchandise, and (iii) with the intent to injure competitors or destroy competition. Cal. Bus. & Prof. Code § 17044.

Because Defendants intentionally sold the Accused Product at a dramatic loss in order to cut NICOR out of supplying the Facebook NAO3, 5 and 6 datacenters, they have violated the Cartwright Act. This wrongful conduct is not coextensive with NICOR's patent claims and, therefore, is not preempted by U.S. Patent Law.

For these reasons, there is sufficient evidence to raise a disputed issue of material fact regarding NICOR's state tort claims against Defendants that prevents summary judgment in Defendants' favor.

**B. <u>A Genuine Dispute of Material Fact Exists Regarding Defendants' Intentional Interference with NICOR's Prospective Economic Relations</u>**

Infinilux's MSJ repeatedly and incorrectly states that NICOR has presented no evidence in support of each element of its claim for intentional interference with prospective economic relations ("IIPER"). (Inf-MSJ at 8-9.) Infinilux's statement is false.

To prevail on its IIPER claim, NICOR must show: (1) an economic relationship between the plaintiff and some third party, with the probability of future economic benefit to the plaintiff; (2) the defendant's knowledge of the relationship; (3) intentional acts on the part of the defendant designed to disrupt the relationship; (4) actual disruption of the relationship; and (5) economic harm to the plaintiff proximately caused by the acts of the defendant. *Sybersound Records, Inc.*

*v. UAV Corp.*, 517 F.3d 1137, 1151 (9th Cir. 2008) (citing *Korea Supply Co. v. Lockheed Martin Corp*., 29 Cal. 4th 1134, 1153, 131 Cal.Rptr.2d 29, 63 P.3d 937 (2003)). To prevail on its summary judgment motion, Infinilux must show there is no dispute of material fact with respect to at least one of these elements.

### 1. NICOR has shown it had an economic relationship with Facebook and Cupertino Electric and that it had a reasonable expectation that the relationship would continue

Infinilux asserts that "NICOR has not presented any evidence that NICOR has an economic relationship with Facebook with probability of future economic benefit to NICOR." (Inf-MSJ at 9.) To the extent Infinilux is asserting that NICOR must show a direct contractual relationship with Facebook to prevail on its IIPER claim, it is mistaken. All that is required for IIER is evidence of an economic relationship, not a direct contractual relationship. *See, e.g., Reeves v. Hanlon*, 33 Cal. 4th 1140, 1152 (2004) ("[A]n interference with an at-will contract properly is viewed as an interference with a prospective economic advantage, a tort that similarly compensates for the loss of an advantageous economic relationship but does not require the existence of a legally binding contract.").

NICOR has produced documents and testimony detailing the economic relationship with Facebook, as well as Cupertino Electric, and the economic benefits NICOR has received from the relationships. (*See, e.g.,* Dkt. 98-6 (NICOR 01811606-607 (spreadsheet of NICOR sales revenue by Facebook datacenter); Dkt. 98-8 through 98-11 (NICOR price quotes to customer for supply of NICOR products to Facebook datacenters); Dkt. 98-12 (Lawrence Depo. Tr. at 66:19-24, 67:23-68:13).) NICOR submitted its price quotations to distributors, such as National Electric or Loeb, that in turn submitted bids to Facebook's electrical subcontractor, Cupertino Electric, to supply NICOR's lighting products, including the NICOR LCU, to Facebook for installation and use in Facebook's NAO datacenters. (*Id.*) Facebook awarded the contract to Cupertino and it is undisputed

that NICOR supplied its patented NICOR LCU and light fixtures to the Facebook NAO1 and NAO2 datacenters.  (DSUF at ¶138.)  It is also undisputed that NICOR received revenue for supplying these datacenters.  (DSUF at ¶139.)

There is also evidence showing that NICOR's would have continued to supply its products to the other Facebook datacenters at NAO3, 5 and 6.  NICOR was added to Facebook's approved alternate specification.  (DSUF at ¶140.)  Because NICOR was on the approved list and had been selected to provide its LCU and light fixtures on NAO1 and NAO2, NICOR had a reasonable expectation that it would continue to provide its products for NAO3, NAO5 and NAO6, which were Facebook's datacenters at the same Albany, Ohio location as NAO 1 and 2.  Direct evidence shows that once a manufacturer is chosen to supply a particular Facebook site, the manufacture does not change absent some drastic circumstance in order to keep uniformity in the products installed at the same location.  (DSUF ¶ 141.)  Ms. Pendyala, deponent for third party Alfatech, testified:

> Q.· ·So just because you were substituted for a project, an earlier project at the same location, ·doesn't mean that you're automatically approved for a later project at the same location?
>
> A.:  Not necessarily but 90 percent of the time it's assumed that it's already approved.  But there's a process we need to make sure that happens.
>
> Q.:  And when does it not happen?
>
> A.:  Never.
>
> Q.:  You just said 90 percent?
>
> A.:  90 percent of the time it's – I mean, when – the process is – always happens.  But it's already assumed that the substitution package, which is approved on a prior –prior building, will be on the next building.  Unless they – unless in between they lose a UL listing, which is a requirement, or something happens and we have to say no.  Typically, it is assumed that it will be approved, but the process always happens.

(Bacani Decl. ISO Opp'n to Inf-MSJ, Ex. 4 (Depo. Tr. Rohini Pendyala at 74:24-75:16).)

Therefore, there exists a dispute of material fact regarding this element of NICOR's IIPER claim.

### 2. *Defendants knew of NICOR's relationships with Facebook and Cupertino Electric*

Contrary to Infinilux's assertions, there is direct evidence that Defendants knew of NICOR's economic relationship with Facebook and intentionally took steps to disrupt that relationship. (*See, e.g.,* Bacani Decl., Ex. 24 (INFX-SB-033827).)  Indeed, Defendants' own documents show they knew NICOR had supplied its products to Facebook through Cupertino for the NAO datacenters and were intent on replacing NICOR.  (DSUF at ¶ 142- 143 (INFX-SB 009232-33).)

In addition, as detailed in Section III.A. supra, Defendants knew that NICOR's products were installed in Facebook datacenter NAO1 and NAO2 (or "NAO1-2") when they opened one up, took detailed pictures of the inside components and structure, and copied it to make their Accused Product.   Infinilux copied the NICOR LCU to create the Accused Product so that Defendants could take over supplying Facebook datacenter NAO3 from NICOR.  (Bacani Decl., Ex. 26 (INFX-SB-140133 ("Would rather not approach NICOR yet until we know exactly what we are doing with them….Would rather be rid of them completely if we can.")).)

In addition, Infinilux's assertion that it had no knowledge that NICOR was originally chosen to supply NICOR's LCU and lighting fixtures at the NAO5 and NAO6 Facebook datacenter is contrary to factual assertions Infinilux made in its own Complaint.  (Case No. 2:21-cv-05300, Dkt. 2 at ¶ 13 ("Facebook had originally specified the NICOR lighting system for NAO5 and NAO6, but subsequently Facebook chose the Solidian® lighting system over the NICOR lighting system for NAO5 and NAO6.").)  Therefore, there exists a dispute of material fact regarding this element of NICOR's IIPER claim.

NICOR'S OPP'N TO INFINILUX'S MOT. FOR PARTIAL SUMM. J.

### 3. Defendants intentionally and wrongfully disrupted NICOR's economic relationships

In support of its argument that NICOR has not alleged any wrongful conduct, Infinilux makes multiple statements that are proven false by its own documents. For example, Infinilux avers that "[e]vidence supports a finding that the SourceBlue Parties have never seen NICOR's pricing." (Inf-MSJ at 10.) However, this statement contradicts multiple emails produced by Defendants in the case that show Defendants went to great lengths to get NICOR's pricing and, ultimately, were successful. (DSUF at ¶¶ 142.)

As discussed in Section IV.A. supra, Defendants purposefully sold the Accused Product at a loss in order to cut NICOR out of supplying its NICOR LCU and related light fixtures to the Facebook NAO3, 5 and 6 datacenters, in violation of the Unfair Practices Act.

Documents produced by Defendants make it clear that Defendants' actions to cut NICOR out were intentional. (DSUF at ¶¶142-143.) As one example, Defendants produced an email dated February 1, 2019 from Torry Guardino from SourceBlue to Rodger Cherry in which Mr. Guardino stated "[a]ny luck with the Nicor pricing?  I need to get some info over to the team working on the estimate. We're trying to position ourselves to provide the lighting direct for all their data centers." (DSUF at ¶ 142.)  Defendants expressly discussed their intention to remove NICOR from supplying future Facebook datacenters. (*Id* ("would rather be rid of them completely.").)  Therefore, there exists a dispute of material fact regarding this element of NICOR's IIPER claim.

### 4. Defendants disrupted NICOR's economic relationships with Facebook and Cupertino Electrinc and NICOR was harmed as a result

Defendants attempt to avoid liability by arguing that NICOR did not lose the NAO Facebook sites because Facebook requires the general contractor to obtain three separate bids. (Inf-MSJ at 10.)  However, it is undisputed that the general

1  contractor on the NAO sites was Turner Construction, Defendants' parent
2  company.  (Dkt. 119-2 at ¶ 3.)  Also, as detailed in Section IV.B.1. supra, the bid
3  requirement does not change the fact that, once a particular manufacturer is chosen
4  to supply a particular Facebook site, Facebook does not change the manufacturer on
5  future datacenters built at the site absent some drastic circumstance.  (DSUF at
6  ¶141.)

7       It is undisputed that NICOR was on the approved alternate list and supplied
8  NAO1 and 2 in Albany, Ohio.  (DSUF at ¶¶138-140.)  However, NICOR lost the
9  bid to supply NAO 3, 5 and 6, because Defendants unlawfully undercut NICOR's
10 pricing and offered the Accused Product at a loss.  (DSUF at ¶ 137.)  Defendants
11 ended up replacing NICOR and it is undisputed that Defendants supplied their
12 Accused Product and light fixtures to NAO 3, 5 and 6.  (DSUF at ¶ 144.)  As a
13 direct and proximate result, NICOR suffered significant financial harm because it
14 lost the sales of its products that it would have made but for Defendants' unlawful
15 conduct.  (Dkt. 98-4 (Martin Revised Expert Report) at 40-41.)  At the very least,
16 these facts create a genuine dispute of material fact regarding this element of
17 NICOR's IIPER claim.

18  **C. A Genuine Dispute of Material Fact Exists Regarding Defendants'**
19  **Unfair Competition**

20       Infinilux's argument regarding NICOR's unfair competition claim relies on
21 the same argument it made for NICOR's IIPER claim and fails for the same reason.
22 As discussed above in Section IV.B., Defendants engaged in unlawful conduct by
23 selling the Accused Product at a loss in order to cut NICOR out of supplying the
24 NAO 3, 5 and 6 Facebook datacenters.  (DSUF, ¶¶ 137, 142-144.)  Such conduct
25 violates the Unfair Practices Act (Cal. Bus. & Prof. Code §§ 17043 and 17044) and
26 is unlawful conduct that supports NICOR's unfair competition claim under Cal.
27 Bus. & Prof. Code §17200.

28

## V.   SUMMARY JUDGMENT ON LOST PROFITS IS INAPPROPRIATE BECAUSE NICOR OFFERS SUBSTANTIAL EVIDENCE SUPPORTING THE *PANDUIT* FACTORS

### A. NICOR Has Substantial Evidence of Demand for NICOR's LCU

NICOR's patented LCU was approved for the Facebook NAO 1/2 data centers and NICOR was asked to bid on the NAO 5/6 data centers.  (Dkt. 95, Ex. 3 at 13-14.)  This is substantial evidence of demand for the patented NICOR LCU.  The SourceBlue Parties' RDCC product, in Defendants' own words, is "exactly the same as NICOR."  (Dkt. 95, Ex. 3 at 14, fn. 20 (citing INFX 021475).)  Thus, the SourceBlue Parties by intentionally copying NICOR's LCU also clearly demonstrated demand for the patented product.

Moreover, NICOR is under no obligation to show the '427 patent covers the LCU product to recover lost profits damages under *Panduit*.  The Federal Circuit holds, "As an initial matter, the demand in question in the first *Panduit* factor is not limited to demand for the patented products. Rather, demand may also arise from a product that "directly competes with the infringing device." *Presidio Components, Inc. v. Am. Technical Ceramics Corp.*, 702 F.3d 1351, 1360 (Fed. Cir. 2012).  There is no question that the SourceBlue Parties' RDCC product and NICOR's LCU products are competitive products.  Accordingly, Defendants' motion for summary judgment should be denied.

### B. NICOR Has Substantial Evidence that There are No Acceptable Non-Infringing Alternatives to its Patented NICIR LCU

Defendants' claim that it is undisputed that there are non-infringing alternatives to NICOR's patented LCU product.  (Dkt. 109-1 at 23.)  This is false.  (Dkt. 95, Ex. 3 at 14-15.)  Mr. Martin reviews this factor in his report.  (*Id.*)  In particular, his footnote cites Infinilux documents and testimony where *Defendants* state that the *thirty* percent failure rate of the Frog Lantana fixtures in the hot aisle

50°C environment make them inferior to their infringing RDCC product. (*Id.* at fn. 22 (citing INFX023642 and Verbeek Depo. Tr. at 157-158). Thus, Mr. Martin does not merely cite Frog Lantana's high failure rates but Defendants' confidence that the infringing RDCC unit is superior in hot aisle conditions to the Lantana device. (*Id.*) In fact, Infinilux's Jet Patel states, "it would be a good idea for us to do our own testing against ourselves to show that our LEDs and our design will sustain quite easily at a 50°C see (sic) environment." (Bacani Decl.,Ex. 29 (INFX-023642).) Infinilux would have no need to offer such test data to FaceBook for its infringing RDCC product if a 30% failure rate was acceptable. This is confirmed in SourceBlue's bid submission for the NAO3 data center that states, "Since temperatures in the hot aisle can reach up to 50°C (122°F) it is highly recommended to utilize remote drivers, as they are the most cost intensive and vulnerable part of the light fixture." (*Id.* at 13-14.) Mr. Martin is not opining on a technical issue, he is repeating Defendants' own admissions that the Frog Lantana device is not an acceptable non-infringing alternative.

The SourceBlue Parties also refer to NICOR's own IMS product as a "non-infringing alternative." (Dkt. 109-1 at 25.) However, the IMS product was not available for use in projects until late 2020 (Decl. of Lawrence, ¶3.) At root, what is or is not a "non-infringing alternative" to NICOR's patented LCU product is an issue of fact for the jury to decide. Defendants' motion should be denied.

### C. NICOR is Entitled to Recover its Lost Profits Due to Lost Sales of NICOR International.

NICOR is entitled to recover lost profits based on sales lost by NICOR International. *See Wireless v. Solid Inc.*, No. 5:14-cv-03750-PSG (N.D. Cal. Sep. 16, 2015); *Callaway Golf Company v. Acushnet Company*, 691 F. Supp.2d 566, 575 (D. Del. 2010)("where the profits of a wholly-owned subsidiary flow up to the parent, inclusion of such profits is appropriate."). Those sales are made by an entity

(NICOR International) that is a wholly owned subsidiary, has no employees and is essentially a bank account and a ledger entry at NICOR's headquarters in Albuquerque, New Mexico.  (Decl. of Lawrence, ¶2.)  NICOR International's profits on sales of the products at issue flow inexorably to its parent, NICOR, Inc. (*Id.*)  As such, the profits of NICOR International are recoverable by NICOR. "[C]riticisms of an expert's method of calculation [are] a matter for the jury's consideration in weighing that evidence."  *Inventist, Inc. v. Ninebot, Inc.*, Civil Action 3:16-cv-5688-BJR, at *23 (W.D. Wash. Jan. 18, 2023) *citing Humetrix, Inc. v. Gemplus S.C.A.,* 268 F.3d 910, 919 (9th Cir. 2001).  It should be up to the finder of fact to determine whether NICOR International's lost sales are recoverable as NICOR's lost profits and not an issue on a motion for summary judgment.

### D. <u>NICOR is Entitled to Recover Lost Profits for NAO3 and LCO Datacenters on its IIPER claim.</u>

The lost profits calculation is not limited to patent infringement in this case and the limitations of 35 U.S.C. §284.  (Dkt. 95, Ex. 3 at 12-23.)  NICOR is also seeking lost profits for the SourceBlue Parties' tortious interference.  Lost profits as a measure of damages for tortious interference is well established. *Grupe v. Glick* (1945) 26 Cal.2d 680, 692-693 ("[W]here the operation of an established business is prevented or interrupted, as by a tort or breach of contract or warranty, damages for the loss of prospective profits that otherwise might have been made from its operation are generally recoverable for the reason that their occurrence and extent may be ascertained with reasonable certainty from the past volume of business and other provable data relevant to the probable future sales.") *See, also, Kids' Universe v. In2Labs*, 95 Cal.App.4th 870, 882-83 (Cal. Ct. App. 2002).  The jury instruction for lost profits tort damages is far broader than patent infringement. *See* CACI 3903N ("To recover damages for lost profits, plaintiff must prove it is reasonably certain it would have earned profits but for defendants' conduct."). California courts have further explained, "It is for the jury to determine the

1  probabilities as to whether damages are reasonably certain to occur in any particular

2  case." *Asahi Kasei Pharma Corp. v. Actelion Ltd.,* 222 Cal.App.4th 945, 972 (2013).

3       The SourceBlue Parties, in one breath, claim that Mr. Martin cannot be

4  allowed to opine on wrongful conduct and, in the next, claim he fails to state a

5  proximate cause between the lost profits claimed and the wrongful conduct alleged.

6  On the contrary, Mr. Martin identifies a host of wrongful conduct from which the

7  lost profits analysis flows.  (Dkt. 95, Ex. 3 at 8-9.)  In particular, Defendants

8  collaborated to intentionally copy NICOR's patented LCU, offered the infringing

9  product for the NAO5/6 data centers at a lower price than NICOR's LCU (*and

10  below their own costs*) and thereby won contracts for NAO5/6 over NICOR. (*Id.*)

11       By any measure, the SourceBlue Parties' conduct was wrongful and unfair.

12  Selling products for below cost alone is wrongful conduct barred by California law

13  and is, at least, an act of unfair competition.  *See, e.g.* Cal. B&P Code §17043 ("the

14  Unfair Practices Act") and *Cel-Tech Communications, Inc. v. Los Angeles Cellular

15  Telephone Co.* (1999) 20 Cal.4th 163, 189.  Mr. Martin's lost profits analysis

16  follows accordingly.  (*Id.* at 17-21.)

17       The SourceBlue Parties, by displacing NICOR as a supplier with their

18  wrongful acts of copying, bid-rigging and below cost sales, have also cost NICOR

19  future projects and profits.  (*Id.* at fn. 25 and 26.)  Mr. Martin thus states,

20  "Moreover, it is reasonable to assume that if not for the wrongful conduct of the

21  Defendants in copying the NICOR LCU, NICOR most likely would have continued

22  as the primary lighting supplier to the buildout of NAO 3, NAO 5/6, and the next

23  phase of the project, beginning with LCO 1/2."  (*Id.* at 21.)  Mr. Martin follows this

24  with his Ohio expansion lost profits analysis. (*Id.* at 21-22.)  Accordingly, the

25  proximate cause of the lost profits damages is clearly stated in Mr. Martin's report

26  for each component of the lost profits, both NAO 5/6 and the Ohio expansion and

27  there is substantial evidence supporting NICOR's IIPER claim for lost profits.

28  Defendants' motion should be denied accordingly.

1

## VI.   <u>CONCLUSION</u>

2

For the foregoing reasons, NICOR respectfully requests that the Court deny

3

Infinilux's Motion for Partial Summary Judgment in its entirety.

4

5

Dated:  May 8, 2023                    Respectfully submitted,

6

LOZA & LOZA, LLP.

7

By: *Lena Bacani*

8

Lena N. Bacani

9

Attorneys for Plaintiff NICOR, Inc.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28